**KIRBY McINERNEY LLP**
Robert J. Gralewski, Jr. (CSB # 196410)
600 B Street, Suite 2110
San Diego, CA 92101
Telephone: (619) 784-1442
bgralewski@kmllp.com

**KIRBY McINERNEY LLP**
Daniel Hume (*pro hac vice*)
Meghan J. Summers (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY 100221
Telephone: (212) 371-6600
dhume@kmllp.com
msummers@kmllp.com

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AXONIC CAPITAL LLC; AXONIC CAPITAL GP LLC; AXONIC CREDIT OPPORTUNITIES MASTER FUND, LP; GIC PRIVATE LIMITED; GOOD HILL CAPITAL LLC; GOOD HILL MASTER FUND L.P.; GOOD HILL PARTNERS LP; OC 523 MASTER FUND, LTD.; RIMROCK CAPITAL MANAGEMENT, LLC; and RIMROCK STRUCTURED PRODUCT (MASTER) FUND, LTD.,<br>Plaintiffs,<br>v.<br>GATEWAY ONE LENDING & FINANCE, LLC; TCF NATIONAL BANK; TCF AUTO RECEIVABLES, LLC; TCF AUTO RECEIVABLES OWNER TRUST 2014-1; TCF AUTO RECEIVABLES OWNER TRUST 2015-1; TCF AUTO RECEIVABLES OWNER TRUST 2015-DP1; TCF AUTO RECEIVABLES OWNER TRUST 2015-2; TCF AUTO RECEIVABLES OWNER TRUST 2016-DP1; and TCF AUTO RECEIVABLES OWNER TRUST 2016-1,<br>Defendants. | CIVIL ACTION NO:<br>2:18-cv-5127 PSG<br><br>AMENDED COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


INTRODUCTION ........ 1

NATURE OF THE ACTION ........ 2

JURISDICTION AND VENUE ........ 12

I. PARTIES ........ 12

A. Plaintiffs ........ 12

B. Defendants ........ 19

1. Gateway ........ 19

2. TCF Auto ........ 21

3. TCF Bank ........ 24

4. The TCF Issuing Trusts ........ 25

C. Non-Parties ........ 28

1. TCF Financial ........ 28

2. The TCF Securitizations' Trustees ........ 29

3. The TCF Securitizations' Initial Purchasers ........ 30

4. The Confidential Witnesses ........ 31

II. THE TCF SECURITIZATIONS, THE CERTIFICATES, THE OFFERING DOCUMENTS, AND THE SUPPLEMENTAL DATA ........ 32

A. The TCF Securitizations ........ 32

B. The Certificates ........ 40

C. The Offering Documents ........ 44

D. The Supplemental Data ........ 57

E. The Investor Presentations ........ 60

III. REPORTED CNL IS MATERIAL TO CERTIFICATE INVESTORS ........ 65

A. CNL Is a Necessary, Fundamental, and Crucial Data Point in ABS Evaluation, Valuation, and Pricing ..... 67

B. For the Above Reasons, CNL Data Is Typically Reported by ABS Securitization Sponsors in Securitization Offering Documents, and Provided as Supplemental Data to Prospective Investors ..... 74

C. The Offering Documents Repeatedly Warned that Losses from the Underlying Receivables Could Materially Diminish Certificate Returns and/or Cause Certificate Investors Material Losses ..... 80

D. ABS Structure Makes Certificate Returns Extremely Sensitive to Underlying Receivables' CNL ..... 81

E. ABS Industry Standards Call for Repo/Remarketing Expenses, When Passed on to ABS Securitizations and their Investors, to be Included in Reported CNL, Where They Form a Material Portion of Total CNL ..... 84

1. Where Repo/Remarketing Expenses are Passed on to ABS Securitizations and ABS Investors, They Are Typically Included in Reported CNL ..... 84

2. Where Repo/Remarketing Expenses Are Passed on to ABS Securitizations and ABS Investors, such Expenses Typically Constitute a Material Portion of Reported CNL ..... 89

IV. DEFENDANTS' MATERIAL MISREPRESENTATIONS, MISLEADING STATEMENTS AND OMISSIONS ..... 91

A. Defendants' Omission to Disclose that Although Defendants Passed on Repo/Remarketing Expenses to their ABS Securitizations/Investors, Defendants' Reported CNL Excluded Repo/Remarketing Expenses, Rendered such Reported CNL False and/or Misleading ..... 91

1. Omissions from the Offering Documents, Supplemental Data, and Investor Presentations ..... 91

2. Omissions in Direct Communications with Plaintiffs ..... 98

3. Defendants Had a Duty to Disclose the Omitted Information ..... 99

B. The Offering Documents, Supplemental Data, and Investor Presentations Misrepresented that Repo/Remarketing Expenses Were Included in Reported CNL ..... 100

1. The Offering Documents ..... 101

2. The Supplemental Data ....... 105

3. The Investor Presentations ....... 106

C. The Offering Documents' Materially Misleading Sensitivity Analyses ....... 108

D. The Offering Documents' Misrepresentations and Omissions Concerning Gateway's Compensation from TCF Securitizations ....... 115

E. TCF Bank's and Gateway's Affirmative Misrepresentations, in Direct Communications with Plaintiffs, Concerning Reported CNL ....... 123

V. ADDITIONAL FACTS RELEVANT TO MATERIALITY: MOODY'S REACTIONS TO DEFENDANTS' CONDUCT FURTHER DEMONSTRATES MATERIALITY ....... 132

A. Moody's Prompted Defendants to Provide the Requisite Disclosure in Pending/Future Auto Loan ABS Securitizations ....... 133

B. Moody's Required Defendants to Restructure their Pending Auto Loan ABS Securitization, TCF 2016-PT1, with Materially Increased Credit Protection to Absorb the Previously-Omitted Repo/Remarketing Expenses ....... 134

C. Moody's Downgraded Certain TCF 2016-1 Notes after Calculating the Increased CNL when Repo/Remarketing Expenses were Included ....... 136

D. Moody's Initiated an Industry-Wide Study of Auto Loan ABS Sponsors' Treatment of Repo/Remarketing Expenses and CNL Reporting, and Found Gateway in Violation of Industry Standards ....... 138

VI. FACTS RELEVANT TO SCIENTER ....... 139

VII. PLAINTIFFS' DUE DILIGENCE ....... 153

A. Plaintiffs' Extensive Pre-Purchase Evaluation of the Certificates ....... 153

B. Plaintiffs' Additional Due Diligence ....... 155

VIII. PLAINTIFFS' REASONABLE AND DIRECT RELIANCE ON DEFENDANTS' REPRESENTATIONS ....... 157

IX. PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO DEFENDANTS' MATERIAL OMISSIONS ....... 165

X. LOSS CAUSATION/ECONOMIC LOSS ....... 166

XI. DEFENDANTS' ACTIONS CONSTITUTE A SERVICER TERMINATION EVENT ....... 168

FIRST CLAIM FOR RELIEF For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants) .................... 170

SECOND CLAIM FOR RELIEF For Common Law Fraud under California Law (Against All Defendants) .................... 173

THIRD CLAIM FOR RELIEF For Aiding and Abetting Common Law Fraud under California Law (Against All Defendants) .................... 174

FOURTH CLAIM FOR RELIEF For a Declaratory Judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 (Against Gateway) .................... 176

DEMAND FOR JURY TRIAL .................... 177

# GLOSSARY / DEFINED TERMS

| Term | Definition |
|---|---|
| ABS | asset-backed security |
| AC Fund | Axonic Credit Opportunities Master Fund, LP |
| Axonic | AC Fund, OC Fund, Axonic Capital, and Axonic Capital GP |
| Axonic Capital | Axonic Capital LLC |
| Axonic Capital GP | Axonic Capital GP LLC |
| California Republic | California Republic Bank |
| Certificates | the certificates issued in/through the TCF Securitizations, including the TCF 2014-1 Certificates, TCF 2015-1 Certificates, TCF 2015-DP1 Certificates, TCF 2015-2 Certificates, TCF 2016-DP1 Certificates, and TCF 2016-1 Certificates |
| CEO | Chief Executive Officer |
| Citigroup | Citigroup Global Markets Inc. |
| CNL | cumulative net losses |
| Credit Suisse | Credit Suisse Securities (USA) LLC |
| Defendants | Gateway, TCF Bank, TCF Auto, and the TCF Issuing Trusts |
| Experienced CNL | cumulative net losses for Gateway loan pools with Repo/Remarketing Expenses included, as passed on to and experienced by investors in Gateway-sponsored ABS |

| | |
|---|---|
| Fifth Third | Fifth Third Bank |
| Gateway | Gateway One Lending & Finance, LLC -- sponsor of the TCF Securitizations, and originator and servicer of the Underlying Receivables |
| Gateway 2014 OM | July 9, 2014 offering memorandum for Gateway-sponsored auto loan ABS shelf |
| Gateway May 2015 OM | May 28, 2015 offering memorandum for Gateway-sponsored auto loan ABS shelf |
| Gateway November 2015 OM | November 9, 2015 offering memorandum for Gateway-sponsored auto loan ABS shelf |
| Gateway 2016 OM | September 7, 2016 offering memorandum for Gateway-sponsored auto loan ABS shelf |
| Gateway March 2015 Overview Presentation | the Gateway One Lending & Finance (GOLF) Overview Presentation – as of March 2015 |
| Gateway March 2015 Performance by Grade Presentation | the Gateway One Lending & Finance (GOLF) Performance History by Grade – March 2015 |
| Gateway March 2015 Presentation | the Gateway One Lending & Finance, LLC Presentation – March 2015 |
| GHP | Good Hill Partners LP |
| GIC | GIC Private Limited |
| Good Hill | GHP, Good Hill Capital, and Good Hill Fund |
| Good Hill Capital | Good Hill Capital LLC |

| | |
|---|---|
| Good Hill Fund | Good Hill Master Fund L.P. and certain predecessor private investment funds whose assets have been combined with Good Hill Master Fund L.P. |
| Initial Purchasers | Credit Suisse, Wells Fargo, Citigroup, and Morgan Stanley |
| Investor Presentations | the TCF 2014-1 Investor Presentation, Gateway March 2015 Overview Presentation, and Gateway March 2015 Performance by Grade Presentation |
| Moody's | Moody's Investors Service |
| Moody's Announcement | Moody's December 14, 2016 publication announcing that it had recently learned that Gateway did not include Repo/Remarketing Expenses in reported CNL (Anna Burns and JingJing Dang, *Moody's Downgrades Auto Loan ABS Issued by TCF in 2016*, Moody's Investors Service, Dec. 14, 2016) |
| Moody's Methodology | Moody's Investors Service published methodology for evaluating and rating auto loan ABS, as set forth in Yan Yan, Matias Langer and William Black, *Moody's Approach to Rating Auto Loan-and Lease-Backed ABS*, Moody's Investors Service, Oct. 6, 2016 |
| Moody's Study | Anna Burns and Yan Yan, *Auto ABS – US: Issuers' Calculations of Cumulative Net Loss May Vary*, Moody's Investor's Service, May 10, 2017 |
| Morgan Stanley | Morgan Stanley & Co. LLC |

| | |
|---|---|
| Notes | the notes issued in/through the TCF Securitizations |
| Notes Offering Documents | the documents through which the Notes were issued, offered, marketed, and sold, including the TCF 2014-1 Notes Offering Documents, TCF 2015-1 Notes Offering Documents, TCF 2015-2 Notes Offering Documents, and TCF 2016-1 Notes Offering Documents |
| OC Fund | OC 523 Master Fund, Ltd. |
| Offering Documents | the TCF Certificate PPMs and the Notes Offering Documents |
| Plaintiffs | GIC, Good Hill, Axonic, and Rimrock |
| Repo/Remarketing Expenses | the expenses incurred by an auto loan servicer to repossess and liquidate the collateral (*i.e.*, the autos) for defaulted auto loans |
| Reported CNL | CNL for Gateway loan pools, as reported by Defendants, with Repo/Remarketing Expenses not included |
| Rimrock | Rimrock Capital and Rimrock Fund |
| Rimrock Capital | Rimrock Capital Management, LLC |
| Rimrock Fund | Rimrock Structured Product (Master) Fund, Ltd. |
| S&P Methodology | Standard & Poor's Global Ratings published methodology for evaluating and rating auto loan ABS, as set forth in S&P Global Ratings, *ABS: General Methodology and Assumptions for Rating U.S. Auto Loan Securitizations*, S&P |

| | |
|---|---|
| | Global Ratings, Jan. 11, 2011 (as updated in 2016 and 2017) |
| SEC | U.S. Securities and Exchange Commission |
| SPV | special purpose vehicle |
| Supplemental Data | statistical data authored and assembled by Gateway, and provided to the Initial Purchasers for distribution to prospective Certificate investors, concerning (1) the credit characteristics of the Underlying Receivables, and (2) the credit characteristics and performance of auto loan pools previously originated by Gateway |
| TCF 2014-1 Certificates | certificates issued in connection with the TCF 2014-1 securitization |
| TCF 2014-1 Certificate PPM | private placement memorandum, dated July 9, 2014, for TCF 2014-1 Certificates |
| TCF 2014-1 Notes OM | final offering memorandum supplement, dated July 16, 2014, for TCF 2014-1 Notes |
| TCF 2014-1 Notes Preliminary OM | preliminary offering memorandum supplement, dated July 9, 2014, for TCF 2014-1 Notes |
| TCF 2015-1 Certificates | certificates issued in connection with the TCF 2015-1 securitization |
| TCF 2015-1 Certificate PPM | private placement memorandum, dated May 28, 2015, for TCF 2015-1 Certificates |

| | |
|---|---|
| TCF 2015-1 Notes OM | final offering memorandum supplement, dated June 3, 2015 for TCF 2015-1 Notes |
| TCF 2015-1 Notes Preliminary OM | preliminary offering memorandum supplement, dated May 28, 2015, for TCF 2015-1 Notes |
| TCF 2015-2 Certificates | certificates issued in connection with the TCF 2015-2 securitization |
| TCF 2015-2 Certificate PPM | private placement memorandum, dated November 10, 2015, for TCF 2015-2 Certificates |
| TCF 2015-2 Notes OM | final offering memorandum supplement, dated November 18, 2015 for TCF 2015-2 Notes |
| TCF 2015-2 Notes Preliminary OM | preliminary offering memorandum supplement, dated November 9, 2015, for TCF 2015-2 Notes |
| TCF 2015-DP1 Certificates | certificates issued in connection with the TCF 2015-DP1 securitization |
| TCF 2015-DP1 Certificate PPM | offering memorandum dated September 28, 2015 for TCF 2015-DP1 Certificates |
| TCF 2016-1 Certificates | certificates issued in connection with the TCF 2016-1 securitization |
| TCF 2016-1 Certificate PPM | private placement memorandum, dated September 8, 2016, for TCF 2015-2 Certificates |
| TCF 2016-1 Notes OM | final offering memorandum supplement, dated September 14, 2016, for TCF 2016-1 Notes |

| | |
|---|---|
| TCF 2016-1 Notes Preliminary OM | preliminary offering memorandum supplement, dated September 7, 2016, for TCF 2016-1 Notes |
| TCF 2016-DP1 Certificates | certificates issued in connection with the TCF 2016-DP1 securitization |
| TCF 2016-DP1 Certificate PPM | offering memorandum dated June 27, 2016 for TCF 2016-DP1 Certificates |
| TCF Bank | TCF National Bank (of which Gateway is a wholly-owned subsidiary) -- administrator of the TCF Securitizations |
| TCF Certificate PPMs | the private placement memorandums through which the Certificates were issued, offered, marketed and sold, including the TCF 2014-1 Certificate PPM, TCF 2015-1 Certificate PPM, TCF 2015-DP1 Certificate PPM, TCF 2015-2 Certificate PPM, TCF 2016-DP1 Certificate PPM and the TCF 2016-1 Certificate PPM |
| TCF 2014-1 Notes Offering Documents | the TCF 2014-1 Notes Preliminary OM, the TCF 2014-1 Notes OM, the Gateway 2014 OM |
| TCF 2015-1 Notes Offering Documents | the TCF 2015-1 Notes Preliminary OM, the TCF 2015-1 Notes OM, and the Gateway May 2015 OM |
| TCF 2015-2 Notes Offering Documents | the TCF 2015-2 Notes Preliminary OM, the TCF 2015-2 Notes OM, and the Gateway November 2015 OM |
| TCF 2016-1 Notes Offering Documents | the TCF 2016-1 Notes Preliminary OM, the TCF 2016-1 Notes OM, and the Gateway 2016 OM |

| | |
|---|---|
| TCF Auto | TCF Auto Receivables, LLC (a wholly-owned subsidiary of Gateway) -- depositor for the TCF Securitizations |
| TCF 2014-1 Investor Presentation | the TCF Auto Receivables Owner Trust 2014-1 Investor Presentation |
| TCF Financial | TCF Financial Corporation (of which Gateway and all TCF entities are wholly-owned subsidiaries) |
| TCF Issuing Trusts | TCF Auto Receivables Owner Trust 2014-1; TCF Auto Receivables Owner Trust 2015-1; TCF Auto Receivables Owner Trust 2015-DP1, TCF Auto Receivables Owner Trust 2015-2; TCF Auto Receivables Owner Trust 2016-DP1 and TCF Auto Receivables Owner Trust 2016-1, each of which are direct or indirect subsidiaries of Gateway |
| TCF Securitizations | TCF 2014-1, TCF 2015-1, TCF 2015-DP1, TCF 2015-2, TCF 2016-DP1, and TCF 2016-1 |
| Transaction Parties | Gateway (sponsor, custodian, originator and servicer); TCF Bank (administrator); TCF Auto (depositor); TCF Issuing Trusts (SPV issuers); US Bank (indenture trustee); Wilmington (owner trustee); Initial Purchasers |
| Underlying Receivables | the pooled auto loans originated by Gateway and transferred from Gateway to the TCF Issuing Trusts, collateralizing or otherwise backing the Notes and Certificates |

| | |
|---|---|
| US Bank | U.S. Bank National Association -- indenture trustee for the TCF Securitizations |
| Wells Fargo | Wells Fargo Securities, LLC |
| Wilmington | Wilmington Trust National Association -- owner trustee for the TCF Securitizations |

Plaintiffs Axonic, GIC, Good Hill, and Rimrock, by their undersigned counsel, bring this action for violations of the federal securities laws and the common law of the state of California on their own behalf against Defendants Gateway, TCF Bank, TCF Auto, and the TCF Issuing Trusts. The allegations in this Complaint are based on Plaintiffs' knowledge as to themselves, and on information and belief, including the investigation of counsel, as to all other matters. The investigation of counsel is predicated upon, among other things, conversations with former executives and management-level employees of Defendants, including Confidential Witness ("CW") 1, and former business associates of Defendants, including CW 2, review and analysis of the TCF Securitization Offering Documents, Supplemental Data, Investor Presentations, Defendants' SEC and other public filings, Defendants' management organizational charts, and review of press releases, media reports, and analyst reports concerning the TCF Securitizations and/or Defendants and their affiliates. Plaintiffs believe that substantial, additional evidentiary support for the allegations set forth herein will be obtained after a reasonable opportunity for discovery.

## INTRODUCTION

1. As detailed herein, Plaintiffs invested in excess of $90 million, purchasing Certificates in auto-loan ABS securitizations sponsored and structured by Defendants and backed by auto loans originated and serviced by Defendant

Gateway. In connection with those securitizations, Defendants materially misrepresented **the single most important data point used by Certificate investors to evaluate, value, and price the Certificates**: the level of cumulative net losses (CNL) associated with Defendants' auto loans. CNL is particularly important to Certificate investors because ABS securitization structure locks loan CNL and Certificate returns in a zero-sum game: every dollar by which CNL increases reduces Certificate returns by the same dollar. Certificate returns, and hence Certificate valuation and pricing, are therefore acutely sensitive to CNL. **Plaintiffs relied directly on Defendants' Reported CNL** in evaluating the Certificates, determining to invest in them and paying the prices they did for them, and were materially damaged thereby.

## NATURE OF THE ACTION

2. Defendants originate and service auto loans, and create and sponsor, as detailed herein, ABS collateralized by pools of such auto loans.

3. Plaintiffs are purchasers of Certificates issued in certain ABS sponsored by Defendants, referred to herein as the TCF Securitizations, which were backed by pools of Gateway-originated auto loans, referred to herein as the Underlying Receivables.

//

//

4. This action arises out of Defendants' fraudulent conduct in connection with the TCF Securitizations and with the offer and sale to Plaintiffs of the Certificates. Plaintiffs allege that:

a. in the Offering Documents for the Certificates, the Investor Presentations, and the Supplemental Data that Defendants provided to Plaintiffs, as well as in Defendants' direct communications with Plaintiffs, Defendants made material misrepresentations, misleading statements, and omissions concerning the CNL historically experienced by Gateway's auto loans, referred to herein as Reported CNL;

b. Plaintiffs, in reliance on Defendants' material misrepresentations, misleading statements, and omissions concerning Reported CNL, decided:

i. to invest in the Certificates; and

ii. to do so at prices determined on the basis of those material misrepresentations, misleading statements, and omissions.

c. Plaintiffs, as a result of Defendants' material misrepresentations, misleading statements, and omissions, suffered substantial damages.

5. In ABS securitizations, such as the TCF Securitizations at issue here, the securities issued (here, the Certificates and several classes of senior/subordinated Notes) are collateralized by pooled underlying assets (here, the Underlying

Receivables). The cashflows generated by the Underlying Receivables (specifically, the payments of interest and repayments of principal on the pooled auto loans, as well as, for defaulted loans, recoveries of principal achieved via repossession and liquidation of the vehicles securing the loans) serve as the basis for:

a. payment obligations to Noteholders (*i.e.*, scheduled interest and repayment of outstanding principal with respect to the Notes);

b. payment obligations to Transaction Parties (*i.e.*, fees/expenses of ABS securitization service providers, such as the servicer for the Underlying Receivables and the securitization trustee(s)); and

c. all further "residual" cashflows, if any, after the above-identified and more senior payment obligations to Noteholders and Transaction Parties have been satisfied, which such residual cashflows accrue to the Certificates and Certificate investors and form the basis of the Certificates' returns.

6. Structuring details aside, the returns and risks of the ABS Notes and Certificates are a direct function of the performance of their underlying asset pool (here, the Underlying Receivables). If the Underlying Receivables perform well, Noteholders receive full payment of interest and principal, and Certificateholders receive applicable returns. The worse the Underlying Receivables perform, however, the more Certificate returns are diminished (or extinguished or turn negative), and the greater the threat to Noteholders of failing to receive full payment

of interest and/or principal. The value and/or price of the Certificates (and Notes) thus directly depend upon the performance of the Underlying Receivables.

7. At the outset of an ABS securitization, the pooled underlying loans are newly originated and have no performance record. Consequently, ABS investors, such as Plaintiffs, in evaluating whether to invest in new-issue ABS securities, such as the Certificates here, and at what price to do so, must evaluate the **prospective** performance and cashflows of the Underlying Receivables.

8. ABS investors, including Plaintiffs, do so by:

a. considering and analyzing at least two different sets of data, namely:

i. data concerning the credit characteristics of the Underlying Receivables (*i.e.*, characteristics of the pool's loans that describe and effect how such loans will perform); and

ii. data concerning the performance record of *prior* loan pools previously originated by the same originator (and/or possessing similar credit characteristics), accompanied by data concerning the credit characteristics of such prior loan pools.

b. applying statistical techniques and financial modeling to develop a "base case" view of how the Underlying Receivables will perform, based on (1) the performance of the above-mentioned previously-originated loan pools, and (2)

the nature and extent of the similarities and differences between the credit characteristics of such prior loan pools and those of the Underlying Receivables;

c. modeling the "base case" Underlying Receivables' cashflows as they flow through the ABS securitization structure to the Notes, Transaction Parties, and Certificates, and thereby modeling "base case" Certificate cashflows;

d. developing multiple "stress" scenario views of the Underlying Receivables' performance, based on the historical record and/or current economic trends, and modeling the resulting "stress" scenario cashflows through the ABS securitization structure to Certificateholders; and

e. if determining after such analyses to invest, formulating a price to offer for the Certificates that allows for satisfactory returns even in such "stress" scenarios.

9. Although each of the above-specified steps involves sophisticated analysis of extensive data, the fact of central relevance here is simple: a fundamental input in investor evaluation, valuation, and pricing of new-issue ABS securities, such as the Certificates, is the reported performance for prior loan pools originated by the same ABS sponsor. **More specifically, the central historical loan pool performance metric considered by and reported to ABS investors, such as Plaintiffs, in connection with new-issue ABS evaluation, is loan pool CNL, expressed as a percentage of a loan pool's initial balance (*e.g.*, 2.5%). ABS**

**investors, such as Plaintiffs, utilize CNL data reported for *prior* loan pools as a key input in determining prospective "base case" CNL for a new loan pool backing new-issue ABS securities**.

10. Certificate valuation and pricing is especially sensitive to CNL because ABS structure makes certificateholders' claims to the pooled cashflows of the underlying assets subordinate to the claims of noteholders and transaction parties. As a result, every dollar increase in the underlying assets' CNL is a dollar decrease in certificate returns, and in effect, comes out of certificate investors' pockets.

11. CNL is generated when pooled loans default. Following default, to obtain recovery of loan principal still outstanding, the loan servicer typically (1) repossesses the vehicle securing the loan, and (2) sells (liquidates) the vehicle, with proceeds from liquidation applied to the extent necessary or possible as recovery of defaulted loan principal.

12. However, and approaching the crux of the misconduct alleged here, in repossessing and liquidating vehicles securing defaulted loans, the ABS sponsor/loan servicer incurs certain additional costs (Repo/Remarketing Expenses), which ABS sponsors treat in one of two ways:

a. the majority of auto loan ABS sponsors (*i.e.*, 22 of the 28 auto loan ABS sponsors whose securities are regularly rated by Moody's) pass on Repo/Remarketing Expenses to the ABS securitizations (and thus to the

securitization investors, including, in the first instance, certificate investors). In ABS sponsored by these sponsors, the CNL experienced by ABS securitization investors is the (1) principal outstanding on defaulted loans, minus (2) gross liquidation recoveries, minus (3) Repo/Remarketing Expenses. Put differently, before liquidation proceeds flow to the ABS securitization and its investors, the servicer extracts reimbursement for its Repo/Remarketing Expenses from such gross liquidation recoveries, leaving "net recoveries" (*i.e.*, net of Repo/Remarketing Expenses) for ABS securitization investors;

b. a smaller number of auto loan ABS sponsors whose securities are regularly rated by Moody's (*i.e.*, 6 of 28) bear Repo/Remarketing Expenses themselves. In ABS sponsored by these sponsors, the CNL experienced by ABS securitization investors is the (1) principal outstanding on defaulted loans, minus (2) gross liquidation recoveries.

13. In sum, where ABS sponsors pass on Repo/Remarketing Expenses to their ABS securitizations, the CNL experienced by investors (Experienced CNL) in such ABS includes Repo/Remarketing Expenses, and where ABS sponsors retain such Expenses, the CNL experienced by investors in such ABS excludes those Expenses.

14. It is standard practice for auto loan ABS sponsors to provide historical CNL figures (Reported CNL) **on the same basis** as the CNL experienced by their

ABS investors (Experienced CNL). With respect to Repo/Remarketing Expenses, this means that:

a. where ABS sponsors pass on Repo/Remarketing Expenses to ABS investors, and thus cause their ABS investors to bear Repo/Remarketing Expenses, such sponsors provide Reported CNL for historical loan pools that includes associated Repo/Remarketing Expenses; and

b. where ABS sponsors retain Repo/Remarketing Expenses, and thus leave their ABS investors untouched by these Expenses, such sponsors provide Reported CNL for historical loan pools that excludes Repo/Remarketing Expenses.

15. Either way, Reported CNL is consistent with Experienced CNL. Such consistency is not merely logical, but, for ABS investors generally, and ABS certificate investors particularly, **it is essential**. Because a fundamental task in investors' evaluation of new-issue ABS is to evaluate the prospective CNL they will experience in connection with it, and because such evaluation depends centrally on the ABS sponsors' Reported CNL for historical loan pools, the Reported CNL's basis must match the one ABS investors will actually experience in connection with their ABS investment (*i.e.*, Experienced CNL). If Reported CNL is presented in a manner that diverges from how ABS securitization investors will experience CNL, their evaluation, valuation, and pricing of new-issue ABS securities, dependent on such Reported CNL, will miss the mark. That is what occurred here.

16. Like many auto loan ABS sponsors, Defendants pass on Repo/Remarketing Expenses to the TCF Securitizations' investors (and in the first instance, to Certificate investors). However, contrary to the standard industry practice explained above, the Reported CNL that Defendants presented in the TCF Securitizations' Offering Documents, Supplemental Data, and Investor Presentations **excluded** Repo/Remarketing Expenses. The TCF Securitization Offering Documents, Supplemental Data, and Investor Presentations not only omitted to disclose this material fact, but affirmatively and materially misrepresented that Reported CNL **included** such Expenses.

17. Defendants' misrepresentations, misleading statements, and omissions relating to Reported CNL were material. Repo/Remarketing Expenses constituted approximately 15%-20% of total CNL, and their exclusion from Reported CNL caused Reported CNL, as reported by Defendants, to be understated by 15-20% (*e.g.*, Reported CNL of 3.0% when Repo/Remarketing Expenses were excluded, versus Reported CNL of 3.5% when Repo/Remarketing Expenses were included). Such a difference (CNL of 3.5%, rather than 3.0%) is highly material to Certificate investors, as the subordination and structural leverage of ABS securitization operate to magnify the impact of such CNL differentials on Certificate returns and value.

18. In reliance upon the Reported CNL that Defendants provided, which secretly excluded Repo/Remarketing Expenses, Plaintiffs unknowingly, materially

over-valued the prospective cashflows of the Underlying Receivables and the Certificates, which Plaintiffs would experience on a basis that included Repo/Remarketing Expenses. Put simply, the practical effect of Defendants' misconduct was to cause Plaintiffs to materially overestimate the cashflows that they could actually expect to receive.

19. In December 2016, subsequent to Plaintiffs' Certificate purchases, Moody's discovered and revealed that Defendants' Reported CNL excluded Repo/Remarketing Expenses. In the ensuing fall-out, Defendants were required to revise offering documents for a pending Gateway-sponsored ABS securitization to provide the requisite disclosure that Reported CNL excluded Repo/Remarketing Expenses, and to restructure the securitization to provide additional credit protection against the Repo/Remarketing Expenses. Moody's also undertook a programmatic re-evaluation of the credit ratings it previously provided for all Gateway-sponsored auto loan ABS. In doing so, Moody's incorporated the Repo/Remarketing Expenses that Defendants had previously excluded. Subsequently, Defendants ceased further auto loan ABS issuances, terminated Brian and David MacInnis, Gateway's co-founders and Chief Executive Officer ("CEO") and President, respectively, and exited the indirect auto finance business (apart from run-off servicing of previously-originated loans).

## JURISDICTION AND VENUE

20. The claims asserted herein arise under Section 10(b) of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated by the U.S. Securities and Exchange Commission (the "SEC"), the Declaratory Judgment Act (28 U.S.C. § 2201), and the common law of the State of California. This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331, 1337, and 1367.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), and because many of the acts and events alleged herein took place within this District.

22. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails.

## I. PARTIES

### A. Plaintiffs

23. Plaintiff GIC, incorporated in 1981 under the Singapore Companies Act and wholly owned by the Government of Singapore, is headquartered in Singapore and has nine offices worldwide, including one in New York. As set forth herein, GIC purchased Certificates at prices artificially inflated by Defendants'

misconduct and materially false and misleading disclosures and suffered substantial damage as a result.

24. GIC is an experienced and substantial auto loan ABS investor. During the prior decade, GIC has invested extensively in auto loan ABS. GIC's auto loan ABS investments are made across the capital structure (from highly-rated notes to unrated residuals), based on GIC's assessments of collateral quality and relative value. GIC is familiar with most auto loan ABS issuance shelves that offer programmatic auto loan ABS issuance and has invested in at least twenty of them (while choosing to avoid others).

25. GIC made the following Certificate purchases:

**GIC's Certificate Investments**

| TCF Securitization | **TCF 2015-2** | | **TCF 2016-DP1** | **TCF 2016-1** |
|---|---|---|---|---|
| Purchase Date | November 20, 2015 | September 30, 2016 | June 23, 2016 | September 16, 2016 |
| Certificates Purchased | 70,000 | 30,000 | 100,000 | 100,000 |
| Certificates Purchased (% of Total Certificate Issuance) | 70.0% | 30.0% | 100.0% | 100.0% |
| Purchase Price | $10,010,000 | $2,863,050 | $21,000,000 | $27,610,000 |

//

26. Plaintiff Good Hill Fund, a Cayman Islands exempted limited partnership, is an investment fund that holds securities that are purchased, sold, and

managed exclusively by Plaintiff GHP. Plaintiff Good Hill Capital, a Delaware limited liability company with its registered office in Delaware, is the general partner of Plaintiff Good Hill Fund. As set forth herein, Good Hill Capital and the Good Hill Fund were induced by Defendants into purchasing Certificates at prices artificially inflated by Defendants' intentional misconduct and materially false and misleading disclosures, upon which Good Hill Capital, the Good Hill Fund, and GHP relied when making investment decisions, and suffered substantial damage as a result.

27. Plaintiff GHP, an SEC-registered investment adviser organized under Delaware law and with a principal place of business at One Greenwich Office Park, Greenwich, CT 06831, is the sole investment advisor for the Good Hill Fund and, pursuant to an Investment Management Agreement by and between the Good Hill Fund and GHP, has full discretionary authority to make investment decisions and to execute securities transactions on behalf of the Good Hill Fund.

28. GHP is an experienced and substantial auto loan ABS investor, and its investment personnel have decades of experience in ABS banking and investing. Since its founding in 2006, GHP, on behalf of the investment funds and managed accounts that it advises, has made over 4,000 ABS investments totaling more than $7 billion, including more than 500 auto ABS investments totaling more than $1 billion and issued through at least 28 different auto ABS issuance shelves.

29. Good Hill made the following Certificate purchases:

**Good Hill's Certificate Investments**

| TCF Securitization | TCF 2014-1 | TCF 2015-1 |
|---|---|---|
| Settlement Date | July 23, 2014 | June 11, 2015 |
| Certificates Purchased | 27,272 | 38,000 |
| Certificates Purchased (% of Total Certificate Issuance) | 27.3% | 38.0% |
| Purchase Price | $5,000,048 | $10,925,000 |

30. Plaintiff, the AC Fund, an exempted limited partnership organized under the laws of the Cayman Islands, is an investment fund that holds securities that are purchased, sold, and managed exclusively by Axonic Capital, its New York-based investment manager. Plaintiff Axonic Capital GP, a Delaware limited liability company with its principal place of business at 390 Park Avenue, 15th Floor, New York, New York 10022, is the general partner of Plaintiff, the AC Fund. As set forth herein, the AC Fund and its general partner, Axonic Capital GP, purchased Certificates at prices artificially inflated by Defendants' misconduct and materially false and misleading disclosures and suffered substantial damage as a result.

31. Plaintiff, the OC Fund, an exempted company organized in and under the laws of the Cayman Islands and with its registered office in the Cayman Islands, is an investment fund that holds securities that are purchased, sold, and managed

exclusively by Axonic Capital, its New York-based investment manager. As set forth herein, the OC Fund purchased Certificates at prices artificially inflated by Defendants' misconduct and materially false and misleading disclosures and suffered substantial damage as a result.

32. Plaintiff Axonic Capital, an SEC-registered investment adviser organized under Delaware law and with a principal place of business at 390 Park Avenue, 15th Floor, New York, NY 10022, serves as investment manager to certain private investment funds and to certain other managed accounts.

33. Axonic Capital is an experienced and substantial auto loan ABS investor. Axonic Capital's primary investment focus is on structured credit products, including ABS. Axonic Capital's investment personnel have invested in ABS/RMBS for more than a decade, making, on behalf of the investment funds and managed accounts that it advises, more than 1,400 ABS/RMBS trades totaling $6.6 billion, including more than 80 auto loan ABS trades, issued through at least 13 different auto loan ABS shelves, totaling more than $380 million.

//

//

34. Axonic made the following Certificate purchases:

**Axonic's Certificate Investments**

| TCF Securitization | TCF 2014-1 | TCF 2015-1 | TCF 2015-DP1 |
|---|---|---|---|

| Purchase Date | July 18, 2014 | June 9, 2015 | September 25, 2015 |
|---|---|---|---|
| Certificates Purchased | 21,817 | 10,000 | 15,000 |
| Certificates Purchased (% of Total Certificate Issuance) | 21.8% | 10.0% | 15.0% |
| Purchase Price | $3,999,929 | $2,875,000 | $4,350,000 |

35. Plaintiff Rimrock Fund is an exempted company organized in and under the laws of the Cayman Islands, with its registered office in the Cayman Islands. Rimrock Fund is an investment fund that holds securities that are purchased, sold, and managed exclusively by Rimrock Capital, its California-based investment manager.

36. Plaintiff Rimrock Capital, a limited liability company organized under the laws of California with is principal place of business in Irvine, California, is an SEC-registered investment adviser focused on multi-sector, hedged fixed income strategies. Rimrock Capital sponsors and manages various investment funds, including the Rimrock Fund, for its investors. Rimrock Capital is the sole investment manager for the Rimrock Fund and, pursuant to the Investment Management Agreement, has full discretionary authority to make investment decisions and to execute securities transactions on behalf of the Rimrock Fund. As set forth herein, Rimrock purchased Certificates at prices artificially inflated by

Defendants' misconduct and materially false and misleading disclosures and suffered substantial damage as a result.

37. Rimrock Capital is an experienced and substantial auto loan ABS investor. The majority of Rimrock Capital's current $4 billion+ assets under management are structured products, including ABS, RMBS, and CMBS, and Rimrock Capital has made annual structured product purchases of between $800 million and $1.6 billion each year since 2013. The individual primarily responsible for Rimrock Capital's ABS and non-agency RMBS investments has nearly two decades of structured product experience. Rimrock Capital invests in auto loan ABS across the capital structure, at senior and subordinate levels, and has purchased 20 different auto loan ABS residuals (*i.e.*, certificates) issued through eight different auto loan ABS shelves.

//

//

//

//

38. Rimrock made the following Certificate purchases:

**Rimrock's Certificate Investments**

| TCF Securitization | **TCF 2014-1** |
|---|---|
| Settlement Date | July 17, 2014 |
| Certificates Purchased | 21,457 |
| Certificates Purchased (% of Total Certificate Issuance) | 21.5% |
| Purchase Price | $3,933,922 |

## B. Defendants[1]

### 1. Gateway

39. Defendant Gateway is a Delaware limited liability corporation with its principal executive offices located at 160 North Riverview Drive, Suite 100, Anaheim, CA 92808.

40. Gateway was founded in 2007 by Brian MacInnis and David MacInnis, who until January 2017, served as Gateway's CEO and President, respectively. In November 2011, Gateway was acquired by TCF Bank, becoming a wholly-owned subsidiary of TCF Bank and an indirect wholly-owned subsidiary to TCF Bank's ultimate parent company, TCF Financial. Upon TCF Bank's acquisition of Gateway,

[1] A breakdown of the individual members of Defendants' management involved in the TCF Securitizations and the misconduct alleged herein is attached as Exhibit 3 hereto.

Brian MacInnis took on the additional role of Executive Vice President ("EVP"), National Consumer Lending for TCF Bank.

41. At all times through November 2017, Gateway focused on indirect automobile finance, by originating and servicing loans for automobile purchases through a network of more than 11,000 automobile franchises and dealers, and, between 2014 and 2016, by securitizing many of the auto loans it originated, including through the TCF Securitizations at issue here. During the first half of 2017, Gateway scaled back its auto loan securitization program, and in November 2017, TCF Financial directed Gateway to cease all further auto loan origination and effectively exit the auto loan business. Immediately thereafter, Gateway began to "wind down operations that support indirect auto originations" and lay off personnel involved in such operations, including Todd Pierson, who served as Gateway's Chief Operating Officer ("COO") until January 2017 and Gateway's President, thereafter, and TCF Financial began to fold Gateway's remaining operations – which post-November 2017, consisted of servicing the dwindling "runoff" portfolio of auto loans previously originated by Gateway – back into TCF Bank.

42. Gateway served as the sponsor of each of TCF Securitizations, and the originator and custodian of all the auto loans underlying those Securitizations (the Underlying Receivables). Pursuant to Servicing Agreements between Gateway, the

TCF Issuing Trusts for each Securitization, and US Bank, Gateway was also the servicer of the Underlying Receivables.

43. Gateway, together with TCF Bank and TCF Auto, through members of their senior management (as detailed further in Sections I.B.2-3, II.C-E, IV.A-E, VI & VII.B, *infra*, and in Exhibit 3 hereto) (i) made direct misrepresentations and omissions to Plaintiffs regarding Reported CNL, and (ii) authored, reviewed, and approved the materially misleading CNL information contained in the Offering Documents, Investor Presentations, and Supplemental Data, which Plaintiffs relied upon in making their decisions to invest in the Certificates.

**2. TCF Auto**

44. Defendant TCF Auto, a Delaware limited liability company formed by Gateway on April 22, 2014, with a principal place of business at 200 Lake Street East, Wayzata, Minnesota 55391, and a wholly-owned special purpose bankruptcy remote subsidiary of Gateway, served as the "depositor" for each of the TCF Securitizations.

45. TCF Auto was formed by Gateway and TCF Bank to serve as an intermediary cog in the creation and organization of the TCF Securitizations in order to make the Securitizations "bankruptcy remote" from Gateway. To do so, and in connection with each of the TCF Securitizations, TCF Auto:

a. acquired from Gateway motor vehicle retail sales contracts originated and serviced by Gateway, and

b. sold, assigned, transferred, pledged, and/or granted security interests in such contracts to the TCF Issuing Trusts.

46. TCF Auto is an affiliate of Gateway, TCF Bank, and the TCF Issuing Trusts. TCF Auto is a direct or indirect Gateway subsidiary, and an indirect subsidiary of TCF Bank.

47. As a SPV formed and employed by Gateway for effecting the TCF Securitizations in a bankruptcy-remote manner, TCF Auto, like the below-discussed TCF Issuing Trusts (*see* Section I.B.4, *infra*), has only a 'paper' existence. It does not have any offices or employees of its own, but instead utilizes those of Gateway, TCF Bank, and their affiliates.

48. For example, Michael S. Jones, TCF Bank's EVP and Chief Financial Officer ("CFO") from January 2012 through January 2016, and EVP, Consumer Banking from January 2016 to the present, was also a Vice President ("VP") of TCF Auto and the signatory to TCF Auto's Form ABS-15G for the TCF 2014-1, TCF 2015-1, TCF 2015-DP1, and TCF 2015-2 Securitizations, which were filed with the SEC pursuant to Section 15G of the Securities Exchange Act of 1934 on May 12, 2015, November 4, 2015, and January 26, 2016, respectively. *See* TCF Auto Receivables, LLC Form ABS-15G (filed May 12, 2015); TCF Auto Receivables,

LLC Form ABS-15G (filed Nov. 4, 2015); TCF Auto Receivables, LLC Form ABS-15G (filed Jan. 26, 2016); *see also* Ex. 3 hereto. As such, Michael Jones was the "senior officer [of TCF Auto] in charge of th[ose] [TCF] [S]ecuritizations," *see* Instructions, Form ABS-15G Asset-Backed Securitizer Report Pursuant to Section 15G of the Exchange Act, and he therefore authorized and/or approved, on TCF Auto's behalf, the Offering Documents for those Securitizations, including the misrepresentations and omissions therein.

49. Brian Maass, TCF Bank's EVP, Treasurer, and Chief Investment Officer from November 2012 through January 2016 and EVP and CFO from January 2016 to the present, was also a VP of TCF Auto and the signatory to TCF Auto's Form ABS-15G for the TCF 2016-DP1 and TCF 2016-1 Securitizations, which were filed with the SEC pursuant to Section 15G of the Securities Exchange Act of 1934 on November 29, 2016 and February 8, 2017, respectively. *See* TCF Auto Receivables, LLC Form ABS-15G (filed Nov. 29, 2016); TCF Auto Receivables, LLC Form ABS 15-G (filed Feb. 8, 2017); *see also* Ex. 3 hereto. As such, Brian Maass was the "senior officer [of TCF Auto] in charge of th[ose] [TCF] [S]ecuritizations," *see* Instructions, Form ABS-15G Asset-Backed Securitizer Report Pursuant to Section 15G of the Exchange Act, and he therefore authorized and/or approved, on TCF Auto's behalf, the Offering Documents for those Securitizations, including the misrepresentations and omissions therein.

50. TCF Auto, together with Gateway and TCF Bank, through members of their senior management (as detailed further Sections I.B.1, I.B.3, II.C-E, IV.A-E, VI & VII.B, *infra*, and in Exhibit 3 hereto) authored, reviewed, authorized, and/or approved the materially misleading CNL information contained in the Offering Documents, Investor Presentations, and Supplemental Data, which Plaintiffs relied upon in making their decisions to invest in the Certificates.

**3. TCF Bank**

51. Defendant TCF Bank, a national banking association organized under the laws of the United States with headquarters located at 2508 South Louise Avenue, Sioux Falls, South Dakota 57106, served as the "administrator" of each of the TCF Securitizations. As such, TCF Bank provided administrative services to the TCF Issuing Trusts, pursuant to an administration agreement between TCF Bank, US Bank, and each of the TCF Issuing Trusts. TCF Bank was also the entity with ultimate authority over the TCF Securitizations.

52. TCF Bank is an affiliate of Gateway, TCF Auto, and the TCF Issuing Trusts. Gateway is a wholly-owned subsidiary of TCF Bank, as are TCF Auto and the TCF Issuing Trusts.

53. As further detailed at Sections II.C-E, IV.A-E, VI & VII.B, *infra*, and in Exhibit 3 hereto, TCF Bank had ultimate authority over the TCF Securitizations, and the approval of (i) TCF Bank's Loan Sale Committee, of which TCF Bank's

Sydney Libsack was a member, and, upon information and belief, (ii) TCF Bank's senior management, including Michael Jones, Brian Maass, and Craig Dahl, among others, was required before the Securitizations could go forward, the Offering Documents, Supplemental Data, and Investor Presentations could be distributed to investors, and the Notes and Certificates could be sold.

54. Moreover, TCF Bank, together with Gateway and TCF Auto, through members of their senior management (as detailed further Sections I.B.1-2, II.C-E, IV.A-E, VI & VII.B, *infra*, and in Exhibit 3 hereto) (i) made direct misrepresentations and omissions to Plaintiffs regarding Reported CNL, and (ii) authored the materially misleading CNL information contained in the Offering Documents, Investor Presentations, and Supplemental Data, which Plaintiffs relied upon in making their decisions to invest in the Certificates.

**4. The TCF Issuing Trusts**

55. Defendant TCF 2014-1 is a statutory trust formed by TCF Auto on July 1, 2014, under the laws of the state of Delaware, for the sole and specific purpose of acquiring certain Gateway-originated and Gateway-serviced motor vehicle retail sales contracts and securitizing them through transactions structured and sponsored by Gateway. TCF 2014-1 served as the issuing entity for the TCF 2014-1 Certificates (and Notes).

56. Defendant TCF 2015-1 is a statutory trust formed by TCF Auto on April 8, 2015, under the laws of the state of Delaware, for the sole and specific purpose of acquiring certain Gateway-originated and Gateway-serviced motor vehicle retail sales contracts and securitizing them through transactions structured and sponsored by Gateway. TCF 2015-1 served as the issuing entity for the TCF 2015-1 Certificates (and Notes).

57. Defendant TCF 2015-DP1 is a statutory trust formed by TCF Auto on April 8, 2015, under the laws of the state of Delaware, for the sole and specific purpose of acquiring certain Gateway-originated and Gateway-serviced motor vehicle retail sales contracts and securitizing them through transactions structured and sponsored by Gateway. TCF 2015-DP1 served as the issuing entity for the TCF 2015-DP1 Certificates (and Notes).

58. Defendant TCF 2015-2 is a statutory trust formed by TCF Auto on October 8, 2015, under the laws of the state of Delaware, for the sole and specific purpose of acquiring certain Gateway-originated and Gateway-serviced motor vehicle retail sales contracts and securitizing them through transactions structured and sponsored by Gateway. TCF 2015-2 served as the issuing entity for the TCF 2015-2 Certificates (and Notes).

59. Defendant TCF 2016-DP1 is a statutory trust formed by TCF Auto on October 8, 2015, under the laws of the state of Delaware, for the sole and specific

purpose of acquiring certain Gateway-originated and Gateway-serviced motor vehicle retail sales contracts and securitizing them through transactions structured and sponsored by Gateway. TCF 2016-DP1 served as the issuing entity for the TCF 2016-DP1 Certificates (and Notes).

60. Defendant TCF 2016-1 is a statutory trust formed by TCF Auto on October 8, 2015, under the laws of the state of Delaware, for the sole and specific purpose of acquiring certain Gateway-originated and Gateway-serviced motor vehicle retail sales contracts and securitizing them through transactions structured and sponsored by Gateway. TCF 2016-1 served as the issuing entity for the TCF 2016-1 Certificates (and Notes).

61. The TCF Issuing Trusts have no officers, directors, employees, or offices of their own. They were created by Gateway and TCF Bank, through TCF Auto, solely to effectuate the TCF Securitizations, by acquiring the Underlying Receivables from Gateway (through TCF Auto) and pledging them, pursuant to respective indentures, and issuing and making payments on the Notes and Certificates.

62. Each of the TCF Issuing Trusts has nominal principal offices in Wilmington, Delaware, in care of Wilmington as owner trustee for each of the TCF Securitizations (and for TCF 2014-1, in care of Wells Fargo Delaware Trust Company, N.A. as owner trustee). As they are without any employees, the TCF

Issuing Trusts do not perform any actions themselves, but rather engage other entities to perform all requisite actions for them, including Gateway (sponsor, originator, and servicer), TCF Auto (depositor), TCF Bank (administrator), US Bank (indenture trustee), Wilmington (owner trustee), and the Initial Purchasers.

63. The TCF Issuing Trusts are affiliates of Gateway, TCF Bank, and TCF Auto. Each of the TCF Issuing Trusts are direct or indirect subsidiaries of TCF Auto, Gateway, and TCF Bank.

**C. Non-Parties**

**1. TCF Financial**

64. TCF Financial, a Delaware corporation with principal executive offices located at 200 Lake Street East, Wayzata, MN 55391-1693, is a public national bank holding company whose shares of common stock trade on the New York Stock Exchange under the ticker "TCF." Through its operating subsidiaries, principally TCF Bank and Gateway, TCF Financial (1) provides retail and commercial banking products and conducts commercial leasing and equipment finance business (TCF Bank), and (2) conducts indirect auto finance business (Gateway). TCF Financial is the ultimate parent company of Gateway, TCF Bank, TCF Auto, and the TCF Issuing Trusts, all of which are direct or indirect wholly-owned subsidiaries of TCF Financial.

**2. The TCF Securitizations' Trustees**

65. US Bank, a national banking association with its principal place of business at 800 Nicollet Mall, Minneapolis, MN 55402, serves as the indenture trustee, registrar, note paying agent, and certificate paying agent in connection with each of the TCF Securitizations. US Bank's corporate trust office located at 190 South LaSalle Street, Mail Code MK-IL-SL7C, Chicago, IL 60603 administers the indentures for each of the TCF Securitizations. Under the terms of the indentures for each of the TCF Securitizations, US Bank is responsible for securities administration, including pool performance calculations, distribution calculations and the preparation of monthly distribution reports (the "Monthly Reports"). For providing such services, US Bank receives compensation as follows:

| TCF Securitization | Indenture Trustee fees |
|---|---|
| TCF 2014-1 | $11,500 per annum plus expenses |
| TCF 2015-1 | $14,000 per annum plus expenses |
| TCF 2015-DP1 | $13,000 per annum plus expenses |
| TCF 2015-2 | $14,000 per annum plus expenses |
| TCF 2016-DP1 | $13,000 per annum plus expenses |
| TCF 2016-1 | $14,000 per annum plus expenses |

//

66. Wilmington, a national banking association with its principal place of business at 1100 North Market Street, Wilmington, DE 19890, serves as the owner trustee in connection with each of the TCF Securitizations (apart from TCF 2014-1, for whom the owner trustee was Wells Fargo Delaware Trust Company, N.A.). Pursuant to governing trust agreements, the role of the owner trustee is quite limited: in certain circumstances, the owner trustee will act concerning management of the TCF Issuing Trusts when so directed by TCF Bank (the administrator) or the Certificateholders. For providing such services, the owner trustee receives compensation as follows:

| **TCF Securitization** | **Owner Trustee fees** |
|---|---|
| TCF 2014-1 | $4,000 per annum plus expenses |
| TCF 2015-1 | $4,000 per annum plus expenses |
| TCF 2015-DP1 | $4,000 per annum plus expenses |
| TCF 2015-2 | $4,000 per annum plus expenses |
| TCF 2016-DP1 | $4,000 per annum plus expenses |
| TCF 2016-1 | $4,000 per annum plus expenses |

### 3. The TCF Securitizations' Initial Purchasers

67. Credit Suisse, Wells Fargo, Citigroup, and Morgan Stanley served as the Initial Purchasers and/or placement agents in connection with the TCF Securitizations, as detailed in the table below. Pursuant to respective Note purchase

agreements between themselves and TCF Auto, Credit Suisse, Wells Fargo, Citigroup, and Morgan Stanley – as placement agents and/or Initial Purchasers – agreed to purchase the Notes and Certificates issued in connection with each of the TCF Securitizations and offer such Notes and Certificates to qualified institutional buyers, such as Plaintiffs.

| TCF Securitization | Certificate Initial Purchaser(s) | Note Initial Purchasers |
|---|---|---|
| TCF 2014-1 | Credit Suisse | Credit Suisse<br>Morgan Stanley |
| TCF 2015-1 | Credit Suisse | Credit Suisse<br>Wells Fargo |
| TCF 2015-DP1 | Wells Fargo | Unknown |
| TCF 2015-2 | Credit Suisse | Credit Suisse<br>Wells Fargo |
| TCF 2016-DP1 | Wells Fargo | Wells Fargo |
| TCF 2016-1 | Credit Suisse | Credit Suisse<br>Wells Fargo<br>Citigroup |

**4. The Confidential Witnesses**

68. Confidential Witness ("CW") 1 is a former Gateway employee who held a management-level position in customer care and quality assurance for Gateway's loan servicing group during times relevant to the Complaint's allegations.

69. CW 2 is a former employee of a company that provided servicing on Gateway's auto loans between 2008 and 2010.

## II. THE TCF SECURITIZATIONS, THE CERTIFICATES, THE OFFERING DOCUMENTS, AND THE SUPPLEMENTAL DATA

### A. The TCF Securitizations

70. As summarized at Exhibit 1 hereto, and discussed in the ensuing paragraphs, Defendants created each of the TCF Securitizations as follows:

71. TCF Bank, as administrator, and Gateway, as sponsor of each of the TCF Securitizations, recruited an effectively identical cast of Transaction Parties to effect each of the TCF Securitizations, including:

a. the TCF Issuing Trusts (TCF 2014-1, TCF 2015-1, TCF 2015-DP1, TCF 2015-2, TCF 2016-DP1 and TCF 2016-1), which were empty-shell SPVs that Gateway created and formed, through its wholly-owned subsidiary TCF Auto, to serve as issuing trusts for the securitization of the Underlying Receivables;

b. Gateway itself, to originate, directly or indirectly, the Underlying Receivables, and to service them;

c. Gateway's wholly-owned subsidiary TCF Auto, to whom Gateway sold the Underlying Receivables, and who in turn sold the Underlying Receivables to the TCF Issuing Trusts, thereby making the TCF Issuing Trusts "bankruptcy remote" from Gateway;

d. TCF Bank itself, to serve as administrator for each of the TCF Securitizations;

e. US Bank and Wilmington, to serve respectively as indenture trustee and owner trustee for each of the TCF Securitizations; and

f. the Initial Purchasers, to purchase the Certificates and Notes issued through the TCF Securitizations and thereafter market and/or sell them to qualified institutional buyers such as, and including, Plaintiffs.

72. As further indicated in Exhibit 1, Gateway, as the TCF Securitizations' sponsor and structurer, and as originator of the Underlying Receivables, originated, assembled, and selected, for each of the TCF Securitizations, a pool of auto loans meeting certain "eligibility criteria," as set forth in the Offering Documents, to serve as each Securitization's Underlying Receivables, including, as summarized in Exhibit 1:

a. the pool of 14,898 auto loans serving as the Underlying Receivables for TCF 2014-1, with an aggregate initial principal balance of $250 million, a weighted average annual percentage rate of 8.24%, a weighted average borrower FICO score of 691, and a weighted average initial term of 67 months;

b. the pool of 24,841 auto loans serving as the Underlying Receivables for TCF 2015-1, with an aggregate initial principal balance of $425 million, a weighted average annual percentage rate of 8.99%, a weighted average borrower FICO score of 680, and a weighted average initial term of 67 months;

c. the pool of 24,045 auto loans serving as the Underlying Receivables for TCF 2015-DP1, with an aggregate initial principal balance of $425 million, a weighted average annual percentage rate of 8.92%, a weighted average borrower FICO score of 679, and a weighted average initial term of 67 months;

d. the pool of 14,376 auto loans serving as the Underlying Receivables for TCF 2015-2, with an aggregate initial principal balance of $250 million, a weighted average annual percentage rate of 9.03%, a weighted average borrower FICO score of 680, and a weighted average initial term of 66 months;

e. the pool of 23,258 auto loans serving as the Underlying Receivables for TCF 2016-DP1, with an aggregate initial principal balance of $400 million, a weighted average annual percentage rate of 8.23%, a weighted average borrower FICO score of 683, and a weighted average initial term of 66 months; and

f. the pool of 29,661 auto loans serving as the Underlying Receivables for TCF 2016-1, with an aggregate initial principal balance of $500 million, a weighted average annual percentage rate of 8.27%, a weighted average borrower FICO score of 684, and a weighted average initial term of 66 months.

73. As summarized in Exhibit 1, Gateway, as the TCF Securitizations' sponsor and structurer, structured each of the TCF Securitizations into a set of tranched senior and subordinated Notes and Certificates backed by (and based on)

differently-prioritized claims to the Gateway-selected Underlying Receivables and their associated cashflows, including:

a. for each of the TCF Securitizations, a set of Notes with an initial par value equivalent to the aggregate initial principal balance of the pooled Underlying Receivables, namely:

i. $250 million of Notes issued by TCF 2014-1, backed by TCF 2014-1's $250 million of Underlying Receivables;

ii. $425 million of Notes issued by TCF 2015-1, backed by TCF 2015-1's $425 million of Underlying Receivables;

iii. $425 million of Notes issued by TCF 2015-DP1, backed by TCF 2015-DP1's $425 million of Underlying Receivables;

iv. $250 million of Notes issued by TCF 2015-2, backed by TCF 2015-2's $250 million of Underlying Receivables;

v. $400 million of Notes issued by TCF 2016-DP1, backed by TCF 2016-DP1's $400 million of Underlying Receivables; and

vi. $500 million of Notes issued by TCF 2016-1, backed by TCF 2016-1's $500 million of Underlying Receivables.

b. for at least TCF 2014-1, TCF 2015-1, TCF 2015-2 and TCF 2016-1, multiple classes of Notes bearing differently-prioritized relationships to the Underlying Receivables' cashflows, including:

i. multiple classes of senior Class A Notes, bearing most senior claims to the Underlying Receivables' cashflows, lower coupons, and triple-A credit ratings (including short-term Class A-1 Notes, and progressively longer-term Class A-2, A-3 and A-4 Notes);

ii. more junior Class B Notes bearing subordinated claims to the Underlying Receivables' cashflows, slightly higher coupons, and double-A credit ratings;

iii. yet more junior Class C Notes bearing more subordinated claims to the Underlying Receivables' cashflows, higher coupons, and single-A credit ratings; and

iv. Class D Notes, bearing yet-more subordinated claims to the Underlying Receivables' cashflows, higher coupons, and triple-B credit ratings (except for TCF 2014-1, where no Class D Notes were issued).

c. for each of the TCF Securitizations, a set of 100,000 Certificates, representing the entire beneficial interest in each of the TCF Issuing Trusts, as further discussed in Section II.B below; and

d. for each of the TCF Securitizations, additional structural mechanisms providing additional credit protection to the TCF Securitizations' Notes, including:

i. the establishment of "overcollateralization" for the Notes, by directing that the TCF Securitizations' priority of payments function to direct certain *initial* residual securitization cashflows (*i.e.*, cashflows that would otherwise have flowed to the Certificates) to Noteholders instead, as principal repayments, so that the aggregate principal amount of the Underlying Receivables would exceed the aggregate principal amount of outstanding Notes (meaning that the Underlying Receivables *over*-collateralize the Notes). Specifically, under the TCF Securitizations' governing priority of payments, initial residual cashflows were directed to provide Noteholder principal payments until a specific targeted level of overcollateralization is reached (the Targeted Overcollateralization Amounts), and subsequent cashflows were to be redirected as necessary to maintain such Targeted Overcollateralization Amounts through the life of the securitizations:

1. for TCF 2014-1, 1.0% of the initial pool balance of the Underlying Receivables, or $2.5 million;

2. for TCF 2015-1, 1.0% of the initial pool balance of the Underlying Receivables, or $4.25 million;

3. for TCF 2015-DP1, 1.0% of the initial pool balance of the Underlying Receivables, or $4.25 million;

4. for TCF 2015-2, 1.1% of the initial pool balance of the Underlying Receivables, or $2.75 million;

5. for TCF 2016-DP1, 0.25% of the initial pool balance of the Underlying Receivables, or $1 million;

6. for TCF 2016-1, 1.0% of the initial pool balance of the Underlying Receivables, or $5.0 million; and

ii. the establishment, in all the TCF Securitizations except for TCF 2016-DP1, of an additional "specified reserve account balance" amounting in each case to 0.25% of the initial pool balance of the Underlying Receivables, likewise to be funded and replenished by residual cashflows, as added funds available to satisfy obligations to Noteholders in the event that normal cashflows failed to do so (primarily due to technical timing matters, such as disjunctures in the payment schedules associated with the Underlying Receivables, on the one hand, and the Notes/Transaction Parties, on the other).

74. Such structuring is graphically depicted at accurate scale, using TCF 2016-1 as an illustrative example, on the following page. The structure of the other TCF Securitizations was substantially identical to the structuring of TCF 2016-1 (with the possible and here-irrelevant exception of TCF 2015-DP1 and TCF 2016-DP1, for which no information concerning structuring of the Notes into different classes is publicly available).

**TCF 2016-1 Structure (to scale)**



**B. The Certificates**

75. Defendants structured each of the TCF Securitizations to include, and caused each of the TCF Securitizations to issue, a set of 100,000 Certificates.

76. Unlike the Notes issued in connection with the TCF Securitizations, the Certificates do not accrue interest and are not entitled to scheduled distributions of interest and principal.

77. Instead, the Certificates represent the entire beneficial (*i.e.*, residual) interest in each of the TCF Issuing Trusts. Such interest consisted, specifically, of each TCF Securitization's residual cashflows, to the extent any existed, following satisfaction of the Securitizations' more senior obligations to (a) Noteholders (*i.e.*, payment of interest coupons and repayment of principal), and (b) Transaction Parties (*i.e.*, servicer fees and expenses, trustee fees and expenses, and any expenses borne or incurred by the TCF Issuing Trusts). Such residual cashflows are often referred to as first loss positions or "excess spread." Excess spread refers to the amount of funds generated by a securitization's underlying assets *over and above* the amount of funds the securitization is obligated to pay out (*e.g.*, to Noteholders, Transaction Parties, and other securitization service providers).[2]

---

[2] ABS securitization structure generates excess spread, as the structural depiction of TCF 2016-1 above helps to illustrate, in largest part by the creation of large classes of senior notes (*e.g.*, the Class A Notes), well-protected from underlying asset principal losses by all more junior notes, that bear relatively low interest coupons in light of such safety. Thus, while the TCF Securitizations' assets (*i.e.*, the pools of Underlying Receivables) bore average interest coupons

78. The Certificates' returns, and thus the Certificates' value, are therefore a direct function of, and dependent on, the amount of excess spread generated by the TCF Securitizations.

79. As further detailed in Section III below, because the TCF Securitizations' excess spread is simply the difference between (1) the cashflows generated by their Underlying Receivables, and (2) their more senior payment obligations to Noteholders (coupons) and Transaction Parties (fees and expenses), the Certificates' returns, and thus the Certificates' value, are dependent on and a function of (1) the performance of the TCF Securitizations' Underlying Receivables, and (2) the TCF Securitizations' obligations to Noteholders and Transaction Parties. If the TCF Securitizations' Underlying Receivables perform poorly, excess spread, squeezed from the top line, can diminish or vanish, which can cause Certificate returns to diminish or turn negative. Similarly, the higher the TCF Securitizations' senior payment obligations are (*e.g.*, the higher the fees and expenses paid out to Gateway for serving as the TCF Securitizations' servicer), the greater the squeeze on excess spread from the bottom line, and concomitant diminishment of Certificate returns.

---

of 8%-9%, approximately 80% of the TCF Securitizations' liabilities (the senior Class A Notes) bore interest rates of only 0.25%-2%. *See* Exhibit 1. In other words, the TCF Securitizations received 8%-9% returns on 100% of their assets, but paid out only 0.25%-2.00% on 80% of their liabilities, and this gap between "money in" and "money out" was primarily responsible for generating the TCF Securitizations' excess spread.

80. As indicated in Exhibit 1, the residual cashflows or excess spread in auto ABS such as the TCF Securitizations can be substantial.

a. For example, at issuance, the weighted average annual interest rate generated by TCF 2015-2's Underlying Receivables was 9.03%. However, the weighted average annual interest rate coupon on TCF 2015-2's Notes was, at the same time, only 1.97%, while fees payable to Transaction Parties consisted almost entirely of the 1.00% annual fee to the servicer (with additional *de minimis* fees payable to the trustees and additional expenses incurred by the TCF Issuing Trusts adding less than 0.10% in annual expenses, at issuance). Thus, at issuance, TCF 2015-2 was structured to generate excess spread of approximately 6% (the 9.07% generated by the Underlying Receivables and taken in by TCF 2015-2, minus the 1.97% in annual noteholder coupon obligations and the 1.10% in annual fee/expense obligations to Transaction Parties that TCF 2015-2 was obligated to pay out).

b. Likewise, at issuance, the weighted average annual interest rate generated by TCF 2016-1's Underlying Receivables was 8.27%. However, the weighted average annual interest rate coupon on TCF 2016-1's Notes was, at the same time, only 1.63%, while fees payable to Transaction Parties consisted almost entirely of the 1.00% annual fee to the servicer (with additional *de minimis* fees payable to the trustees and additional expenses incurred by the TCF Issuing Trusts adding less than 0.10% in annual expenses, at issuance). Thus, at issuance, TCF

2016-1 was structured to generate excess spread of approximately 5.5% (the 8.27% generated by the Underlying Receivables and taken in by TCF 2016-1, minus the 1.97% in annual noteholder coupon obligations and the 1.10% in annual fee/expense obligations to Transaction Parties that TCF 2016-1 was obligated to pay out).

81. The above illustrations are simplified, and overstate the excess spread generated by the TCF Securitizations. For example, they ignore the requirements that excess spread be initially directed to funding overcollateralization to targeted levels ($2.75 million for TCF 2015-2, $5.0 million for TCF 2016-1). Likewise, they also ignore the winnowing of excess spread over the life of the securitizations, from both the top line and the bottom line, due *inter alia* to the amortization of the Underlying Receivables due to voluntary principal prepayments (diminishing excess spread from the top line, as the asset pool generating the excess spread shrinks), as well as the related amortization of the senior Class A Notes (diminishing excess spread from the bottom line, by leaving ever higher weighted average coupons on the remaining, higher-coupon notes still outstanding). Notwithstanding such and other simplifications, they are directionally correct. For example, more sophisticated analysis conducted by S&P calculated excess spread for TCF 2015-2 as 5.41%, and for TCF 2016-1 as 5.06%.[3]

[3] *See* respectively, S&P November 10, 2015 Presale Report for TCF 2015-2 at 4, and S&P September 8, 2016 Presale Report for TCF 2016-1 at 2.

82. At their offering and/or initial placement, the Certificates were not issued, offered, marketed, and/or sold at a set price. Instead, Defendants and/or the Initial Purchasers marketed the Certificates with pricing "guidance" based on their proffered modeling of the Underlying Receivables' prospective performance and TCF Securitizations' prospective cashflows, and sought and accepted bids from Plaintiffs and other prospective investors based (as detailed herein) on Plaintiffs' own evaluation, modeling, and pricing of such performance and cashflows.

**C. The Offering Documents**

83. The Certificates were issued and sold pursuant to the Offering Documents identified below, all of which prominently displayed Gateway's, TCF Auto's, and the TCF Issuing Trusts' names on their front cover:

**TCF Securitization Offering Documents**

| | **Certificates Preliminary Private Placement Memorandum, dated** | **Notes Offering Memorandum, dated** | **Notes Preliminary Offering Memorandum Supplement, dated** | **Notes Final Offering Memorandum Supplement, dated** |
|---|---|---|---|---|
| **TCF 2014-1** | July 9, 2014 | July 9, 2014 | July 9, 2014 | July 16, 2014 |
| **TCF 2015-1** | May 28, 2015 | May 28, 2015 | May 28, 2015 | June 3, 2015 |
| **TCF 2015-DP1** | September 28, 2015 | n/a | n/a | n/a |
| **TCF 2015-2** | November 10, 2015 | November 9, 2015 | November 9, 2015 | November 18, 2015 |

| | | | | |
|---|---|---|---|---|
| **TCF 2016-DP1** | June 27, 2016 | n/a | n/a | n/a |
| **TCF 2016-1** | September 8, 2016 | September 7, 2016 | September 7, 2016 | September 14, 2016 |

84. In the first instance, the Certificates for each of the TCF Securitizations were issued and sold pursuant to private placement memorandums that related specifically to the Certificates (as opposed to the Notes), including:

a. the TCF 2014-1 Certificate PPM, a preliminary private placement memorandum dated July 9, 2014;

b. the TCF 2015-1 Certificate PPM, a preliminary private placement memorandum dated May 28, 2015;

c. the TCF 2015-DP1 Certificate PPM, a certificate offering memorandum dated September 28, 2015;

d. the TCF 2015-2 Certificate PPM, a preliminary private placement memorandum dated November 10, 2015;

e. the TCF 2016-DP1 Certificate PPM, a certificate offering memorandum dated June 27, 2016; and

f. the TCF 2016-1 Certificate PPM, a preliminary private placement memorandum dated September 8, 2016.

85. In addition, the TCF 2014-1 Certificate PPM, TCF 2015-1 Certificate PPM, TCF 2015-2 Certificate PPM and TCF 2016-1 Certificate PPM included, as

exhibits thereto, additional documents also relating to the Notes offered in the TCF 2014-1, TCF 2015-1, TCF 2015-2 and TCF 2016-1 Securitizations.

a. The TCF 2014-1 Certificate PPM attached, as Exhibit A thereto:

i. the TCF 2014-1 Notes Preliminary OM, a preliminary offering memorandum supplement dated July 9, 2014; and

ii. the Gateway 2014 OM, an offering memorandum for Gateway's general auto securitization program, dated July 9, 2014.

b. The TCF 2015-1 Certificate PPM attached, as Exhibit A thereto:

i. the TCF 2015-1 Notes Preliminary OM, a preliminary offering memorandum supplement dated May 28, 2015; and

ii. the Gateway May 2015 OM, an offering memorandum for Gateway's general auto securitization program, dated May 28, 2015.

c. The TCF 2015-2 Certificate PPM attached, as Exhibit A thereto:

i. the TCF 2015-2 Notes Preliminary OM, a preliminary offering memorandum supplement dated November 9, 2015; and

ii. the Gateway November 2015 OM, an offering memorandum for Gateway's general auto securitization program, dated November 9, 2015.

//

d. The TCF 2016-1 Certificate PPM attached, as Exhibit A thereto:

i. the TCF 2016-1 Notes Preliminary OM, a preliminary offering memorandum supplement dated September 7, 2016; and

ii. the Gateway 2016 OM, an offering memorandum for Gateway's general auto securitization program, dated September 7, 2016.

86. The TCF 2014-1 Preliminary OM was later superseded by the TCF 2014-1 Notes OM, a final offering memorandum for the TCF 2014-1 Notes, dated July 16, 2014. The TCF 2015-1 Preliminary OM was later superseded by the TCF 2015-1 Notes OM, a final offering memorandum for the TCF 2015-1 Notes, dated June 3, 2015. The TCF 2015-2 Preliminary OM was later superseded by the TCF 2015-2 Notes OM, a final offering memorandum for the TCF 2015-2 Notes, dated November 18, 2015. The TCF 2016-1 Preliminary OM was later superseded by the TCF 2016-1 Notes OM, a final offering memorandum for the TCF 2016-1 Notes, dated September 14, 2016. In all cases (*i.e.*, for the TCF 2014-1, TCF 2015-1, TCF 2015-2 and TCF 2016-1 Securitizations), the preliminary and final versions of the Notes offering memorandums were substantively identical, with the principal difference being that the preliminary versions omitted the final note pricing (*i.e.*, the interest rates offered on each Class of Notes) while the final versions provided such information.

87. The TCF Certificate PPMs stated that they included the exhibits thereto (*i.e.*, the documents identified in ¶ 86, *supra*), and advised Certificate investors to read **all** the documents together (*i.e.*, in addition to the TCF Certificate PPMs, the Notes Offering Documents as well). The Notes Offering Documents were thus part of the TCF Certificate PPMs (at least with respect to the TCF 2014-1, TCF 2015-1, TCF 2015-2 and TCF 2016-1 Securitizations).

88. In most cases, the TCF Certificate PPMs, relying on and referring to more extensive information in the related Notes Offering Documents (which formed a part of the TCF Certificate PPMs), were typically shorter documents (for example, the TCF 2016-1 Certificate PPM was approximately 40 pages), while the Notes Offering Documents, which contained more extensive information, were substantially longer (for example, the TCF 2016-1 Notes Preliminary OM and the TCF 2016-1 Notes OM were approximately 140 pages, while the Gateway 2016 OM was approximately 70 pages).[4]

[4] The TCF 2015-DP1 Certificate PPM and TCF 2016-DP1 Certificate PPM diverged from this pattern because they were unaccompanied by any offering documents for the TCF 2015-DP1 Notes and the TCF 2016-DP1 Notes (which may have been sold privately to Wells Fargo and/or other purchasers). As a result, the TCF 2015-DP1 Certificate PPM and TCF 2016-DP1 Certificate PPM were substantially longer (~155 pages) than the other TCF Certificate PPMs, because they had to include within them the information that was normally placed in the Notes Offering Documents.

89. The Certificate PPMs for the TCF 2014-1, TCF 2015-1, TCF 2015-2 and TCF 2016-1 Securitizations consisted of (using the TCF 2016-1 Certificate PPM as an illustrative example):

a. an initial preamble section, including cover pages containing numerous boilerplate warning labels, and a table of contents (first seven pages, including un-numbered pages and pp. i-v);

b. a "Summary of Terms" section providing an overview of selected, salient information concerning the Certificates and TCF Securitization structure and terms (pp. 1-5);

c. a "Risk Factors" section disclosing "the material risks" of investing in the Certificates (pp. 6-9);

d. a "Description of the Certificates" section (pp. 10-13);

e. a "Sensitivity Analysis," demonstrating the variability of Certificate returns under various default/loss scenarios with respect to the Underlying Receivables, utilizing particular assumptions concerning the performance of the Underlying Receivables and other matters (pp. 14-15);

f. a section devoted to tax matters (pp. 16-25);

g. a section titled "Notice to Investors," concerning certain restrictions on the transfer or sale of the Certificates (pp. 26-30);

h. a section titled "Private Placement," concerning the Initial Purchasers' efforts to market and sell the Certificates (pp. 30-31); and

i. a glossary of terms and index (pp. 32-34).

90. The Notes Offering Documents for the TCF 2014-1, TCF 2015-1, TCF 2015-2 and TCF 2016-1 Securitizations (using the TCF 2016-1 Notes OM as an illustrative example) consisted of:

a. a similar initial preamble section, including cover pages containing numerous boilerplate warning labels, a table of contents, and one-page summary depictions of the transaction structure and flow of funds among the Transaction Parties, and of the securitization's normal priority of payments (first ten pages, including un-numbered pages and pp. i-viii);

b. an analogous, but substantially longer and more detailed "Summary of Terms" section, providing an overview of selected, salient information from the larger offering memorandum concerning the securitization structure, the Notes and their terms (pp. S1-S12);

c. an analogous, but substantially longer and more detailed "Risk Factors" section disclosing "the material risks" of investing in the Notes (pp. S13-S26);

d. a series of sections identifying each of the Transaction Parties (*e.g.*, the TCF Issuing Trust, the indenture trustee, the owner trustee, the depositor,

the originator and servicer, the administrator), and their roles in the securitizations (pp. S27-S31);

e. a section titled "The Receivables Pool," providing extensive statistical information on the credit characteristics of the Underlying Receivables, including "stratifications" of the Underlying Receivables by annual percentage rate, geography, FICO score, loan-to-value ratio, original term, remaining term, seasoning, original principal balance, outstanding principal balance, quarter of origination, vehicle model year, vehicle make and Gateway credit tier (pp. S31-S40);

f. a section titled "Weighted Average Life of the Notes," illustrating, on the basis of certain assumptions concerning the performance of the Underlying Receivables and other matters, prospective principal amortization and repayment schedules for each class of Notes under different Underlying Receivables' prepayment scenarios (pp. S40-S53);

g. a section titled "Origination and Servicing of the Underlying Receivables," consisting of:

i. a narrative summary of Gateway's underwriting model and procedures for the Underlying Receivables, Gateway's servicing and collection policies and procedures, including Gateway's efforts to collect on delinquent loans,

repossess cars securitizing such delinquent loans, and sell such cars to recover outstanding loan amounts, and Gateway's charge-off policies (pp. S54-56);

ii. summary statistical information concerning the delinquencies, defaults, repossession, and loss experience relating to Gateway's entire auto loan program (referred to as "managed pool" basis) (pp. S56-S58);

iii. extensive statistical information disaggregating the entire Gateway "managed pool" data into a series of "static" loan pools by fiscal quarter of loan origination (*e.g.*, loans originated in Q1 2009, Q2 2009, Q3 2009, etc.), including extensive descriptive statistics relating to:

1. the credit quality of such static, quarterly loan pools (*e.g.*, number of loans, aggregate and average principal balance, weighted average interest rate, weighted average initial and remaining terms, weighted average FICO scores, and distributions by interest rate range, percentages of new/used vehicles, and geography); and

2. the performance of such static, quarterly loan pools (*e.g.*, delinquency rates, prepayment speeds, and CNL by month), both for each such quarterly pool on an overall basis (*i.e.*, for the entire quarterly pool) and as disaggregated within each pool by Gateway's internal loan credit tiers (*e.g.*, for Tier 1

loans in the Q1 2009 pool, for Tier 2 loans on the Q1 2009 pool, and for Tier 3 loans in the Q1 2009 pool) (pp. S59-S93).

h. an analogous, but substantially longer and more detailed "Description of the Notes" section, providing a summary of "all material provisions of the notes" and their governing indenture, including Notes transfer restrictions, payments of interest and principal, etc. (pp. S94-S101);

i. a section titled "The Transaction Documents and the Indenture," summarizing the various agreements between the Transaction Parties, including the Servicing Agreements, and the structure and mechanics of the TCF Securitizations, including: the sale/assignment of the Underlying Receivables; the securitization's priority of payments; the fees and expenses owed to Transaction Parties, including the servicing fee and supplemental servicing fees owed to the servicer; the credit enhancement available to the Notes; the roles and responsibilities of the owner trustee, indenture trustee and administrator; possible early redemption of the Notes; servicer termination events and circumstances under which the servicer could be removed or replaced; events of default and their consequences; and the provision of monthly reports to Notes/Certificates holders (pp. S101-S120);

j. an analogous section devoted to tax matters (pp. S120-S123);

k. a final set of standard sections concerning, *inter alia*, the plan of distribution with respect to the Notes, the use of forward-looking statements, and the existence of material legal proceedings (pp. S124-S127); and

l. a glossary of terms and index (pp. S128-S135).

91. As detailed herein, the Offering Documents contained material misrepresentations, misleading statements, and omissions concerning, principally, the CNL experience of Gateway-originated auto loans, and Plaintiffs relied upon such material misrepresentations, misleading statements, and omissions when making their decisions to invest in the Certificates.

92. Defendants, through members of their senior management (*see* Exhibit 3 hereto), wrote, authorized, and approved the Offering Documents and their contents, including the material misrepresentations, misleading statements, and omissions therein.

93. Specifically, the Offering Documents were jointly created by (i) TCF Bank's Syndicated Loan & Asset Sales Group, and (ii) Gateway's Business Analytics Group.

94. TCF Bank's Syndicated Loan & Asset Sales Group was headed by TCF Bank's Senior Vice President ("SVP"), Syndicated Loan & Asset Sales, Sydney Libsack, who reported directly to (i) Michael Jones, TCF Bank's EVP and CFO (January 2012-January 2016) and EVP, Consumer Banking (January 2016-present),

and who was also a VP of Gateway and TCF Auto, and (ii) Brian MacInnis, Gateway's co-founder and CEO, who also served as TCF Bank's EVP, National Consumer Lending until January 2017. Other members of the Syndicated Loan & Asset Sales Group included TCF Bank's Matthew Cook and TCF Bank's Denise Sorrells, who also served as Gateway's Assistant Vice President ("AVP"), Cash Manager.

95. Gateway's Business Analytics Group was comprised of several individuals including Brandon Pierson, Gateway's VP and Chief Risk Officer, and Gina "Frankie" Judy, AVP, Business Analytics, who personally authored the false and/or misleading Reported CNL data, information, definitions, and explanatory footnotes (as detailed further in Sections IV.A-D, *infra*) that were ultimately included in the Offering Documents. Prior to being provided to Mr. Libsack and TCF Bank's Syndicated Loan & Asset Sales Group for inclusion in the Offering Documents, the false and/or misleading Reported CNL data, information, definitions, and explanatory footnotes created by Ms. Judy, were reviewed and approved by the head of Business Analytics, Brandon Pierson, and were also provided to Gerald Wilkins, Gateway's EVP and CFO.

96. After reviewing and approving the false and/or misleading Reported CNL data, information, definitions, and explanatory footnotes provided by Gateway's Business Analytics Group, TCF Bank's Sydney Libsack and/or others in

the Syndicated Loan & Asset Sales Group included them within the Offering Documents.

97. Prior to dissemination to investors, the Offering Documents, including the Reported CNL data, information, definitions, and explanatory footnotes, were, upon information and belief, also reviewed and approved by TCF Bank's Loan Sale Committee (including Committee member Sydney Libsack and other members of TCF Bank's senior management), which had final authority over the TCF Securitizations. Members of Gateway's Auto Platform Management Team, including Brian MacInnis (to whom Mr. Libsack directly reported) and Gerald Wilkins, also attended and participated in Loan Sale Committee meetings involving the TCF Securitizations. The Offering Documents were also reviewed and/or approved by members of TCF Bank's senior management, including (i) TCF Bank's CFO, Michael Jones (who was also a VP for Gateway and signatory to the Servicing Agreements on Gateway's behalf, and the "senior officer" in charge of the TCF 2014-1, 2015-1, 2015-DP1, and 2015-2 Securitizations for TCF Auto), (ii) TCF Bank's EVP, Treasurer (until 1/2016) and CFO (1/2016-present), Brian Maass (who was also the "senior officer" in charge of the TCF 2016-DP1 and 2016-1 Securitizations for TCF Auto), and (iii) TCF Bank's CEO, Craig Dahl.

### D. The Supplemental Data

98. As detailed in Section III.A *infra*, evaluation, valuation, and pricing of ABS requires analysis of extensive data concerning: (1) the credit characteristics of the pooled assets underlying the instant securitization; (2) the performance of similar, prior asset pools, particularly with respect to the timing and extent of losses (*i.e.*, CNL) and of voluntary prepayments; and (3) how the instant securitization channels incoming cashflows from the underlying assets to transaction parties, internal accounts, and note and certificate investors. As likewise detailed in Section III.A *infra*, the first two sets of data are required to generate a "base case" view of the prospective performance of the instant securitization's pooled assets, and the third to model how the underlying assets' cashflows – in "base case" as well as various "stress" scenarios – travel through the ABS securitization and to note and certificate investors.

99. Consequently, the provision of such data (the Supplemental Data) to prospective ABS investors, in usable and manipulable form (*e.g.*, excel spreadsheets, or data files in other formats, etc.) is a standard and typical part of the ABS securitization offering process.[5] Typically, such data – especially concerning

---

[5] To a significant extent, such Supplemental Data merely reproduced in more usable form information already contained in ABS offering documents (and actually contained, as detailed herein, in the Offering Documents here). However, some of the Supplemental Data provided was additive (*e.g.*, disaggregation of CNL and/or prepayment information, within static quarterly pools, by credit tier/program) to the more aggregated information provided in the Offering Documents.

the pooled assets underlying the instant Securitizations, and concerning the performance of prior assets pools originated and serviced by the same sponsor – is assembled by the securitization's sponsor and/or other transaction parties, and then provided by those parties to the securitization's underwriters or initial purchasers for distribution to prospective ABS investors.

100. In connection with each of the TCF Securitizations here:

a. Gateway's Business Analytics Group, including Brandon Pierson and Gina "Frankie" Judy, created and assembled extensive Supplemental Data, detailed specifically below. Indeed, the Supplemental Data that Defendants provided to Plaintiffs (*see* Exhibit 2 hereto) was personally authored by Gateway's Gina "Frankie" Judy. Upon information and belief, after review by members of Gateway's Auto Platform Management Team, which included Brian and David MacInnis, Todd Pierson, Gerald Wilkins, and Andy Sturm, the Business Analytics Group provided it to TCF Bank's Sydney Libsack for review and final approval by TCF Bank's Loan Sale Committee members (detailed above and in Exhibit 3 hereto), and other members of TCF Bank's senior management (detailed above and in Exhibit 3 hereto) who then provided it to the Initial Purchasers;

b. At Defendants' direction, the Initial Purchasers provided the Supplemental Data (together with the Offering Documents discussed at Section II.C, *supra*, and Investor Presentations discussed at Section II.E, *infra*) to Plaintiffs, who

used it and relied on it in evaluating the TCF Securitizations, the Certificates, the Certificates' value, risk, and returns, whether or not to purchase the Certificates, and the price at which to do so.

101. The Supplemental Data provided to Plaintiffs in connection with the TCF Securitizations is summarized in Exhibit 2 hereto.

102. As indicated in Exhibit 2, in connection with their evaluation and ultimate purchase of the Certificates, and as part of the due diligence they conducted prior to such purchases, Plaintiffs received, considered, and employed extensive Supplemental Data concerning: (1) the credit characteristics of the Underlying Receivables for the applicable TCF Securitizations; (2) the credit characteristics and performance (including, centrally, prepayment and CNL information) of auto loans previously originated and serviced by Gateway, including "static pool" information concerning such loans as grouped by quarter of origination (and/or by month of origination), both as a whole and disaggregated by Gateway internal credit tier/program; and (3) the performance of prior TCF securitizations and of their underlying receivables.

103. Notably, the largest part of the Supplemental Data provided to Plaintiffs consisted of Reported CNL information for loans previously originated and serviced by Gateway – displayed on a "static pool" basis that grouped Gateway loans by quarterly or monthly vintage of origination, reporting CNL for such static

loan pools throughout their lives, both on an overall pool basis and, within each pool, as disaggregated by Gateway internal credit tier/program.

104. The CNL information provided with the Supplemental Data was material to Plaintiffs, as further detailed in Section III below, and was materially false and/or misleading, as further detailed in Section IV below. Plaintiffs reasonably relied upon such materially false and/or misleading information when making their decision to invest in the Certificates.

**E. The Investor Presentations**

105. In addition to the Offering Documents and Supplemental Data, Defendants also created and disseminated to investors, including Plaintiffs, various Investor Presentations, including the TCF 2014-1 Investor Presentation, the Gateway March 2015 Overview Presentation, the Gateway March 2015 Performance by Grade Presentation, and the Gateway March 2015 Presentation.

106. The TCF 2014-1 Investor Presentation, which, together with the Offering Documents and Supplemental Data, was provided to Plaintiffs Axonic, Good Hill, and Rimrock prior to investing in the TCF 2014-1 Certificates, was authored by Gateway's AVP, Manager, Business Analytics, Gina "Frankie" Judy and other members of Gateway's Business Analytics Group. Upon information and belief, it was then reviewed and approved by Gateway's Brandon Pierson, TCF Bank's Sydney Libsack and/or other members of TCF Bank's Syndicated Loan &

Asset Sale Group, the TCF Bank Loan Sale Committee, and/or Michael Jones, TCF Bank's CFO.

107. The TCF 2014-1 Presentation, which prominently displayed TCF Bank's name and logo on the front cover and top right-hand corner of every page, consisted of:

a. A corporate overview of TCF Bank, including information about its loan and lease portfolio, credit performance, deposit generation, and the financial performance of its securitized platform (pp. 7-15);

b. A description of TCF Bank's Auto Finance Business, run by Gateway, including information regarding TCF Bank's acquisition of Gateway and the relevant experience of Gateway's Auto Platform Management Team with reporting loan performance data to investors (pp. 16-19);

c. An overview of the TCF 2014-1 Securitization, including the relevant Transaction Parties and timeline, the Securitization's capital structure, credit enhancement, and loss coverage (pp. 20-25);

d. A discussion of the TCF 2014-1 Securitization's collateral and historical performance, including a comparison of the TCF 2014-1 Securitization's collateral with that of CarMax's ABS Program (pp. 26-29);

e. An overview of Gateway's origination, underwriting, and servicing process (pp. 30-40); and

f. A presentation of the historical performance of Gateway's managed portfolio, including (i) Gateway's managed pool delinquencies for the years ending December 31, 2009 through December 31, 2013 and the quarters ending March 31, 2013 and March 31, 2014, (ii) Gateway's Reported CNL for the years ending December 31, 2009 through December 31, 2013 and the quarters ending March 31, 2013 and March 31, 2014, and (iii) a graphical comparison of Gateway's loss recoveries and Reported CNL with that of Gateway competitor, CarMax (pp. 41-44).

108. The Gateway March 2015 Overview Presentation, which was provided to Plaintiff GIC prior to investing in the TCF 2015-2 Certificates, was authored by Gateway's Business Analytics Group (which included Brandon Pierson and Gina "Frankie" Judy) and Gateway's Investor Relations Manager, Chelsea Feliciano. Upon information and belief, it was also reviewed and approved by members of Gateway's Auto Platform Management Team, TCF Bank's Sydney Libsack, and/or members of TCF Bank's Loan Sale Committee and senior management (as described above).

109. The Gateway March 2015 Overview Presentation, which prominently displayed Gateway's and TCF Bank's names and logos on the front cover and bottom right-hand corner of every page, consisted of:

a. An overview and history of Gateway's business, including its lending programs, origination volume, and diversification (pp. 2-5);

b. A presentation of Gateway's performance history, including delinquencies and historical CNL on a static pool basis (p. 6); and

c. A discussion of Gateway's compliance (p. 7).

110. The Gateway March 2015 Performance by Grade Presentation, which was provided to Plaintiff GIC prior to investing in the TCF 2015-2 Certificates, was also authored by Gateway's Business Analytics Group (including Brandon Pierson and Gina "Frankie" Judy) and Gateway's Investor Relations Manager, Chelsea Feliciano. Upon information and belief, it was also reviewed and approved by members of Gateway's Auto Platform Management Team, TCF Bank's Sydney Libsack, and/or members of TCF Bank's Loan Sale Committee and senior management (as described above).

111. The Gateway March 2015 Performance by Grade Presentation, which prominently displayed Gateway's and TCF Bank's names and logos on the front cover and bottom right-hand corner of every page, consisted of:

a. A graphical presentation of Gateway's delinquency trending by grade from January 2012 through March 2015 (pp. 2-3);

b. A graphical presentation of Gateway's historical CNL by grade (pp. 4-5); and

c. A graphical presentation of Gateway's static CNL projections, based on Gateway's historical CNL on loans originated since March 2009 (p. 6).

112. The Gateway March 2015 Presentation, which was provided to Plaintiff GIC prior to investing in the TCF 2015-2 Certificates, was also authored by Gateway's Business Analytics Group (including Brandon Pierson and Gina "Frankie" Judy) and Gateway's Investor Relations Manager, Chelsea Feliciano. Upon information and belief, it was also reviewed and approved by members of Gateway's Auto Platform Management Team, TCF Bank's Sydney Libsack, and/or members of TCF Bank's Loan Sale Committee and senior management (as described above).

113. The Gateway March 2015 Presentation, which prominently displayed Gateway's name and logo on the front cover and bottom left-hand corner of every page, consisted of:

a. A summary of Gateway's history (p. 3);

b. An overview of Gateway's management team, which was represented to have "100+ years of combined experience in the auto origination and servicing industry," (pp. 4-5); and

c. A discussion of Gateway's business, including its origination, underwriting, and servicing processes (pp. 6-28);

114. As detailed herein, the CNL information provided in all of the Investor Presentations was material to Plaintiffs, and contained material misrepresentations, misleading statements, and/or omissions concerning the CNL experience of Gateway-originated auto loans. Plaintiffs reasonably relied upon such material misrepresentations, misleading statements, and/or omissions when making their decision to invest in the Certificates.

## III. REPORTED CNL IS MATERIAL TO CERTIFICATE INVESTORS

115. Reported CNL is *a priori* material to ABS investors generally, and to Certificate investors such as Plaintiffs particularly, because, *inter alia* and as detailed below in Sections III.A-D:

a. it is a central and fundamental input into ABS investor evaluation, valuation, and pricing of ABS notes and certificates, and was so for Plaintiffs' evaluation, valuation, and pricing of the Certificates here;

b. it, for that reason, is extensively disclosed in ABS offering documents, supplemental data, and marketing materials generally, and in the TCF Securitizations' Offering Documents, Investor Presentations, and Supplemental Data here;

c. it, for the same reason, is the subject of "risk factor" disclosures in ABS offering documents generally, and in the TCF Securitizations' Offering Documents here; and

d. the structure of ABS securitizations generally, and of the TCF Securitizations here, leaves certificates and certificate investors generally, and the Certificates and Plaintiffs here, most exposed to increases in CNL, which reduce on a dollar for dollar basis the cashflows and returns on certificates generally, and on the Certificates here.

116. Furthermore, as detailed below in Section III.E below, where Repo/Remarketing Expenses are passed on to ABS securitization trusts and investors, they form a material portion of total CNL (typically, 15%-20%), and hence are typically included in reported CNL. Gateway's omission of Repo/Remarketing Expenses from Reported CNL is an illogical and material departure from industry standard.

117. Additionally, and as separately detailed in Section V, *infra*, Moody's various reactions to its December 2016 discovery of Gateway's omission of Repo/Remarketing Expenses from Reported CNL – namely: (1) prompting Gateway to provide the requisite disclosure in offering documents for a then-pending Gateway-sponsored ABS securitization; (2) requiring Gateway to restructure its then-pending auto ABS securitization so as to nearly quadruple the size of the securitization's reserve fund (from 25 basis points to 90 basis points) in order to provide such securitization's note investors with increased credit protection against Gateway's previously-omitted Repo/Remarketing Expenses; (3) downgrading

credit ratings for prior Gateway-sponsored ABS securitizations in light of material increases to CNL estimates once Repo/Remarketing Expenses were added back in; and (4) initiating and publishing an industry-wide study of ABS sponsors' treatment of Repo/Remarketing Expenses and CNL reporting – all further demonstrate materiality *post facto*.

### A. CNL Is a Necessary, Fundamental, and Crucial Data Point in ABS Evaluation, Valuation, and Pricing

118. As explained below, **all** ABS investors (including Plaintiffs), as well as the credit rating agencies responsible for providing ABS credit ratings, utilize reported CNL as a **central** factor in evaluating, valuing, and/or pricing ABS.[6] Indeed, reported CNL is a **necessary** factor for the evaluation, valuation, and pricing of ABS: ABS evaluation, valuation, and/or pricing cannot be accomplished without CNL data. Consequently, reported CNL is highly material to ABS investors.

119. ABS cashflows, and hence value, derive directly from the performance of the pooled assets underlying the ABS. However, the performance of such assets (here, the Underlying Receivables) is not known at the outset of the ABS

[6] The credit rating agencies' published methodologies for evaluating and rating auto loan provide a very detailed example of how ABS are evaluated, and of the fundamental, central and necessary role of reported CNL in any such evaluation. *See e.g*. Yan Yan, Matias Langer and William Black, *Moody's Approach to Rating Auto Loan- and Lease-Backed ABS*, Moody's Investors Service, Oct. 6, 2016 ("Moody's Methodology"); S&P Global Ratings, *ABS: General Methodology and Assumptions for Rating U.S. Auto Loan Securitizations,* S&P Global Ratings, Jan. 11, 2011 (as updated in 2016 and 2017) ("S&P Methodology"). The methods Plaintiffs employed to evaluate the Underlying Receivables here, and evaluate, value and price the Certificates, are substantially similar to those set forth in the Moody's Methodology and the S&P Methodology, as set forth herein.

securitization: most of the assets are newly-originated and will continue to perform (or not) over the course of the ensuing five to six years (the standard term for auto loans). Therefore, ABS investors – as well as the credit rating agencies, who also must evaluate ABS and their underlying assets at the outset of the ABS securitization – have developed standard methods to evaluate the prospective performance of ABS underlying assets (and, on the basis of such prospective performance, evaluation of the ABS securities themselves) through sophisticated analysis of extensive statistical data, including, as here, the CNL experienced by previously-originated, similar loan pools.

120. In evaluating ABS, ABS investors generally, Plaintiffs here specifically, and the credit rating agencies, such as Moody's, all employ a substantially similar three-step methodology:

a. first, they develop a "base case" view of the prospective performance and cashflows of the securitization's underlying assets, particularly with respect to the extent of their CNL, the timing of such losses (loss curves), and their voluntary prepayment rates, by

i. evaluating the credit characteristics of the pooled assets underlying the instant securitization,

ii. analyzing the timing and extent of the losses, and prepayments, experienced by **previously**-originated, similar loan pools, for which actual performance data is available, and

iii. analyzing the manner(s) and extent to which such prior loan pools differed from the instant pooled loans, in order to determine the extent to which prospective loss/prepayment performance of the instant pool might differ from historical pools;

b. second, they project base case underlying asset cash lows, over the life of the securitization, through the ABS securitization structure (*i.e.*, the securitization's priority of payments, or waterfall) and to the ABS securities themselves, in order to envision and evaluate the prospective performance and returns of the ABS securities (in such a base case view of underlying asset performance); and

c. third, they perform further projections of underlying asset cashflows through the securitization structure but utilize a variety of alternative "stress" scenarios – in which the extent and/or timing of losses and/or prepayments is higher/worse than in the base case scenario – to evaluate the ABS securities' risks, performance, and returns in such alternative scenarios.[7]

[7] In addition to evaluating such downside scenarios to the "base case," ABS investors (including Plaintiffs here) and the credit rating agencies also considered **upside** scenarios (*e.g.*, where

121. In the first and most fundamental of the above three steps, CNL (and prepayment) data for prior, similar loan pools was considered and utilized in order to generate a base case view of the prospective performance of the pooled loans underlying the TCF Securitizations, based on evaluation of the manner and extent of the differences between the historical and instant loan pools' credit qualities. To perform this analysis, ABS investors generally, and Plaintiffs specifically, required at least two different categories of data:

a. First, the credit characteristics of the assets underlying the instant ABS securitization (*e.g.*, for auto loan ABS, among other things, the credit programs or tiers under which the loans were originated or underwritten, the loans' loan-to-value (LTV) ratios, the loans' interest rates, the loans' terms, the FICO scores of the loans' obligors, whether the autos were purchased new or used, the make of the autos, the geographic distribution of the autos/obligors, etc.); and

b. Second, extensive historical data concerning the performance of the originator's **previously**-originated loans (or other pools of similar loans), including the timing and extent of such loans' CNL (as well as the voluntary prepayments associated with such loans, which also can affect the cashflows and

---

Underlying Receivables performed better, and/or experienced lower CNL, than envisioned in the base case scenario).

valuations of ABS notes and ABS residuals), and the credit characteristics of such loans.

122. The performance of such previously-originated loans, and the CNL they experienced, provide prospective ABS investors, Plaintiffs, and the credit rating agencies with *actual* performance/loss data from meaningfully-similar loans (*e.g.*, loans originated by the same originator, using similar underwriting processes and standards, to a similar population of obligors, serviced by the same servicer, etc.). Additionally, ABS investors, Plaintiffs, and the credit rating agencies could, and often did, also consider available historical performance data on loan pools originated by different originators, but with otherwise similar credit characteristics as the instant pooled loans.

123. ABS investors, Plaintiffs, and the credit rating agencies then applied statistical techniques and analysis to evaluate the degrees of similarity and/or divergence between (1) the loans underlying the TCF Securitizations, and (2) the previously-originated loan pools for which historical performance, CNL, and prepayment data was provided. For example, the loans underlying the TCF Securitization might have better credit characteristics than prior loan pools, indicating that their prospective CNL would be lower than those generated by prior pools; or conversely, might have worse credit characteristics, thus indicating that CNL would be higher than those prior loan pools experienced. Application of

statistical techniques and analysis can better specify the precise degrees of similarity and/or divergence between the historical and instant loan pools, and hence provide a basis for more precise quantification of the extent to which prospective losses from the instant loan pool might diverge (or not) from those associated with prior loan pools.

124. Details aside, the goal of the above-described ABS evaluation methodology is simple: to develop a "base case" view of the underlying assets' prospective performance generally, and CNL particularly. As an illustration, such a "base case" view could conclude that the instant pool's CNL would come to 2.5% of the pooled loans' principal balance – based on (1) reported CNL data for prior pooled loans (which yielded 2.0% cumulative losses), and (2) the similarities/differences between the instant pool loans and the prior loan pools (where the instant pooled loans presented poorer credit characteristics than prior pools, and were thus likely to generate higher losses).

125. In the second of the above three steps, ABS investors, Plaintiffs, and the credit rating agencies used the prospective, base-case performance, loss, and prepayment conclusions (*e.g.*, CNL of 2.5%; a prepayment speed of 1.5% per month) as parameters to input into a model that tracked the Underlying Receivables' cashflows (according to the base case scenario parameters), over their entire term, **through the securitization** (*i.e.*, employing the securitization's priority of

payments, or cashflow waterfall) and to the Notes and Certificates themselves, yielding a base case view of the performance/returns of the Notes and Certificates.

126. In so doing, ABS investors, Plaintiffs, and the credit rating agencies used sophisticated cash-flow modeling systems, either proprietary (in the case of the credit rating agencies) or developed by specialized third-party vendors (such as Intex, used by many/most ABS investors, including Plaintiffs). Intex, for example, provides and maintains cashflow models that follow the priority of payment structures set forth in almost all ABS securitizations, and allows ABS investors to track cashflows through such structures under a variety of user-defined performance scenarios concerning underlying asset performance (such as the "stress" scenarios discussed below).

127. In the third of the above three steps, ABS investors, Plaintiffs, and the credit rating agencies tracked cashflows through the ABS securitization under multiple "stress" scenarios that assumed, for example, loss or prepayment performance *worse* than that provided in the base case (for example, CNL at 3.0%, or 3.3%, rather than the 2.5% base case; or prepayments running at a 1.75% speed, rather than the 1.5% base case). Such stress testing allowed ABS investors, Plaintiffs, and the credit rating agencies insight into the extent of the risks to the Certificates and Notes and to their returns (*e.g.*, how were returns affected if CNL for the Underlying Receivables were 3.3%, rather than 2.5%?). Often, one

component of such stress testing was a "break even" analysis that determined the highest level of CNL that the securitization could stand before investors would experience losses (*i.e.*, the level of CNL at which investors would "break even.").

128. The purpose of the foregoing paragraphs is not to provide a complete description of all the details involved in ABS evaluation, valuation, and pricing (for that, *see e.g.* the Moody's Methodology and the S&P Methodology), but rather to provide a general understanding of the basic steps involved in such evaluation, and to indicate the critical role of CNL in such evaluation. As set forth above, CNL was both:

a. a critical and absolutely necessary input in ABS evaluation, in the form of reported CNL for **prior** asset pools; and

b. the most fundamental goal of the ABS evaluation, insofar as ABS evaluation required and depended on estimating CNL for the **instant** Underlying Receivables based, as set forth above, on the credit qualities of such assets and the CNL reported for **prior** pooled assets.

**B. For the Above Reasons, CNL Data Is Typically Reported by ABS Securitization Sponsors in Securitization Offering Documents, and Provided as Supplemental Data to Prospective Investors**

129. As a result of the foregoing, ABS sponsors (such as and including Gateway) typically report extensive historical CNL data in ABS securitization offering documents (as Defendants did here in the Offering Documents), as well as

in supplemental data provided to prospective ABS investors (as Defendants did here with the Supplemental Data), and in other marketing materials (as Defendants did here with the Investor Presentations).

130. The Offering Documents that Defendants created here reported extensive CNL information. *See* TCF 2014-1 Notes Preliminary OM at S51-S53 and S67-S74; TCF 2014-1 Notes OM at S50-S52 and S66-S73; TCF 2015-1 Notes Preliminary OM at S57-S59 and S78-S93; TCF 2015-1 Notes OM at S55-S57 and S76-S91; TCF 2015-DP1 Certificate PPM at 49-51 and 69-88; TCF 2015-2 Notes Preliminary OM at S56-S58 and S78-S97; TCF 2015-2 Notes OM at S56-S58 and S78-S97; TCF 2016-DP1 Certificate PPM at 48-50 and 69-94; TCF 2016-1 Notes Preliminary OM at S56-S58 and S78-S93; TCF 2016-1 Notes OM at S56-S58 and S78-S93.

131. Specifically, the CNL information in the Offering Documents reported CNL (and other performance information, including prepayments and delinquencies) for static loan pools originated by Gateway each fiscal quarter since the first quarter of 2009 – *i.e.*, the pool of all auto loans Gateway originated in the first quarter of 2009, the pool of all auto loans Gateway originated in the second quarter of 2009, etc. *See* TCF 2014-1 Notes Preliminary OM at S67-S74; TCF 2014-1 Notes OM at S66-S73; TCF 2015-1 Notes Preliminary OM at S78-S93; TCF 2015-1 Notes OM at S76-S91; TCF 2015-DP1 Certificate PPM at 69-88; TCF 2015-

2 Notes Preliminary OM at S78-S97; TCF 2015-2 Notes OM at S78-S97; TCF 2016-DP1 Certificate PPM at 69-94; TCF 2016-1 Notes Preliminary OM at S78-S93; TCF 2016-1 Notes OM at S78-S93. For each such static pool, the level of CNL (and prepayments, and delinquencies) was reported on a monthly basis (*e.g.*, at month 1, CNL of 0.00%; at month 2, 0.01%; at month 3, 0.02%, etc.). *Id.* In addition to reporting CNL for each of these pools in the pool's entirety (aggregate pool CNL), the Offering Documents also disaggregated the CNL data by Gateway's internal credit tiers (Tiers 1, 2 and 3) to report the particular CNL associated with the Tier 1 loans in each pool, the Tier 2 loans in each pool, and the Tier 3 loans in each pool.

132. Furthermore, and for the reasons set forth in Section III.A above, the Offering Documents also provided further information concerning the credit characteristics of each such static loan pool, to be evaluated in conjunction with the pool CNL data. *See* TCF 2014-1 Notes Preliminary OM at S53-S58; TCF 2014-1 Notes OM at S52-S57; TCF 2015-1 Notes Preliminary OM at S60-S65; TCF 2015-1 Notes OM at S58-S63; TCF 2015-DP1 Certificate PPM at 51-56; TCF 2015-2 Notes Preliminary OM at S59-S64; TCF 2015-2 Notes OM at S59-S64; TCF 2016-DP1 Certificate PPM at 51-56; TCF 2016-1 Notes Preliminary OM at S59-S64; TCF Notes OM at S59-S64.

133. The Supplemental Data that Defendants created and provided to the Initial Purchasers for distribution to prospective TCF Securitization investors,

including Plaintiffs, reproduced the above-detailed information reported in the Offering Documents, but in more usable form for analysis (*e.g.*, as excel spreadsheet data).

134. In addition, the Supplemental Data contained additional CNL data not included in the Offering Documents, including:

a. more particularized disaggregation of CNL reporting by Gateway's various, more particular internal credit programs (termed, in descending order of credit quality, Longest Drive, Hole in One, Double Eagle, Eagle, Birdie, Bogie and PAR);[8] and

b. CNL reporting for pools underlying Gateway's prior TCF Securitizations.

135. Finally, the Investor Presentations that Defendants created and provided to Plaintiffs here also included a variety of CNL information. *See* TCF 2014-1 Investor Presentation at 29, 43-44; Gateway March 2015 Overview Presentation at 6; Gateway March 2015 Performance by Grade Presentation at 4-6.

136. For example, the TCF 2014-1 Investor Presentation contained a slide entitled "Managed Pool Losses" that reproduced the CNL information presented in the TCF 2014- Notes Preliminary OM at S52 and the TCF 2014-1 Notes OM at S51.

---

[8] Gateway's internal Tier 1 loans included loans generated through the Longest Drive, Hole in One and Double Eagle credit programs; Tier 2 loans included those from the Eagle and Birdie credit programs; and Tier 3 loans included those from the PAR and Bogie credit programs.

Specifically, this data consisted of Gateway's quarter-end CNL for the quarters ending March 31, 2013 and March 31, 2014, and Gateway's year-end CNL for the years ending December 31, 2009 through December 31, 2013.

137. The TCF 2014-1 Investor Presentation also contained two slides that compared Gateway's historical CNL performance with that of its competitor CarMax. *See* TCF 2014-1 Investor Presentation at 29 and 44.

138. The first slide, entitled "Collateral Comparison: TCF 2014-1 Pool vs. CarMax," contained a line graph entitled "TCF vs. CarMax CNL Performance," which compared the CNL for the TCF 2014-1 Securitization loan pool with the CNL for the loan pools of several of CarMax's securitizations, including CarMax 2011-1, CarMax 2012-1, and CarMax 2013-1. *See* TCF 2014-1 Investor Presentation at 29.

139. The second slide, entitled "Managed Portfolio Performance Compared to CarMax," contained two bar graphs. The first, entitled "Loss Recoveries" compared Gateway's loss recoveries for the period 2010-2013 with CarMax's loss recoveries for the same period. The second, entitled "Portfolio Net Losses," compared Gateway's CNL for the period 2009-2013 with that of CarMax. Notably, as discussed further at Section IV.B.3, *infra*, Gateway's CNL was portrayed as significantly lower than CarMax's CNL for every year depicted. *See* TCF 2014-1 Investor Presentation at 44.

140. The Gateway March 2015 Overview Presentation also contained CNL information. For example, the presentation included a slide entitled "GOLF Performance History," that graphically displayed Gateway's static CNL loss projections based on Gateway's historic performance on loans originated since March 2009 projected forward using industry timing curves. *See* Gateway March 2015 Overview Presentation at 6.

141. Finally, the Gateway March 2015 Performance by Grade Presentation contained several slides graphically depicting Gateway's historical CNL disaggregated by credit tiers (Tier 1, Tier 2, Tier 3) and further disaggregated by internal credit program (Hole-in-One, Double Eagle, Eagle, Birdie, Par, Bogie). *See* Gateway March 2015 Performance by Grade Presentation at 4-5.

142. Like the March 2015 Overview Presentation, the March 2015 Performance by Grade Presentation also contained a graph displaying Gateway's static CNL loss projections based on its historic performance on loans originated since March 2009 projected forward using industry timing curves. *See* Gateway March 2015 Performance by Grade Presentation at 6.

143. Such CNL data was provided in the Offering Documents, Supplemental Data, and Investor Presentations because it was material to investors, for the reasons set forth in Section III.A above.

//

### C. The Offering Documents Repeatedly Warned that Losses from the Underlying Receivables Could Materially Diminish Certificate Returns and/or Cause Certificate Investors Material Losses

144. The Offering Documents repeatedly warned that Certificate returns were dependent on performance of the Underlying Receivables, and that losses from the Underlying Receivables would result in diminished returns and/or significant losses for the Certificates:

> The subordination of the certificates is intended to increase the likelihood of timely payments of principal of and interest on the notes. Accordingly, holders of the certificates will bear the greatest risk of non-payment or underpayment. Payments on the certificates will be extremely sensitive to losses on the receivables and the timing of payments on the receivables because if collections are lower than expected, the amount available for payment to certificateholders will be diminished.
>
> Finally, there is no credit enhancement for the certificates. Any diminution in cash flow on the receivables and other assets of the issuing entity due to losses, prepayments or other reasons described herein will diminish amounts that would have been available for distributions on the certificates and may cause holders of the certificates to experience significant losses on their investment.

*See* TCF 2014-1 Certificate PPM at 6; TCF 2015-1 Certificate PPM at 6; TCF 2015-DP1 Certificate PPM at 11; TCF 2015-2 Certificate PPM, at 6; TCF 2016-DP1 Certificate PPM, at 11; TCF 2016-1 Certificate PPM, at 6 (underline added for emphasis).

> Investors are urged to make their investment decisions based on their determinations as to anticipated rates of cash flows and losses under a variety of scenarios. Investors in the certificates should fully consider the risk that losses on the receivables could result in the failure of those investors to fully recover their investments.

*See* TCF 2014-1 Certificate PPM at 15; TCF 2015-1 Certificate PPM at 15; TCF 2015-DP1 Certificate PPM at 45; TCF 2015-2 Certificate PPM, at 15; TCF 2016-DP1 Certificate PPM, at 45; TCF 2016-1 Certificate PPM, at 15 (underline added for emphasis).

145. Hence, the Offering Documents themselves asserted/warned that CNL was material.

**D. ABS Structure Makes Certificate Returns Extremely Sensitive to Underlying Receivables' CNL**

146. ABS structure generally, and the structure of the TCF Securitizations here, make certificate returns extremely sensitive to underlying asset performance and losses, for two reasons.

147. First, the residual interest cashflows that flow to certificate investors in ABS securitizations generally, and in the TCF Securitizations here specifically, are subordinated to all other disclosed securitization payment obligations (*i.e.*, paying interest and principal on the notes, and paying fees and expenses to transaction parties). Consequently, any diminution in the cashflows from a securitization's

underlying assets affects, first, the residual cashflows available to certificate investors, and reduces such cashflows on a dollar for dollar basis.

148. Second, the structural leverage inherent in the structure of ABS securitizations (for Certificateholders here, approximately 10 to 1 or more in the TCF Securitizations) means that even a small rise in underlying assets' CNL has substantial consequences for certificate risk, returns, and value. For example, in the TCF Securitizations, when Underlying Receivables' CNL rise from approximately 2.5% to approximately 4.0%, Certificate returns drop from above 10% per annum to zero – and should losses increase further, Certificateholders suffer substantial and/or near-total losses on their investments.

149. Indeed, the Offering Documents repeatedly warned that, due to such subordination and leverage, Certificate returns were "extremely sensitive to losses on the receivables:"

> The subordination of the certificates is intended to increase the likelihood of timely payments of principal of and interest on the notes. Accordingly, <u>holders of the certificates will bear the greatest risk of non-payment or underpayment.</u> <u>Payments on the certificates will be extremely sensitive to losses on the receivables</u> and the timing of payments on the receivables because if collections are lower than expected, the amount available for payment to certificateholders will be diminished.
>
> Finally, <u>there is no credit enhancement for the certificates. Any diminution in cash flow on the receivables and other assets of the issuing entity due to losses, prepayments or other reasons described herein will diminish amounts that</u>

> would have been available for distributions on the certificates and may cause holders of the certificates to experience significant losses on their investment.

*See* TCF 2014-1 Certificate PPM at 6; TCF 2015-1 Certificate PPM at 6; TCF 2015-DP1 Certificate PPM at 11; TCF 2015-2 Certificate PPM, at 6; TCF 2016-DP1 Certificate PPM, at 11; TCF 2016-1 Certificate PPM, at 6 (underline added for emphasis).

***

> [T]he yield on the certificates is extremely sensitive to losses, prepayments and delinquencies on the receivables.

*See* TCF 2014-1 Certificate PPM at 14; TCF 2015-1 Certificate PPM at 14; TCF 2015-DP1 Certificate PPM at 42; TCF 2015-2 Certificate PPM, at 14; TCF 2016-DP1 Certificate PPM, at 42; TCF 2016-1 Certificate PPM, at 14.

***

> Investors are urged to make their investment decisions based on their determinations as to anticipated rates of cash flows and losses under a variety of scenarios. Investors in the certificates should fully consider the risk that losses on the receivables could result in the failure of those investors to fully recover their investments.

*See* TCF 2014-1 Certificate PPM at 15; TCF 2015-1 Certificate PPM at 15; TCF 2015-DP1 Certificate PPM at 45; TCF 2015-2 Certificate PPM, at 15; TCF 2016-

DP1 Certificate PPM, at 45; TCF 2016-1 Certificate PPM, at 15 (underline added for emphasis).

150. Hence, Reported CNL, which was a necessary and critical input into ABS investors' and Plaintiffs' evaluations of the Underlying Receivables' CNL, was material.

**E. ABS Industry Standards Call for Repo/Remarketing Expenses, When Passed on to ABS Securitizations and their Investors, to be Included in Reported CNL, Where They Form a Material Portion of Total CNL**

151. When Repo/Remarketing Expenses are passed on to ABS securitizations and thus ABS investors, such expenses (1) are typically included in the CNL figures reported in ABS offering documents, marketing materials, and/or supplementary data, and (2) typically amount to approximately 15%-20% of reported CNL.

**1. Where Repo/Remarketing Expenses are Passed on to ABS Securitizations and ABS Investors, They Are Typically Included in Reported CNL**

152. Defendants' treatment of Repo/Remarketing Expenses in their CNL reporting is contrary to common industry practice.

153. Following Moody's December 2016 discovery that Defendants did not include Repo/Remarketing Expenses in Gateway's Reported CNL, yet still passed on Repo/Remarketing Expenses to ABS securitizations and ABS investors, Moody's decided to study how auto ABS sponsors treated and reported

Repo/Remarketing Expenses. In doing so, Moody's queried the 28 programmatic auto ABS sponsors whose auto ABS securities it rated and published the results of its study in May 2017. *See* Anna Burns and Yan Yan, *Auto ABS – US: Issuers' Calculations of Cumulative Net Loss May Vary*, Moody's Investor's Service, May 10, 2017 (the "Moody's Study").

154. The Moody's Study indicated clear industry standards with respect to Repo/Remarketing Expenses and CNL reporting, and that Defendants' here-detailed conduct violated such standards.

155. First, the Moody's Study found that most ABS sponsors (19 of 28) included Repo/Remarketing Expenses as part of Reported CNL, and that all such sponsors passed on those Repo/Remarketing Expenses to ABS securitizations/investors. *See* Moody's Study at 1-2.

156. Second, the Moody's Study found that, where ABS sponsors did <u>not</u> include Repo/Remarketing Expenses as part of Reported CNL, this was largely because such ABS sponsors (six of the remaining nine) **assumed those expenses themselves** rather than passing them on to ABS securitizations/investors. *See* Moody's Study at 2-3.

157. Thus, the clear industry standard revealed by the Moody's Study is that:

a. where Repo/Remarketing Expenses are passed on to ABS securitizations/investors, they are included in Reported CNL; and

b. where Repo/Remarketing Expenses are <u>not</u> passed on to ABS securitizations/investors, and instead borne by the sponsor/servicer, they are not included in Reported CNL.

158. The above-expressed standard with respect to treatment/reporting of Repo/Remarketing Expenses is not merely consistent, but logical. Where Repo/Remarketing Expenses affect ABS investors' returns (because the servicer recoups such expenses from securitization cashflows, thereby reducing available residual cashflows to certificate investors), they are included in reported CNL. Where Repo/Remarketing Expenses do not affect ABS investors' returns (because the servicer bears such costs rather than passing them on), they are not included in reported CNL. **The loss reporting in both instances is thus appropriate under the respective circumstances**, as in both instances CNL is presented as the aggregate, cumulative losses generated from the underlying assets that flow to the ABS securitizations and to ABS investors.

159. Gateway, however, is one of only three auto ABS sponsors that does not comply with the above-indicated industry standards (the other two ABS sponsors are Fifth Third and California Republic). For the reasons stated immediately below, Gateway is by far the worst abuser of the three.

160. Gateway, like most ABS sponsors, passes on Repo/Remarketing Expenses to ABS securitizations and their investors. According to CW 1, however,

Gateway's Repo/Remarketing Expenses during the relevant time period were often unreasonably high. Specifically, Gateway spent unnecessarily large amounts of money on repossessions and liquidations – an amount that CW 1 indicated bordered on "recklessness," and an issue that CW 1 brought to the attention of Gateway's senior management, including EVP, Loan Servicing, Andy Sturm, Chief Risk Officer, Brandon Pierson, and AVP, Business Analytics, Gina "Frankie" Judy, to no avail. *See* Section VI, *infra*. Gateway then forced investors in its ABS securitizations, including Plaintiffs, to shoulder these exorbitant Expenses.

161. Moreover, and even worse, departing from industry standard practice (and common sense), **Defendants do not include Repo/Remarketing Expenses in Gateway's Reported CNL,** thus opening an unusual and illogical disjuncture between (1) Reported CNL, and (2) the CNL generated from the Underlying Receivables that flow to the TCF Securitizations and their investors, including, principally, Certificate investors such as Plaintiffs.

162. Although Fifth Third treats Repo/Remarketing Expenses in similar fashion, its behavior is effectively immaterial because, in the auto loan ABS it sponsors, Fifth Third only offers notes with triple-A credit ratings for sale to other ABS investors, and **retains for itself** all remaining securitization interests/risks below the triple-A level (*i.e.*, in effect, what in other ABS securitizations would constitute double-A, single-A and triple-B rated notes, and certificates). Because

such Repo/Remarketing Expenses would first operate to diminish certificate returns, and in more extreme cases potentially diminish the returns of lower-rated notes, there is effectively no scenario in which treatment of Repo/Remarketing Expenses (either inclusion or exclusion) would have any effect on triple-A rated notes.[9] Consequently, although Fifth Third treats Repo/Remarketing Expenses similarly to Defendants, no external ABS investors are affected or harmed by Fifth Third's reporting. Put simply, Fifth Third "eats its own cooking" – the only entity affected by Fifth Third's inconsistent treatment/reporting is Fifth Third itself, and it is inherently aware of the inconsistent treatment/reporting.

163. California Republic is the last ABS sponsor identified by Moody's that also passes on certain Repo/Remarketing Expenses to the ABS securitizations it sponsors while nevertheless excluding such expenses from its reported CNL. However, California Republic's inconsistent treatment/reporting of CNL was substantially more limited than Defendants' in two ways. First, while Defendants omitted both repossession expenses **and** remarketing expenses from its historical CNL reporting, California Republic omitted **only one** of these two expense

[9] Practical demonstration of this fact can be seen in the Moody's Announcement of December 14, 2016 (discussed below at Section V.C), where Moody's, among other things, downgraded the two junior-most classes of TCF 2016-1 Notes, but maintained the triple-A ratings for TCF 2016-1's senior-most Class A Notes, following its discovery that Gateway's Reported CNL had not included Repo/Remarketing Expenses. As Moody's explained in the Moody's Announcement, the triple-A ratings on the senior Notes were maintained, even as more junior Note class ratings were cut, because the increased losses had no realistic impact on the triple-A rated Class A Notes. *See* Moody's Announcement at 2.

categories from historical CNL reporting (specifically, repossession expenses). *See* Moody's Study at 3. Second and relatedly, **the magnitude of the omitted expenses in California Republic-sponsored ABS is far lower than in Defendants' TCF Securitizations** (*e.g.*, less than 5% of reported CNL for California Republic, versus 15%-20% or more for Gateway).[10] For both the above reasons, California Republic's inconsistent treatment of Repo/Remarketing Expenses and reporting of CNL is **less material** to investors in California Republic-sponsored ABS than Defendants' treatment/reporting is to investors in the Gateway-sponsored TCF Securitizations, including, principally, Certificate investors such as Plaintiffs.

### 2. Where Repo/Remarketing Expenses Are Passed on to ABS Securitizations and ABS Investors, such Expenses Typically Constitute a Material Portion of Reported CNL

164. Moody's estimates, based on discussions with auto loan securitization sponsors, that:

[10] Following the Moody's Announcement, California Republic revised its CNL reporting and its auto loan ABS offering document disclosures to clearly indicate the amount of additional repossession expenses experienced by its loan pools in addition to reported CNL for such pools. *See e.g.*, preliminary prospectus dated February 3, 2017 for California Republic Auto Receivables Trust 2017-1 ("CRB 2017-1 PPM") at A3-A4 (showing one column for CNL for prior static loan pools, and another column for additional repossession expenses). For example, for California Republic's 2012-1 auto loan ABS, reported CNL stood at 2.28% by month 49, while additional repossession expenses amounted cumulatively at that time to only 0.10% – indicating that omitted repossession expenses amounted to 4.4% of reported CNL. *Id.* at A4. Prior to the Moody's Announcement, offering documents for California Republic auto ABS did not include the latter column for additional repossession expenses or otherwise disclose the existence or amount of such additional repossession expenses.

a. the average vehicle repossession cost is $350;

b. the average remarketing cost is about $400;

c. repossession cost, when included in CNL, leads to a 5%-10% increase in CNL; and

d. Repo/Remarketing Expenses, when included in CNL, lead to an approximately 20% increase in CNL.[11]

165. Consequently, exclusion of Repo/Remarketing Expenses from reported CNL where, as here, Repo/Remarketing Expenses are still passed through to the securitization trust and securitization investors, such as Plaintiffs, makes reported CNL materially lower (*e.g.*, 15%-20%) than the actual losses associated with the Underlying Receivables and incurred by the securitization trust (and securitization investors). *See* Moody's Study at 2-3.

166. Gateway-specific data is consistent with Moody's above-detailed general analysis. For example, and as detailed in Section V.C *infra*, in the case of TCF 2016-1, Repo/Remarketing Expenses were estimated to amount to 0.5% of TCF 2016-1's initial balance, and increased the estimated CNL for TCF 2016-1 from 3.0% (based on Reported CNL that excluded Repo/Remarketing Expenses) to 3.5% (based on Reported CNL that included Repo/Remarketing Expenses) (a 16.7% increase).

[11] *See* Moody's Study at 3.

## IV. DEFENDANTS' MATERIAL MISREPRESENTATIONS, MISLEADING STATEMENTS AND OMISSIONS

167. In the Offering Documents, Supplemental Data, and Investor Presentations, members of TCF Bank's, Gateway's, and TCF Auto's senior management (as detailed in Sections 1.B and II.C-E, *supra*, and in Exhibit 3 hereto) made, approved, and authorized the below-specified material misrepresentations, materially misleading statements, and material omissions. Moreover, in direct communications with Plaintiff GIC (as detailed in Sections IV.E and VI, *supra*, and in Exhibit 3 hereto), members of TCF Bank's and Gateway's senior management made the below-specified material misrepresentations, materially misleading statements, and material omissions.

### A. Defendants' Omission to Disclose that Although Defendants Passed on Repo/Remarketing Expenses to their ABS Securitizations/Investors, Defendants' Reported CNL Excluded Repo/Remarketing Expenses, Rendered such Reported CNL False and/or Misleading

#### 1. Omissions from the Offering Documents, Supplemental Data, and Investor Presentations

168. In the auto loan ABS securitizations that Gateway sponsored, including the TCF Securitizations, Gateway did not assume the Repo/Remarketing Expenses that it incurred in servicing the Underlying Receivables, but instead passed them on to the Securitizations backed by such Underlying Receivables, and thus to the

Securitizations' investors (in the first instance and most specifically, to Certificate investors, including Plaintiffs).

169. This practice is, as detailed above, standard in the auto loan ABS industry. *See* Section III.E, *supra*, and Section V.D, *infra*.

170. However, where Repo/Remarketing Expenses are borne by ABS investors, rather than the ABS sponsor, it is also standard practice to report CNL figures **that include such expenses**. *See* Section III.E, *supra*, and Section V.D, *infra*. This standard practice operates to ensure that the basis for the CNL reported by the ABS sponsor matches the basis for the CNL experienced by the ABS investors.

171. Defendants, however, reported CNL in contravention of this standard. The Reported CNL that Defendants created, approved, and caused to be included in the Offering Documents, Supplemental Data, and Investor Presentations, did not include Repo/Remarketing Expenses, notwithstanding that Gateway passed on such Expenses, which according to CW 1, were often unnecessarily high, to investors, including Plaintiffs.

172. Defendants Gateway, TCF Bank, and TCF Auto, through members of their senior management, including, *inter alia* (i) Gateway's Gina "Frankie" Judy, Brandon Pierson, Gerald Wilkins, Todd Pierson, David MacInnis, Brian MacInnis, and Chelsea Feliciano, (ii) TCF Bank's and Gateway's Denise Sorrells, (iii) TCF

Bank's Sydney Libsack, Craig Dahl, and Matthew Cook, (iv) TCF Bank's and TCF Auto's Brian Maass, and (v) TCF Bank's, Gateway's, and TCF Auto's Michael Jones, (*see* Sections I.B and II.C-E, *supra*, and Exhibit 3 hereto), caused the Offering Documents, Supplemental Data, and Investor Presentations to include extensive Reported CNL figures presenting the purported CNL experience of previously-originated Gateway auto loans, on both a "Managed Pool" and "Static Pool" basis.

173. The presentation of such Reported CNL occupied a substantial portion of those documents. *See* TCF 2014-1 Notes Preliminary OM at S51-S53 and S67-S74; TCF 2014-1 Notes OM at S50-S52 and S66-S73; TCF 2015-1 Notes Preliminary OM at S57-S59 and S78-S93; TCF 2015-1 Notes OM at S55-S57 and S76-S91; TCF 2015-DP1 Certificate PPM at 49-51 and 69-88; TCF 2015-2 Notes Preliminary OM at S56-S58 and S78-S97; TCF 2015-2 Notes OM at S56-S58 and S78-S97; TCF 2016-DP1 Certificate PPM at 48-50 and 69-94; TCF 2016-1 Notes Preliminary OM at S56-S58 and S78-S93; TCF 2016-1 Notes OM at S56-S58 and S78-S93; TCF 2014-1 Investor Presentation at 29, 43-44; Gateway March 2015 Overview Presentation at 6; Gateway March 2015 Performance by Grade Presentation at 4-6; Exhibit 2.

a. As presented on a "Managed Pool" basis, the Offering Documents and TCF 2014-1 Investor Presentation provided Reported CNL, as of calendar year end for each of the most recent five calendar years, for Gateway's

entire portfolio of originated auto loans, as well for the most recently fiscal quarter for which data was available (and the year-ago quarter for comparison). *See* TCF 2014-1 Notes Preliminary OM at S51-S53; TCF 2014-1 Notes OM at S-50-52; TCF 2015-1 Notes Preliminary OM at S57-S59; TCF 2015-1 Notes OM at S55-S57; TCF 2015-DP1 Certificate PPM at 49-51; TCF 2015-2 Notes Preliminary OM at S56-S58; TCF 2015-2 Notes OM at S56-S58; TCF 2016-DP1 Certificate PPM at 48-50; TCF 2016-1 Notes Preliminary OM at S56-S58; TCF 2016-1 Notes OM at S56-S58; TCF 2014-1 Investor Presentation at 43.

b. As presented on "Static Pool" basis, the Offering Documents, Gateway March 2015 Overview Presentation, and Gateway March 2015 Performance by Grade Presentation provided Reported CNL by:

i. disaggregating Gateway's previously-originated auto loans into separate, "static" pools by quarterly vintage of origination (*e.g.*, all auto loans Gateway originated in the first quarter of 2009, all in the second, etc.), from the first quarter of 2009 to the most recently-completed fiscal quarter prior to each respective TCF Securitization;

ii. providing Reported CNL levels, for each such quarterly static loan pool, after each successive month of its life, and thereby indicating both the extent and the timing of CNL in such loan pools (*e.g.*, at month 1, CNL of 0.00%;

at month 2, 0.01%; at month 3, 0.02%; at month 12, 0.50%; at month 18, 0.85%, etc.); and

iii. further disaggregating such quarterly static loan pools into Gateway's three credit tiers (Tiers 1, 2 and 3), and providing Reported CNL levels by separate credit tiers within each pool, thereby showing CNL/performance differentials by credit tier. *See* TCF 2014-1 Notes Preliminary OM at S67-S74; TCF 2014-1 Notes OM at S66-S73; TCF 2015-1 Notes Preliminary OM at S78-S93; TCF 2015-1 Notes OM at S76-S91; TCF 2015-DP1 Certificate PPM at 69-88; TCF 2015-2 Notes Preliminary OM at S78-S97; TCF 2015-2 Notes OM at S78-S97; TCF 2016-DP1 Certificate PPM at 69-94; TCF 2016-1 Notes Preliminary OM at S78-S93; TCF 2016-1 Notes OM at S78-S93; Gateway March 2015 Presentation by Grade at 4-5; Gateway March 2015 Overview Presentation at 6.

174. The Supplemental Data that Defendants provided to the Initial Purchasers for distribution to prospective TCF Securitization investors, including Plaintiffs:

a. reproduced the above-specified Reported CNL provided in the Offering Documents and Investor Presentations, but in more usable form for analysis (*e.g.*, as excel spreadsheet data); and

b. contained further, more granular static pool Reported CNL data, including:

i. more particularized disaggregation of Reported CNL by Gateway's seven internal credit programs (termed, in descending order of credit quality, Longest Drive, Hole in One, Double Eagle, Eagle, Birdie, Bogie and PAR),[12] and

ii. CNL reporting for pools underlying Gateway's prior TCF securitizations.

175. The Offering Documents, Supplemental Data, and Investor Presentations omitted, and nowhere disclosed, that the above-specified Reported CNL figures and information did not include Repo/Remarketing Expenses.

176. Defendants' exclusion of Repo/Remarketing Expenses from Reported CNL was, at all times until December 2016, known and knowable only to Defendants (as alleged in further detail in Sections IV.A.3 and VIII, *infra*).

177. Defendants' CNL reporting created a mismatch between the basis of the CNL Defendants reported (*i.e.*, Reported CNL, which excluded Repo/Remarketing Expenses) and the basis for the CNL that investors in Gateway-sponsored ABS effectively experienced (*i.e.*, Experienced CNL, which included Repo/Remarketing Expenses). Defendants' Reported CNL for Gateway loan pools, by excluding Repo/Remarketing Expenses, under-reported the CNL that investors

---

[12] Gateway's internal Tier 1 loans included loans generated through the Longest Drive, Hole in One and Double Eagle credit programs; Tier 2 loans included those from the Eagle and Birdie credit programs; and Tier 3 loans included those from the PAR and Bogie credit programs.

would actually experience in ABS securitizations backed by such loan pools, which included Repo/Remarketing Expenses associated with such pools (Experienced CNL).

178. Such under-reporting, as detailed in Section III.E.2, *supra*, was material.

179. Defendants' omission from the Offering Documents and Supplemental Data of the fact that Reported CNL excluded Repo/Remarketing Expenses meant that TCF Securitization investors, including Plaintiffs, were unaware of the material mismatch between the CNL reported by Defendants for Gateway loan pools (Reported CNL, which did not include Repo/Remarketing Expenses) and the CNL that investors would actually experience in connection with the same loan pools (Experienced CNL, which included Repo/Remarketing Expenses).

180. Such omission rendered the Reported CNL in the Offering Documents, Supplemental Data, and Investor Presentations materially misleading and/or false. ABS investors, including Plaintiffs, who relied on the Reported CNL figures to evaluate the prospective CNL of the TCF Securitizations' Underlying Receivables, and to value and price the Certificates, were materially misled by the Reported CNL that Defendants included in the Offering Documents, Supplemental Data, and Investor Presentations, which caused Plaintiffs to unknowingly underestimate the prospective CNL that they would experience in connection with the TCF

Securitizations' Underlying Receivables, and to over-value and over-price the Certificates.

### 2. Omissions in Direct Communications with Plaintiffs

181. In addition to Defendants' omission from the Offering Documents, Supplemental Data, and Investor Presentations of the fact that Reported CNL excluded Repo/Remarketing Expenses, Defendants Gateway and TCF Bank, through members of their senior management, made further omissions of the same fact in each of their direct communications with Plaintiff GIC (which direct communications are detailed below in Section IV.E, *infra*) and Plaintiff Axonic (which direct communications are detailed in Section VII.B, *infra*).

182. In all such direct communications with Plaintiffs GIC and Axonic, Gateway's and TCF Bank's senior management discussed, *inter alia*, Reported CNL. In all such direct communications, Gateway's and TCF Bank's senior management, although discussing Reported CNL, omitted to disclose that Reported CNL omitted Repo/Remarketing Expenses, notwithstanding that Defendants passed on such Expenses to Gateway-sponsored securitizations and their investors, including Plaintiffs. Such omission was material and rendered Gateway's and TCF Bank's discussions of and representations concerning Reported CNL materially misleading and/or false.

### 3. Defendants Had a Duty to Disclose the Omitted Information

183. Defendants had a duty to disclose the omitted information – namely, that the Reported CNL in the Offering Documents, Supplemental Data, and Investor Presentations excluded Repo/Remarketing Expenses, and thus materially understated Gateway's CNL and the CNL that investors in the TCF Securitizations, including Plaintiffs, could expect to experience.

184. *First*, as discussed in Section III, *supra*, and Section V, *infra*, Defendants' exclusion of Repo/Remarketing Expenses from Reported CNL was material because, *inter alia*, it created a mismatch between the basis of the historical CNL Defendants reported (*i.e.*, Reported CNL, which excluded Repo/Remarketing Expenses) and the basis for the CNL that investors in the TCF Securitizations, including Plaintiffs, would experience (*i.e.*, Experienced CNL, which included Repo/Remarketing Expenses). In other words, by excluding Repo/Remarketing Expenses from Reported CNL for Gateway loan pools, Defendants materially under-reported the CNL that investors would actually experience in the TCF Securitizations backed by such loan pools.

185. *Second*, Defendants had a duty to disclose this material information to TCF Securitization investors, including Plaintiffs, because it was, at all times until December 2016, known and knowable only to Defendants (as alleged in further detail in Section VIII, *infra*). As such, the TCF Securitization investors, including

Plaintiffs, were unaware of the material mismatch between the historical CNL reported by Defendants for Gateway's loan pools and the CNL that investors, including Plaintiffs, would experience in connection with the same loan pools.

186. *Third*, Defendants also had a duty to disclose this material information based on their affirmative representations regarding CNL in the Offering Documents, Supplemental Data, Investor Presentations, and in their direct communications with Plaintiffs GIC and Axonic. In other words, once Defendants chose to present investors, including Plaintiffs, with information regarding Gateway's CNL, they had a duty to disclose all information on that subject necessary to make their representations accurate and complete – namely, that Reported CNL excluded Repo/Remarketing Expenses and thus, was materially less than the CNL that TCF Securitization investors, including Plaintiffs, could expect to experience.

**B. The Offering Documents, Supplemental Data, and Investor Presentations Misrepresented that Repo/Remarketing Expenses Were Included in Reported CNL**

187. Although the Offering Documents, Supplemental Data, and Investor Presentations excluded Repo/Remarketing Expenses from Reported CNL but omitted to so state (*see* Section IV.A immediately above), they also made affirmative misrepresentations indicating that Repo/Remarketing Expenses had been included in Reported CNL.

**1. The Offering Documents**

188. The Offering Documents for each of TCF Securitizations provided uniform definitions for the terms "Cumulative Net Losses," "Aggregate Monthly Net Loss," and "Liquidation Proceeds." Specifically, the Offering Documents defined:

a. "Cumulative Net Losses" as:

> "Cumulative Net Losses" means, as of any payment date, a fraction (expressed as a percentage), the numerator of which is the Aggregate Monthly Net Losses experienced on all Defaulted Receivables from the cut-off date through the last day of the related Collection Period and the denominator of which is the Initial Pool Balance.

*See* TCF 2014-1 Notes Preliminary OM at S-110; TCF 2014-1 Notes OM at S-109; TCF 2015-1 Notes Preliminary OM at S-128; TCF 2015-1 Notes OM at S-126; TCF 2015-DP1 Certificate PPM at 135; TCF 2015-2 Notes Preliminary OM at S-133; TCF 2015-2 Notes OM at S-133; TCF 2016-DP1 Certificate PPM at 135; TCF 2016-1 Notes Preliminary OM at S-129; TCF 2016-1 Notes OM at S-129.

b. "Aggregate Monthly Net Losses" as:

> "Aggregate Monthly Net Loss" means, with respect to any payment date and the related Collection Period, an amount (which may be a positive or negative number) equal to (a) the aggregate amount financed immediately prior to becoming a Defaulted Receivable of each receivable newly designated as a Defaulted Receivable during that Collection Period minus (b) all Liquidation Proceeds collected during that Collection Period with respect to all Defaulted Receivables.

*See* TCF 2014-1 Notes Preliminary OM at S-109; TCF 2014-1 Notes OM at S-108; TCF 2015-1 Notes Preliminary OM at S-127; TCF 2015-1 Notes OM at S-125; TCF 2015-DP1 Certificate PPM at 134; TCF 2015-2 Notes Preliminary OM at S-132; TCF 2015-2 Notes OM at S-132; TCF 2016-DP1 Certificate PPM at 134; TCF 2016-1 Notes Preliminary OM at S-128; TCF 2016-1 Notes OM at S-128.

c. "Liquidation Proceeds" as:

> "Liquidation Proceeds" means, with respect to a Defaulted Receivable, all amounts realized with respect to such receivable (including any amounts received by the issuing entity in connection with the sale of any Deficiency Balance) net of the liquidation expenses and any amounts that are required to be refunded to the obligor on such receivable, but in any event not less than zero.

*See* TCF 2014-1 Notes Preliminary OM at S-111; TCF 2014-1 Notes OM at S-110; TCF 2015-1 Notes Preliminary OM at S-129; TCF 2015-1 Notes OM at S-127; TCF 2015-DP1 Certificate PPM at 136; TCF 2015-2 Notes Preliminary OM at S-134; TCF 2015-2 Notes OM at S-134; TCF 2016-DP1 Certificate PPM at 136; TCF 2016-1 Notes Preliminary OM at S-131; TCF 2016-1 Notes OM at S-131.

189. In other words, as such terms are used in the Offering Documents:

a. Cumulative Net Losses are simply the sum of Aggregate Monthly Net Losses, divided by the initial principal amount of the Underlying Receivables;

b. Aggregate Monthly Net Losses are the sum of the principal outstanding on Underlying Receivables loans that defaulted during the month, minus Liquidation Proceeds collected the same month from defaulted Underlying Receivables loans; and

c. Liquidation Proceeds are the proceeds received after repossessing and reselling (liquidating) the vehicles securing defaulted Underlying Receivables "**net of the liquidation expenses**" (emphasis added).

190. The clear conclusion arising from reading these inter-related definitions together, is that, as presented and discussed in the Offering Documents, Cumulative Net Losses included liquidation recoveries "net of the liquidation expenses" – *i.e.*, net of Repo/Remarketing Expenses. For the avoidance of doubt, such definitions communicated that Cumulative Net Losses in the Offering Documents did not merely represent the principal outstanding on defaulted loans minus (1) **gross** liquidation proceeds from sale of the vehicles securing such loans, but rather minus (2) **net** liquidation proceeds from sale of the vehicles securing such loans (*i.e.*, gross liquidation proceeds after subtracting out "liquidation expenses," meaning Repo/Remarketing Expenses).

191. Second, and to exactly the same effect, the Offering Documents for each of TCF Securitizations, when presenting the Reported CNL figures on a "Managed Pool" basis, utilized uniform footnotes purportedly explaining the basis

of the Reported CNL and other figures presented – including, in relevant part here – the terms "Net Credit Loss," "Gross Charge-Offs," "Net Charge-Offs," and "Recoveries." *See* TCF 2014-1 Notes Preliminary OM at S-52; TCF 2014-1 Notes OM at S-51; TCF 2015-1 Notes Preliminary OM at S-59; TCF 2015-1 Notes OM at S-57; TCF 2015-DP1 Certificate PPM at 50; TCF 2015-2 Notes Preliminary OM at S-58; TCF 2015-2 Notes OM at S-58; TCF 2016-DP1 Certificate PPM at 50; TCF 2016-1 Notes Preliminary OM at S-58; TCF 2016-1 Notes OM at S-58. Specifically, the Offering Documents represented that in such figures, "Recoveries" included "the **net** amounts received with respect to retail contracts previously charged off" (*i.e.*, liquidation proceeds net of, or minus, liquidation expenses – *i.e.*, Repo/Remarketing Expenses), and that "Net Charge Offs" (also termed "Net Credit Loss") were simply Gross Charge-Offs minus such Recoveries. *Id.*

192. Again, and consistent with the prior set of definitions (¶¶ 189-91, *supra*), the clear conclusion arising from such explanatory footnotes was that "Net Credit Loss" and "Net Charge-Offs" were net of "Recoveries," which themselves were presented on a "net" rather than gross basis (*i.e.*, net of recovery-related expenses – meaning Repo/Remarketing Expenses).

193. In sum, the above-identified statements in the Offering Documents misrepresented that Reported CNL figures contained therein were net of (*i.e.*, included, rather than excluded) Repo/Remarketing Expenses.

### 2. The Supplemental Data

194. When presenting Reported CNL figures on a "Managed Pool" basis, the Supplemental Data, utilized footnotes identical to those in the Offering Documents (detailed above at ¶¶ 192-93), purportedly explaining the basis of the Reported CNL and other figures presented therein – including, in relevant part here – the terms "Net Credit Loss," "Gross Charge-Offs," "Net Charge-Offs," and "Recoveries."

195. Specifically, the Supplemental Data represented that in such figures, "Recoveries" included "the net amounts received with respect to retail contracts previously charged off" (*i.e.*, liquidation proceeds net of, or minus, liquidation expenses – *i.e.*, Repo/Remarketing Expenses), and that "Net Charge Offs" (also termed "Net Credit Loss") were simply Gross Charge-Offs (*i.e.*, "the total aggregate net outstanding balance of receivables determined to be uncollectible during the period") minus such Recoveries (*i.e.*, "proceeds from the disposition of related vehicles including net amounts received from customers with respect to retail contracts previously charged off").

196. Again, the clear conclusion arising from such explanatory footnotes was that "Net Credit Loss" and "Net Charge-Offs" were net of "Recoveries," which themselves were presented on a "net" rather than gross basis (*i.e.*, net of recovery-related expenses – meaning Repo/Remarketing Expenses).

197. In sum, the above-identified statements in the Supplemental Data misrepresented that Reported CNL figures contained therein were net of (*i.e.*, included, rather than excluded) Repo/Remarketing Expenses.

**3. The Investor Presentations**

198. In connection with the TCF 2014-1 Securitization, Defendants prepared, approved, and caused to be disseminated to potential investors, including to Plaintiffs Axonic, Good Hill, and Rimrock, the TCF 2014-1 Investor Presentation.

199. When presenting Gateway's Reported CNL on a "Managed Pool" basis, the TCF 2014-1 Investor Presentation utilized the same uniform footnotes contained within the Offering Documents and Supplemental Data, (discussed above at ¶¶ 192-93, 195-97), that purported to explain the basis of the Reported CNL and other figures presented, including the terms "Net Credit Loss," "Gross Charge-Offs," "Net Charge-Offs," and "Recoveries." TCF 2014-1 Investor Presentation at 43.

200. Specifically, the TCF 2014-1 Investor Presentation indicated that "Recoveries" included "the net amounts received with respect to retail contracts previously charged off" (*i.e.*, liquidation proceeds net of, or minus, liquidation expenses – *i.e.*, Repo/Remarketing Expenses), and that "Net Charge Offs" (also termed "Net Credit Loss") were simply Gross Charge-Offs (*i.e.*, "the total aggregate net outstanding balance of receivables determined to be uncollectible during the

period") minus such Recoveries (*i.e.*, "proceeds from the disposition of related vehicles including net amounts received from customers with respect to retail contracts previously charged off"). TCF 2014-1 Investor Presentation at 43.

201. Once again, the clear conclusion arising from such explanatory footnotes was that "Net Credit Loss" and "Net Charge-Offs" were net of "Recoveries," which themselves were presented on a "net" rather than gross basis (*i.e.*, net of recovery-related expenses – meaning Repo/Remarketing Expenses).

202. In addition, the TCF 2014-1 Presentation provided a graphical comparison of Gateway's Reported CNL for 2009, 2010, 2011, 2012, and 2013, with its competitor, CarMax's CNL for the same period. *See id.* at 44.

203. The Presentation demonstrated that for each year, Gateway's CNL was significantly lower than CarMax's CNL. Specifically, in 2009, Gateway's CNL was 59.2% lower than CarMax's CNL; in 2010, Gateway's CNL was 63.9% lower than CarMax's CNL; in 2011, Gateway's CNL was 3.9% lower than CarMax's CNL; in 2012, Gateway's CNL was 10.8% lower than CarMax's CNL; and in 2013, Gateway's CNL was 15.9% lower than CarMax's CNL. *See id.*

204. CarMax, like the majority of auto loan ABS originators, includes Repo/Remarketing Expenses in its Reported CNL. *See* Moody's Report at 2. Gateway, however, does not. *See id.*; *see also* Section V, *infra*.

205. Thus, when presented together with the footnotes in the previous slide of the TCF 2014-1 Investor Presentation, which, as discussed above, falsely indicated that Gateway, like CarMax, included Repo/Remarketing Expenses in its CNL calculations, Defendants' comparison of Gateway's historical CNL with that of CarMax falsely and misleadingly represented to Plaintiffs that the performance of the TCF Securitizations, and their Underlying Receivables, was superior to that of CarMax's securitizations and underlying loan pools.

206. However, as revealed by the Moody's Announcement in December 2016, Gateway's superior CNL was nothing more than an artefact of Defendants' undisclosed practice of excluding Repo/Remarketing Expenses from Reported CNL.

### C. The Offering Documents' Materially Misleading Sensitivity Analyses

207. Each of the Certificate PPMs included a "Sensitivity Analysis" purporting to indicate the Certificates' prospective returns (yields), and demonstrate the sensitivity of such yields, in multiple "cases" defined principally by assuming varying levels of Underlying Receivables' CNL. *See* TCF 2014-1 Certificate PPM at 14-15; TCF 2015-1 Certificate PPM at 14-15; TCF 2015-DP1 Certificate PPM at 42-45; TCF 2015-2 Certificate PPM at 14-15; TCF 2016-DP1 Certificate PPM at 42-45; TCF 2016-1 Certificate PPM at 14-15.

208. The "Sensitivity Analyses" included in the Certificate PPMs are reproduced in relevant part below:

**Table 1**
**The Sensitivity Analyses**

**TCF 2014-1**

| | Case 1 | Case 2 | Case 3 | Case 4 | Case 5 | Case 6 |
|---|---|---|---|---|---|---|
| CNL (%) | 1.80% | 2.00% | 2.20% | 1.80% | 2.00% | 2.20% |
| ABS (Prepayment rate) | 1.20% | 1.20% | 1.20% | 1.40% | 1.40% | 1.40% |
| Certificate Yield to Maturity * | 14.98% | 13.28% | 11.60% | 10.53% | 8.80% | 7.09% |

* assuming aggregate Certificates purchase price of $14.725 million

**TCF 2015-1**

| | Case 1 | Case 2 | Case 3 |
|---|---|---|---|
| CNL (%) | 2.60% | 2.80% | 3.00% |
| ABS (Prepayment rate) | 1.40% | 1.40% | 1.40% |
| Certificate Yield to Maturity* | 10.21% | 8.60% | 7.01% |

* assuming aggregate Certificates purchase price of $32.6 million

**TCF 2015-DP1**

| | Case 1 | Case 2 | Case 3 | Case 4 | Case 5 |
|---|---|---|---|---|---|
| CNL (%) | 2.20% | 2.30% | 2.45% | 2.60% | 2.70% |
| ABS (Prepayment rate) | 1.30% | 1.30% | 1.30% | 1.30% | 1.30% |
| Certificate Yield to Maturity * | 10.43% | 9.72% | 8.66% | 7.61% | 6.91% |

* assuming aggregate Certificates purchase price of $35.565 million

**TCF 2015-2**

| | Case 1 | Case 2 | Case 3 |
|---|---|---|---|
| CNL (%) | 2.50% | 2.75% | 3.00% |
| ABS (Prepayment rate) | 1.50% | 1.50% | 1.50% |
| Certificate Yield to Maturity* | 11.49% | 9.14% | 6.84% |

* assuming aggregate Certificates purchase price of $16.05 million

**TCF 2016-DP1**

| | Case 1 | Case 2 | Case 3 | Case 4 | Case 5 |
|---|---|---|---|---|---|
| CNL (%) | 2.75% | 2.60% | 2.45% | 2.30% | 2.15% |
| ABS (Prepayment rate) | 1.40% | 1.40% | 1.40% | 1.40% | 1.40% |
| Certificate Yield to Maturity * | 9.56% | 11.56% | 13.57% | 15.60% | 17.63% |

* assuming aggregate Certificates purchase price of $22.682 million

**TCF 2016-1**

| | Case 1 | Case 2 | Case 3 | Case 4 |
|---|---|---|---|---|
| CNL (%) | 2.40% | 2.55% | 2.70% | 2.85% |
| ABS (Prepayment rate) | 1.45% | 1.45% | 1.45% | 1.45% |
| Certificate Yield to Maturity * | 14.79% | 13.23% | 11.68% | 10.16% |

* assuming aggregate Certificates purchase price of $28.46 million

*See* TCF 2014-1 Certificate PPM at 14-15; TCF 2015-1 Certificate PPM at 14-15; TCF 2015-DP1 Certificate PPM at 42-45; TCF 2015-2 Certificate PPM at 14-15; TCF 2016-DP1 Certificate PPM at 42-45; TCF 2016-1 Certificate PPM at 14-15.

209. The above-detailed "Sensitivity Analysis" representations in the Certificate PPMs were materially false and misleading, for the reasons set forth below.

210. First and most fundamentally, the "Sensitivity Analyses" materially overstated prospective Certificate yields at all CNL levels by omitting the effect of Repo/Remarketing Expenses on Certificate yields (or, alternatively stated, by omitting to disclose that such CNL levels did not include Repo/Remarketing Expenses).

211. This omission was material. Repo/Remarketing Expenses for the Underlying Receivables in the TCF Securitizations amounted to approximately 0.50% of the Underlying Receivables' initial balance.[13] As the Sensitivity Analyses themselves demonstrate, a 0.50% increase in Underlying Receivables' CNL has dramatic effects on Certificate returns. For example, the TCF 2015-2 Sensitivity Analysis indicates that when CNL rises 0.50%, from 2.50% to 3.00%, Certificate yields fall from 11.49% to 6.84%. Likewise, the TCF 2015-DP1 Sensitivity Analysis indicates that when CNL rises 0.50%, from 2.20% to 2.70%, Certificate yields fall from 10.43% to 6.91%. Indeed, a 0.50% rise in CNL is so material that

[13] As set forth in Section V.C, *infra*, this was revealed in December 2016 when, only months after TCF 2016-1's closing date, Moody's increased its CNL estimates for TCF 2016-1 from 3.0% to 3.5% after learning that Defendants' Reported CNL had omitted Repo/Remarketing Expenses, and after adding back in such Repo/Remarketing Expenses. This 0.50% increase in CNL was due *solely* to re-integration of Repo/Remarketing Expenses, rather than to any other developments (*e.g.*, deteriorating economic conditions, deteriorating loan performance, etc.).

the Sensitivity Analyses for three of the six TCF Securitizations failed to even contemplate it (the Sensitivity Analyses in the TCF 2014-1, TCF 2015-1 and TCF 2016-1 Certificate PPMs showed a maximum CNL increase of only 0.40%), while the Sensitivity Analyses for two of the remaining three TCF Securitizations (TCF 2015-2, TCF 2015-DP1) featured as a *maimum* a 0.50% rise in CNL.

212. Second, and as indicated by the yellow highlighting in Table 1 above, among the multiple "cases" presented in the Sensitivity Analysis for each TCF Securitization, with each "case" defined principally by differing levels of Underlying Asset CNL, was an effective midpoint case, featuring a midpoint CNL. Such cases and their midpoint CNLs are reproduced in Table 2 below:

**Table 2**
**The Sensitivity Analyses' Midpoint CNL Scenarios**

| | TCF 2014-1 | | TCF 2015-1 | TCF 2015-DP1 |
|---|---|---|---|---|
| | Case 2 | Case 5 | Case 2 | Case 3 |
| CNL (%) | 2.00% | 2.00% | 2.80% | 2.45% |
| ABS (Prepayment rate) | 1.20% | 1.40% | 1.40% | 1.30% |
| Certificate Yield to Maturity * | 13.28% | 8.80% | 8.60% | 8.66% |

| | TCF 2015-2 | TCF 2016-DP1 | TCF 2016-1 | |
|---|---|---|---|---|
| | Case 2 | Case 3 | Case 2 | Case 3 |
| CNL (%) | 2.75% | 2.45% | 2.55% | 2.70% |
| ABS (Prepayment rate) | 1.50% | 1.40% | 1.45% | 1.45% |
| Certificate Yield to Maturity * | 9.14% | 13.57% | 13.23% | 11.68% |

213. The midpoint cases/CNL in the Sensitivity Analyses were meant to communicate, and functioned as, Defendants' *de facto* "guidance" for "base case" performance of the Underlying Receivables – and, hence, of the Certificates. Such guidance was materially false and misleading, for the same reasons set forth in ¶¶ 211-12 above.

214. Although the Offering Documents warned investors that "differences between the assumptions and actual characteristics and performance of the related receivables will result in yields different from those shown in the [Sensitivity

Analyses],"[14] the Offering Documents did not warn investors of the key, material fact. Namely, that even if the actual characteristics and performance of the Underlying Receivables **perfectly matched** the Analyses' assumptions, investors would never, under any scenario, receive the yields displayed in the Sensitivity Analyses, because those yields had been calculated using CNL figures that omitted Repo/Remarketing Expenses and as a result, were materially understated. Accordingly, even if the Underlying Receivables performed **exactly as assumed**, the yields displayed in the Sensitivity Analyses were materially larger than the yields Certificate investors would ever experience.

215. For the avoidance of doubt, the Sensitivity Analyses are not alleged to have been materially false and/or misleading because they proffered a more favorable view of the Underlying Receivables' performance, defaults, and CNL than later materialized. Rather, they were materially false and/or misleading because even if the actual Underlying Receivables performance materialized to match Defendants' guidance, the represented Certificate yields materially overstated the yields that Plaintiffs and other Certificate investors would experience, because the Sensitivity Analyses omitted the effect of Repo/Remarketing Expenses on

[14] *See* TCF 2014-1 Certificate PPM at 14-15; TCF 2015-1 Certificate PPM at 14-15; TCF 2015-DP1 Certificate PPM at 42-45; TCF 2015-2 Certificate PPM at 14-15; TCF 2016-DP1 Certificate PPM at 42-45; TCF 2016-1 Certificate PPM at 14-15.

Certificate yields (or, alternatively stated, omitted to disclose that the Reported CNL levels did not include Repo/Remarketing Expenses).

216. As set forth in Sections III.A, *supra*, and VIII.A, *infra*, Plaintiffs formed their own "base case" views concerning prospective Underlying Receivables performance and Certificate returns. However, in addition to forming their own views based on their own analyses and evaluations, Plaintiffs also considered, *inter alia*, Defendants' guidance.

### D. The Offering Documents' Misrepresentations and Omissions Concerning Gateway's Compensation from TCF Securitizations

217. The Offering Documents represented that Gateway's compensation for acting as the TCF Securitizations' servicer, and for servicing the Underlying Receivables, would consist of two fee streams: the "Servicing Fee" and the "Supplemental Servicing Fees."[15]

218. First, as the TCF Securitization's servicer, Gateway was entitled to a Servicing Fee, payable monthly at an annualized rate of 1.00% of the Underling Receivables balance (as of the first day of each month). *See e.g.* TCF 2014-1 Certificate PPM at 2; TCF 2014-1 Preliminary Notes OM at S-5 and S-91; TCF

---

[15] The Offering Documents also disclosed that Gateway would extract a third income stream, consisting of investment income from amounts on deposit in the collections accounts of the TCF Securitizations. Such "float income" – the interest earned on obligor loan payments, after such payments were deposited in the TCF Securitizations' collections accounts and before such funds were paid out to Noteholders, Transaction Parties and Certificateholders – was immaterial from the perspective of Certificateholders, as Gateway's taking of such float income did not diminish returns to Certificateholders.

2014-1 Notes OM at S-5 and S-90; TCF 2015-1 Certificate PPM at 2; TCF 2015-1 Preliminary Notes OM at S-5 and S-108-09; TCF 2015-1 Notes OM at S-5 and S-106-07; TCF 2015-2 Certificate PPM at 2; TCF 2015-2 Preliminary Notes OM at S-5 and S-113; TCF 2015-2 Notes OM at S-5 and S-113; TCF 2015-DP1 Certificate PPM at 4 and 104; TCF 2016-DP1 Certificate PPM at 4 and 100; TCF 2016-1 Certificate PPM at 2; TCF 2016-1 Preliminary Notes OM at S-5 and S-109; TCF 2016-1 Notes OM at S-5 and S-109.

219. Second, Gateway was also entitled to "Supplemental Servicing Fees." *See id.* Such "Supplemental Servicing Fees" were defined in the Offering Documents as follows:

> "Supplemental Servicing Fees" means any late fees, prepayment charges, extension fees and other administrative fees and expenses or similar charges allowed by applicable law collected (from whatever source) on the receivables during each Collection Period permitted to be retained by the servicer pursuant to the servicing agreement.

*See* TCF 2014-1 Preliminary Notes OM at S-113; TCF 2014-1 Notes OM at S-112; TCF 2015-1 Preliminary Notes OM at S-131; TCF 2015-1 Notes OM at S-129; TCF 2015-2 Preliminary Notes OM at S-136; TCF 2015-2 Notes OM at S-136; TCF 2015-DP1 Certificate PPM at 138; TCF 2016-DP1 Certificate PPM at 138; TCF 2016-1 Preliminary Notes OM at S-133; TCF 2016-1 Notes OM at S-133.

220. The Offering Documents also referred to such Supplemental Servicing Fees as the "additional servicing compensation" payable to Gateway over and above the Servicing Fee:

> The servicing fee paid to the servicer on each payment date is equal to the product of one-twelfth of 1.00% per annum and the Pool Balance as of the first day of the related Collection Period. *The servicer is also entitled to retain late fees, prepayment charges, extension fees and other administrative fees and expenses or similar charges collected on the receivables as additional servicing compensation*.

*See* TCF 2014-1 Preliminary Notes OM at S-5; TCF 2014-1 Notes OM at S-5; TCF 2015-1 Preliminary Notes OM at S-5; TCF 2015-1 Notes OM at S-5; TCF 2015-2 Preliminary Notes OM at S-5; TCF 2015-2 Notes OM at S-5; TCF 2015-DP1 Certificate PPM at 4; TCF 2016-DP1 Certificate PPM at 4; TCF 2016-1 Preliminary Notes OM at S-5; TCF 2016-1 Notes OM at S-5 (emphasis added).

221. The Offering Documents indicated that Gateway's right to receive the Servicing Fee and Supplemental Servicing Fees was pursuant to Servicing Agreements between Gateway and the TCF Issuing Trust for each of the TCF Securitizations.

222. However, while the Offering Documents purported to summarize the key terms of the Servicing Agreements, including Gateway's right to fees and compensation, those Agreements were not made available to investors, including

Plaintiffs, despite Plaintiffs' repeated requests for access to those Agreements both before and after they invested in the TCF Securitizations.

223. The above-identified representations concerning Gateway's compensation from the TCF Securitizations' cashflows were materially misleading in and of themselves, as well as in conjunction with the above-detailed representations in the Offering Documents concerning Reported CNL and Repo/Remarketing Expenses (*see* Sections IV.A-B, *supra*), for the reasons set forth below.

224. First, the above representations indicated that Gateway's compensation was congruent with standard practice in the auto ABS industry, where servicers typically received fees substantially similar to the above-described Servicing Fee and Supplemental Servicing Fees (which latter fees consisted essentially of *additional* fees charged to the Underlying Receivables' obligors ["late fees, prepayment charges, extension fees and other administrative fees. . . "] over and above such obligors' normal interest and principal obligations). Furthermore, when read together with the above-detailed representations in the Offering Documents concerning Reported CNL and Repo/Remarketing Expenses, these representations further indicated that Repo/Remarketing Expenses were already integrated into CNL reporting (or alternatively, did nothing to disclose that although such Repo/Remarketing Expenses had not been integrated into Defendants' Reported

CNL, Gateway would extract such Repo/Remarketing Expenses from the TCF Securitizations' Underlying Receivables' cashflows).

225. In other words, the above representations were false and/or misleading because they omitted to disclose that Defendants had omitted from Reported CNL one set of cashflows related to the Underlying Receivables (*i.e.*, Repo/Remarketing Expenses), but nevertheless would still extract, from the Underlying Receivables' cashflows and as part of their compensation, such Repo/Remarketing Expenses.

226. In effect, Defendants secretly re-classified Repo/Remarketing Expenses from a CNL-related item to a compensation-related item, while omitting to disclose either (1) that Repo/Remarketing Expenses had not been included in Reported CNL, or (2) that Defendants would extract Repo/Remarketing Expenses as part of their TCF Securitization compensation. This secret re-classification is especially egregious given that, according to CW 1, Gateway's Repo/Remarketing Expenses were "reckless[ly]" and unnecessarily high.

227. Second, the above representations concerning Gateway's TCF Securitization compensation indicated, falsely and/or misleadingly, that the compensation that Gateway would extract from the TCF Securitizations' Underlying Receivables' cashflows would:

a. be limited to the 1.00% Servicing Fee and the Supplemental Servicing Fees;

b. amount to little more than the 1.00% Servicing Fee, because the Supplemental Servicing Fees ("late fees, prepayment charges, extension fees and other administrative fees. . .") were relatively inconsequential; and

c. apart from the 1.00% Servicing Fee, do little or nothing to reduce the stream of normal interest and principal cashflows generated from the TCF Securitizations' Underlying Receivables that reached Certificateholders, because the Supplemental Servicing Fees consisted entirely of *additional* fees charged to the Underlying Receivables' obligors ("late fees, prepayment charges, extension fees and other administrative fees. . .") over and above such obligors' normal interest and principal obligations.

228. The above representations were false and/or misleading because of their omission to disclose that Gateway would also extract Repo/Remarketing Expenses from the TCF Securitizations' Underlying Receivables' cashflows. Unlike the Supplemental Servicing Fees disclosed in the Offering Documents, Repo/Remarketing Expenses (1) are substantial, and (2) when extracted by Defendants, materially reduce the Underlying Receivables' cashflows available to Certificate investors.

229. When read in conjunction with the above-detailed representations in the Offering Documents, Supplemental Data, and Investor Presentations concerning Reported CNL, the above representations concerning Defendants' TCF

Securitization compensation were false and misleading. While Defendants in effect, but secretly, re-classified Repo/Remarketing Expenses from a CNL-related item to a compensation-related item, Defendants omitted to disclose (1) that Reported CNL did not include Repo/Remarketing Expenses, and (2) that Gateway would extract Repo/Remarketing Expenses as part of its TCF Securitization compensation.

230. The above-detailed representations and omissions concerning Gateway's compensation from the TCF Securitizations were material.

231. Gateway's compensation for acting as the TCF Securitizations' servicer, and for servicing the Underlying Receivables, was funded from the cashflows generated by the Underlying Receivables. As a Transaction Party, Gateway's claims to payment of its Servicing Fee were senior to Certificateholders' claims (and Noteholders' claims) on the same cashflows, and Gateway's claims to payment of its Supplemental Servicing Fees were likewise senior to Certificateholders' claims (although not Noteholders' claims) on the same cashflows. As a result, every dollar paid to Defendants as compensation from the TCF Securitizations and the cashflows generated by their Underlying Receivables was a dollar that otherwise would have flowed to Certificateholders.

232. Therefore, the compensation paid to Gateway from the cashflows generated by the TCF Securitizations' Underlying Receivables were material to

Certificate investors, because such compensation reduced, on a dollar for dollar basis, Certificate investors' returns.

233. Additionally, Gateway's Repo/Remarketing Expenses, which Defendants omitted from Reported CNL but extracted from the TCF Securitizations' cashflows, were sufficiently sizeable as to be material, for the reasons set forth in Section III.E.2, *supra*, and Section V, *infra*. Cumulative Repo/Remarketing Expenses in each of the TCF Securitizations amounted to 0.50% or more of the initial balance of the Underlying Receivables, and when integrated into the Underlying Receivables' CNL constituted 15%-20% or more of such CNL. As the Offering Documents themselves indicated (*see* Section IV.C, *supra*), a 0.50% rise in CNL materially diminishes Certificate investors' returns.

234. Lastly, the above-detailed misrepresentations and omissions concerning Gateway's compensation from the TCF Securitizations are consistent with, and mutually reinforced by, Defendants' materially misleading Sensitivity Analyses (detailed in Section IV.C, *supra*). The TCF Securitization cashflow modeling and Certificate return calculations that Defendants presented in the Sensitivity Analyses were premised on modeling Gateway's compensation cashflows to consist solely of the 1.00% Servicing Fee (and *de minimis* further expenses payable to other Transaction Parties, such as US Bank and Wilmington), and omitted any cashflows relating to Repo/Remarketing Expenses.

### E. TCF Bank's and Gateway's Affirmative Misrepresentations, in Direct Communications with Plaintiffs, Concerning Reported CNL

235. In connection with the TCF Securitizations and with Plaintiff GIC's investments in the Certificates, GIC communicated directly with members of TCF Bank's and Gateway's senior management on multiple occasions, via telephone, email, and through in-person meetings.

236. For example, GIC communicated directly with TCF Bank and Gateway on the following occasions:

| Date | Communication Type | Plaintiffs' Participants | Defendants' Participants* | TCF Securitization | Topics of Communication |
|---|---|---|---|---|---|
| 10/19-20/2015 | meeting (Gateway offices in Anaheim, CA) | GIC (M.U.; D.L.; W.B.) | Brian MacInnis (TCF Bank and Gateway); David MacInnis (Gateway); Todd Pierson (Gateway); Brandon Pierson (Gateway); Gerald Wilkins (Gateway); Sydney Libsack (TCF Bank); Jennifer Ishiguro (Gateway); Denise Sorrells (TCF Bank and Gateway); Chelsea Feliciano (Gateway) | TCF 2015-2 | Gateway loan origination and loan underwriting operations, policies, and procedures; Gateway's loan servicing operations, policies, and procedures (including Gateway's collections and recovery management operations, and Gateway's loan performance reporting); and Gateway loan performance, including Gateway's CNL |
| 11/5/2015 | phone | GIC (M.U.) | Brian MacInnis (TCF Bank and Gateway) | TCF 2015-2 | discussion, among other things, of Gateway's CNL |
| 11/10/2015 | phone | GIC (M.U.) | Brian MacInnis (TCF Bank and Gateway) | TCF 2015-2 | discussion, among other things, of Gateway's CNL |
| 6/7/2016 | meeting (GIC offices in NYC) | GIC (M.U.) | Sydney Libsack (TCF Bank) | TCF 2016-DP1 | discussion, among other things, of Gateway's CNL |

| | | | | | |
|---|---|---|---|---|---|
| 8/22/2016 | meeting (NYC dinner) | GIC (M.U.) | Brian MacInnis (Gateway and TCF Bank) | TCF 2016-1 | discussion, among other things, of Gateway's CNL |
| 10/25/2016 | meeting (GIC offices in NYC) | GIC (M.U.) | Sidney Libsack (TCF Bank) | TCF 2016-1, TCF 2016-DP1, and TCF 2015-2 | discussion of Gateway's CNL and loss severity issues |
| 10/25/2016-11/8/2016 | email correspondence | GIC (M.U.) | Sydney Libsack (TCF Bank); Matthew Cook (TCF Bank) | TCF 2016-1, TCF 2016-DP1, and TCF 2015-2 | discussion of Gateway's CNL and loss severity issues |

* The Defendants' Participants' positions at each Defendant company are set forth in Exhibit 3 hereto.

237. In all of GIC's direct communications reflected in the table above, Gateways' Reported CNL was discussed.

238. For example, prior to making any investments in auto loans originated by Defendants or auto ABS sponsored by Defendants, such as the TCF Securitizations, GIC:

a. examined the performance record of Gateway-originated auto loans;

b. compared it the performance of other originators' auto loans;

c. observed that Gateway-originated loans' credit performance (including Reported CNL) appeared superior to that of other originators; and

d. determined that the apparent performance differential was not fully explained by differences in the loans' credit characteristics.

239. Consequently, on October 19-20, 2015, prior to investing in the TCF 2015-2 Securitization, GIC traveled to Gateway's headquarters in Anaheim, California to discuss, among other things, the apparent performance differential between Gateway's CNL and that of other originators, with members of Gateway's and TCF Bank's senior management. During GIC's October 19-20, 2015 visit, GIC explicitly and repeatedly asked the following people to explain the reason for Gateway's apparently superior CNL and loan performance: (1) Brian MacInnis, Gateway's CEO and TCF Bank's EVP, National Consumer Lending; (2) David MacInnis, Gateway's President; (3) Sydney Libsack, TCF Bank's SVP, Syndicated Loan & Asset Sales, and member of TCF Bank's Loan Sale Committee; (4) Todd Pierson, Gateway's COO; (5) Brandon Pierson, Gateway's Chief Risk Officer and head of Gateway's Business Analytics Group; (6) Gerald Wilkins, Gateway's CFO; (7) Jennifer Ishiguro, Gateway's Chief Legal Officer; (8) Denise Sorrells, Gateway's AVP, Cash Manager and member of TCF Bank's Syndicated Loan & Asset Sales Group; and (9) Chelsea Feliciano, Gateway's Investor Relations Manager.

240. Their constant and repeated answer to GIC's queries during the October 19-20, 2015 visit was that Defendants were simply better at credit selection

(when extending and/or funding loans), and at loan servicing thereafter than their peers – *inter alia*, by re-underwriting every loan Gateway funded, and by aggressively servicing.

241. Shortly thereafter, on November 5, 2015, GIC had a phone conversation with Brian MacInnis, during which GIC once again questioned Mr. MacInnis about the apparent performance differential between Gateway's Reported CNL and that of other originators. In response, Mr. MacInnis once again stated that the performance differential was due to the fact that Defendants were better at credit selection and loan servicing than their peers.

242. Five days later, on November 10, 2015, GIC had another phone call with Brian MacInnis, during which GIC once again asked Mr. MacInnis about the apparent performance differential between Gateway's Reported CNL and that of other originators. In response, Mr. MacInnis once again stated that the performance differential was due to the fact that Defendants were better at credit selection and loan servicing than their peers.

243. Prior to investing in the TCF 2016-DP1 Securitization, GIC had similar conversations with members of Gateway's and TCF Bank's senior management. For example, on June 7, 2016, GIC met with TCF Bank's Sydney Libsack in New York City. During that meeting, GIC questioned Mr. Libsack about the apparent performance differential between Gateway's Reported CNL and that of other

originators. In response, Mr. Libsack stated that the performance differential was due to the fact that Defendants were better at credit selection and loan servicing than their peers.

244. Prior to investing in the TCF 2016-1 Securitization, GIC met with Brian MacInnis in New York City. During that meeting, GIC once again questioned Mr. MacInnis about the apparent performance differential between Gateway's Reported CNL and that of other originators. In response, Mr. MacInnis repeated his earlier explanation – namely, that the apparent performance differential was due to the fact that Defendants were better at credit selection and loan servicing than their peers.

245. GIC believed TCF Bank's and Gateway's above-detailed responses and reassurances to provide a reasonable qualitative explanation for the apparent performance differential. Indeed, the apparently superior performance of Defendants' auto loans formed one of the bases for GIC's decision to begin investing in the TCF Securitizations, and to purchase the Certificates specifically.

246. Gateway's and TCF Bank's affirmative representations concerning Reported CNL, in the above direct communications with GIC, were materially false and misleading.

247. Specifically, the apparently superior performance of Gateway-originated loans, as indicated by Defendants' Reported CNL, was not due to

Defendants' superior credit selection abilities, as TCF Bank and Gateway repeatedly represented to GIC. Rather, as revealed by the Moody's Announcement in December 2016, the loans' apparently superior performance was nothing more than an artefact of Defendants' undisclosed practice of omitting Repo/Remarketing Expenses from Reported CNL.

248. Even after GIC's investment in the TCF 2016-1 Certificates, Defendant TCF Bank continued to make false and/or misleading statements to GIC regarding Reported CNL.

249. For example, on October 25, 2016, TCF Bank's Sydney Libsack and Matthew Cook visited GIC's offices in New York City. During that meeting, GIC again questioned Mr. Libsack and Mr. Cook about the apparent performance discrepancy between Gateway's Reported CNL and that of its competitors. And once again, Mr. Libsack and Mr. Cook assured GIC that the performance differential was due to Defendants' superior credit selection and loan servicing compared with their peers.

250. In that meeting, GIC also discussed with Mr. Libsack and Mr. Cook the fact that Gateway's loss severities had been higher in recent months (between 60% and 71%) than the Offering Documents' base case marketing assumption of 50%, and higher than the loss severities predicted by GIC's pre-investment analyses, which, as discussed at Sections III, *supra*, and VII *infra*, were based on the Reported

CNL and other data that Defendants provided in the Offering Documents, Supplemental Data, and Investor Presentations.

251. Directly after the meeting, GIC also sent a follow up email to Mr. Libsack and Mr. Cook, asking them to explain Gateway's unexpectedly high loss severity numbers.

252. On November 7, 2016, Mr. Libsack responded (cc'ing Mr. Cook). He indicated that after consulting with Gateway's Business Analytics Group, he believed that the unexpectedly high loss severities could be due to calculation inconsistencies on GIC's part and/or a higher number of charge-offs during the preceding months than normally experienced by Gateway.

253. The following day, GIC responded and assured Mr. Libsack and Mr. Cook that GIC applied its calculation methodology consistently, and attached to that email, a spreadsheet containing GIC's loss severity calculations. Notably, the spreadsheet demonstrated that GIC properly calculated loss severity by dividing Gateway's average monthly CNL (which were provided by Defendants to Plaintiffs in monthly distribution statements) by Gateway's defaulted monthly receivables. In other words, Gateway's CNL figures served as the numerator for GIC's loss severity calculations.

254. However, based on Defendants' repeated misrepresentations that Gateway's CNL already included Repo/Remarketing Expenses (when they did not),

the CNL figures in GIC's spreadsheet, and utilized in GIC's loss severity calculations, did not separately account for Repo/Remarketing Expenses. Nevertheless, Mr. Libsack and Mr. Cook again failed to disclose their exclusion of Repo/Remarketing Expenses from Gateway's CNL.

255. TCF Bank's post-investment representations and omissions were false and/or misleading. For one, the apparently superior performance of Gateway-originated loans, as indicated by Defendants' Reported CNL, was not due to Defendants' superior credit selection abilities, as TCF Bank's Sydney Libsack and Matthew Cook once again represented to GIC. Rather, as revealed by the Moody's Announcement in December 2016, the loans' apparently superior performance was nothing more than an artefact of Defendants' undisclosed practice of omitting Repo/Remarketing Expenses from Reported CNL.

256. Moreover, Mr. Libsack's explanation for why Gateway's loss severities were higher than expected – namely, that GIC purportedly applied its calculation methodology inconsistently and/or that charge-offs had been temporarily higher than usual – was materially false and/or misleading because it omitted to disclose that the CNL figures GIC was relying upon in calculating Gateway's loss severities did not include Repo/Remarketing Expenses. Indeed, had those Expenses been included, loss severities would have been higher still.

257. Defendants had an ongoing duty to Plaintiffs and other investors in the TCF Securitizations to correct their prior misstatements, including their repeated misrepresentation that Defendants' Reported CNL included Repo/Remarketing Expenses. Nevertheless, Mr. Libsack and Mr. Cook not only failed to correct this misstatement in their October and November 2016 communications with GIC (or in any of their other communications with GIC), they (1) continued to affirmatively misrepresent that Defendants' superior CNL performance was due to Defendants' superior credit selection and loan servicing, rather than Defendants' exclusion of Repo/Remarketing Expenses from Gateway's CNL, and (2) affirmatively misrepresented that Gateway's higher-than-anticipated loss severities were merely due to a nonexistent calculation inconsistency and/or temporarily higher than usual charge-offs.

## V. ADDITIONAL FACTS RELEVANT TO MATERIALITY: MOODY'S REACTIONS TO DEFENDANTS' CONDUCT FURTHER DEMONSTRATES MATERIALITY

258. On December 14, 2016, Moody's announced that it had recently learned that Gateway's CNL, as reported at all times by Defendants, had not included Repo/Remarketing Expenses, notwithstanding that Defendants passed on such expenses to Gateway-sponsored securitizations and their investors. *See* Anna Burns and JingJing Dang, *Moody's Downgrades Auto Loan ABS Issued by TCF in 2016*, Moody's Investor's Service, Dec. 14, 2016 (the "Moody's Announcement").

259. Moody's reactions to this information further demonstrate its materiality.

**A. Moody's Prompted Defendants to Provide the Requisite Disclosure in Pending/Future Auto Loan ABS Securitizations**

260. At the time of the Moody's Announcement, Defendants were then sponsoring and marketing a new auto loan ABS securitization, TCF 2016-PT1, for which a certificate private placement memorandum and a notes preliminary offering memorandum supplement had already issued (dated, respectively, December 1 and December 8, 2016).

261. On or about December 12, 2016 and/or December 14, 2016, Defendants issued subsequent and revised certificate private placement memoranda for the TCF 2016-PT1 certificates that contained two substantive, unusual and related changes: (1) an added explicit disclosure in the "Risk Factors" section, warning that Reported CNL did not include Repo/Remarketing Expenses (*see* immediately below); and (2) a near-quadrupling of TCR 2016-PT1's reserve account, from 0.25% of the initial Underlying Receivables' pool balance to 0.90% (detailed next in Section V.B *infra*).

262. The new and explicit warning, added to the first "Risk Factor" listed in the private placement memorandum, disclosed that the Reported CNL figures included in the TCF 2016-PT1 offering documents excluded Repo/Remarketing Expenses:

> Gateway's cumulative net loss experience set forth in the tables included in "*Origination and Servicing of The Receivables—Static Pool Information About Gateway's Total Managed Portfolio*" does not include expenses incurred by Gateway in connection with the liquidation of the related vehicles or certain other reimbursable expenses. Such expenses are reimbursable to Gateway, will not be included as available funds, and will reduce the amounts available for distribution on the certificates and may result in losses to the Certificateholders.

*See, e.g.*, December 14, 2016 TCF 2016-PT1 certificate private placement memorandum, at 6-7.

263. The above-identified new disclosure was prompted by Moody's discovery that Reported CNL had not included Repo/Remarketing Expenses and by the related/impending Moody's Announcement.

**B. Moody's Required Defendants to Restructure their Pending Auto Loan ABS Securitization, TCF 2016-PT1, with Materially Increased Credit Protection to Absorb the Previously-Omitted Repo/Remarketing Expenses**

264. As set forth above (Section II.A, *supra*) and in Exhibit 1 (TCF Securitizations Summary), Gateway structured each of the TCF Securitizations to provide Notes investors with an additional layer of credit protection through the institution of a "reserve account." The funds in the reserve account served as an additional buffer against payment shortfalls to Noteholders, such that if normal cashflows from the Underlying Receivables fell short of obligations payable to

Noteholders and Transaction Parties in any given period, such cashflows could be supplemented with funds from the reserve fund.

265. The reserve account for each of TCF Securitizations was funded and maintained at a level equal to 0.25% of the initial balance of the Underlying Receivables (*e.g.*, a $500 million securitization, such as TCF 2016-1, featured a $1.25 million reserve account). *See e.g*. Section II.A, *supra*, and Exhibit 1 hereto.

266. Prior to the Moody's Announcement, and as indicated by the preliminary offering documents for the TCF 2016-PT1 notes and certificates, the reserve account for TCF 2016-PT1 was structured identically to those of the prior TCF Securitizations, at 0.25% of the Underlying Receivables. *See, e.g.*, December 1, 2016 TCF 2016-PT1 preliminary certificate private placement memorandum, at 7; December 8, 2016 TCF 2016-PT1 preliminary notes offering memorandum supplement, at S-10.

267. However, in conjunction with the Moody's Announcement, and as indicated by the final offering documents for the TCF 2016-PT1 notes and certificates (dated December 14, 2016, the date of the Moody's Announcement), the reserve account for TCF 2016-PT1 was nearly **quadrupled** – at effectively the last moment – from 0.25% of the initial balance of the Underlying Receivables to 0.90%.

268. The dramatic upsizing of TCF 2016-PT1's reserve account, which occurred between December 12 and December 14, 2016, was directly related to

Moody's discovery that Reported CNL had excluded Repo/Remarketing Expenses and was required by Moody's as extra credit protection for TCF 2016-PT1 noteholders in light of such Expenses (and their prior exclusion from Reported CNL).

### C. Moody's Downgraded Certain TCF 2016-1 Notes after Calculating the Increased CNL when Repo/Remarketing Expenses were Included

269. In connection with and as part of the Moody's Announcement, Moody's announced that it had re-evaluated all of the credit ratings it had previously assigned to the notes issued by all Gateway-sponsored auto loan ABS, including the TCF Securitizations, by including previously-excluded Repo/Remarketing Expenses into its CNL calculations. *See* Moody's Announcement at 2. Inclusion of Repo/Remarketing Expenses caused Moody's CNL estimates for such securitizations to rise as much at 0.75% (in absolute terms, and as much as 23% in relative terms). *Id*.

270. As a result of its re-evaluation, Moody's downgraded certain of the initial credit ratings it had provided for TCF 2016-1 Notes only two months earlier, upon their initial issuance on or about September 23, 2016. *See* Moody's Announcement, at 2. Specifically, Moody's downgraded its credit ratings on the two junior-most classes of TCF 2016-1 Notes that it had rated: the Class B Notes

(downgraded from Aa3 to A1); and the Class C Notes (downgraded from A3 to Baa1).[16]

271. As Moody's explained, the downgrades to these junior note classes, which had been issued only two months earlier and did not yet have any actual performance record to speak of, were driven **entirely** by Moody's recalculation of CNL to include the previously-excluded Repo/Remarketing Expenses, which resulted in estimated TCF 2016-1 CNL increasing by 16.7%, from 3.0% to 3.5%. *See* Moody's Announcement at 2 ("For the 2016-1 transaction, the inclusion of additional servicer expenses led to an increase in CNL to 3.50% from 3.00%. . . This drove the downgrades on Classes B and C.").

272. That Moody's deemed the increased/accurate CNL sufficiently material to require downgrades for TCF 2016-1's Class B and Class C **Notes** demonstrates all the more the materiality for TCF 2016-1's **Certificates.** The Certificates were not merely junior to the Class B/C Notes, and thus affected more severely by the increased/accurate CNL, but, unlike the Notes, were wholly unprotected from Underlying Receivables' CNL by any more junior securities and were thus exposed on a front-line, dollar for dollar basis to increased CNL.

[16] Moody's had declined to rate TCF 2016-1's junior-most Class D Notes, most likely because they did not merit a triple-B (Baa) rating under Moody's credit rating methodology.

### D. Moody's Initiated an Industry-Wide Study of Auto Loan ABS Sponsors' Treatment of Repo/Remarketing Expenses and CNL Reporting, and Found Gateway in Violation of Industry Standards

273. As detailed above (*see* Section III.E, *supra*), following Moody's December 2016 discovery that Defendants had not included Repo/Remarketing Expenses in Gateway's Reported CNL, yet still passed on Repo/Remarketing Expenses to ABS securitizations and ABS investors, Moody's decided to study how auto ABS sponsors treated and reported Repo/Remarketing Expenses, querying all of the 28 auto ABS sponsors whose securities it regularly rated, and published its findings in the May 10, 2017 Moody's Study.

274. The Moody's Study initiation, as well as its findings, both demonstrate materiality.

275. First, Moody's decision to conduct a comprehensive study of treatment of Repo/Remarketing Expenses in CNL reporting, and/or investigate whether other auto loan ABS sponsors operated similarly to Defendants, demonstrates the materiality of the matter.

276. Second and relatedly, as Moody's explained in the Moody's Study, CNL is a fundamental and material issue for ABS investors such as Plaintiffs:

> Cumulative Net Loss (CNL) is an important performance metric to analyze auto loan asset-backed securities (ABS), because it reflects the cumulative net loss borne by the ABS trust on the defaulted collateral. In some cases, however, the reported CNL excludes the costs of

> repossession and remarketing of the vehicles backing defaulted loans. The costs included in the reported CNL vary among issuers . . . Understanding these reporting differences and the costs that the trusts bear is important when comparing CNL across auto loan ABS pools or when projecting losses that ABS noteholders could incur.

Moody's Study at 1.

277. Third, and as detailed above (*see* Section III.E, *supra*), the Moody's Study documented a consistent and logical industry standard, followed by 25 of 28 auto loan ABS sponsors, in which (1) sponsors that passed on Repo/Remarketing Expenses to ABS securitizations/investors included such Expenses in reported CNL, while (2) sponsors that bore such Expenses themselves excluded them from reported CNL. *See* Moody's Study at 2; Section III.E, *supra*. Only Gateway and two other auto loan ABS sponsors operated in violation of this standard; Gateway's violations were the most extreme of all, for the reasons set forth in Section III.E, *supra*, and the two other auto loan ABS sponsors' violations were immaterial.

## VI. FACTS RELEVANT TO SCIENTER

278. Defendants' scienter is supported by the following facts.

279. First, Gateway, through its Auto Platform Management Team, including its EVP, Loan Servicing, Andy Sturm, was at all times actually aware of the Repo/Remarketing Expenses associated with Gateway-originated and Gateway-serviced auto loans, which Gateway itself incurred. Moreover, on more than one occasion, CW 1 discussed with Andy Sturm Gateway's Repo/Remarketing

Expenses, including that they appeared to be exorbitantly and unnecessarily high. Mr. Sturm brushed off CW 1's concerns and thereafter, refused to discuss the topic with CW 1 or allow CW 1 to attend meetings where the topic was discussed. CW 1 also brought up this issue with members of Gateway's Business Analytics Group, including Brandon Pierson and Gina "Frankie" Judy, and offered ways to reduce Repo/Remarketing Expenses. Thereafter, he was no longer permitted to attend meetings with the Business Analytics Group. Accordingly, Gateway, through Mr. Sturm, Mr. Pierson, and Ms. Judy, among others, was clearly aware of Gateway's Repo/Remarketing Expenses.

280. Gateway's actual awareness, as well as TCF Bank's, TCF Auto's, and the TCF Issuing Trusts' awareness, of Gateway's Repo/Remarketing Expenses, and of the fact that Gateway passed those Expenses on to investors, is confirmed by the following:

a. Gateway required the ABS securitizations it sponsored to reimburse Gateway for the Repo/Remarketing Expenses Gateway incurred in connection with such securitizations' underlying receivables;

b. The Servicing Agreements, to which both Gateway and the TCF Issuing Trusts were parties, by their terms, entitled Gateway to such reimbursement;

c. Those Agreements were signed by members of Gateway's, TCF Bank's, TCF Auto's, and the TCF Issuing Trusts' senior management, including, on

Gateway's behalf, by Gateway's VP, Michael Jones (who was also TCF Bank's EVP and CFO and TCF Auto's VP);

d. Gateway submitted its Repo/Remarketing Expenses for reimbursement to the TCF Issuing Trusts for each Securitization on a monthly basis;

e. The TCF Issuing Trusts for each of the Securitizations remitted monthly reimbursements for such Expenses to Gateway; and

f. Upon information and belief, Gateway's submission and receipt of reimbursements for such Expenses was overseen by Denise Sorrells, Gateway's AVP, Cash Manager, who was also a member of TCF Bank's Syndicated Loan & Asset Sales Group – the group charged with creating the Offering Documents (which, as discussed at Section IV.D, *supra*, omitted to disclose Gateway's right to reimbursement for Repo/Remarketing Expenses).

281. Second, Gateway, TCF Bank, and TCF Auto, through members of their senior management, were aware at all times that Gateway's Reported CNL excluded Repo/Remarketing Expenses, and that the Offering Documents, Supplemental Data, and Investor Presentations falsely represented that Repo/Remarketing Expenses were included.[17] This is confirmed by the following facts:

---

[17] Gateway's, TCF Bank's, and TCF Auto's scienter with respect to Defendants' exclusion of Repo/Remarketing Expenses from Reported CNL is imputable to the TCF Issuing Trusts because each of the TCF Issuing Trusts were SPVs without any employees of their own and were created by the other Defendants for the sole purposes of issuing the TCF Securitizations. They had no employees of their own, and all of their functions with respect to the TCF Securitizations were

a. TCF Bank's Syndicated Loan & Asset Sales Group, headed by TCF Bank SVP, Sydney Libsack, who reported to Brian MacInnis (Gateway's CEO and TCF Bank's EVP, National Consumer Lending) and Michael Jones (TCF Bank's CFO and Gateway's and TCF Auto's VP), was responsible for creating and/or overseeing the creation of the Offering Documents, Supplemental Data, and Investor Presentations. Other members of the Syndicated Loan & Asset Sales Group, which included *inter alia*, Matthew Cook and Denise Sorrells (who, as discussed above, also served as Gateway's AVP, Cash Manager), also helped to create the Offering Documents, Supplemental Data, and Investor Presentations, and were therefore knowledgeable about their contents and the CNL information therein.

b. TCF Bank's Syndicated Loan & Asset Sales Group worked together with Gateway's Business Analytics Group (which included Gateway's VP and Chief Risk Officer, Brandon Pierson, and Gateway's AVP, Manager, Business Analytics, Gina "Frankie" Judy, among others), and Gateway's Investment Relations Manager, Chelsea Feliciano, to create the Supplemental Data and Investor Presentations, as well as the Reported CNL figures and definitions to be included within the Offering Documents.

---

carried out by individuals employed by TCF Bank, Gateway, and other Transaction Parties. The TCF Issuing Trusts thus functioned as alter egos of Gateway and TCF Bank, and/or at all relevant times, were under Gateway's and TCF Bank's effective control.

c. Specifically, Gina “Frankie” Judy, who reported to Gateway’s Chief Risk Offer, Brandon Pierson, created the Supplemental Data and TCF 2014-1 Investor Presentation that were provided to Plaintiffs, and which (i) excluded Repo/Remarketing Expenses from Reported CNL but (ii) included explanatory footnotes falsely representing that Repo/Remarketing Expenses were included in Reported CNL.

d. Upon information and belief, these documents were reviewed and approved by Brandon Pierson, to whom Ms. Judy directly reported, and by members of Gateway’s Auto Platform Management Team, including, on information and belief, Gerald Wilkins and Brian MacInnis. They were also reviewed and approved by TCF Bank’s Sydney Libsack and other members of TCF Bank’s Syndicated Loan & Asset Sales Group, who then caused the same Reported CNL figures and explanatory footnotes contained in the Supplemental Data and TCF 2014-1 Investor Presentation to be included in the Offering Documents as well.

e. The Gateway March 2015 Overview Presentation and Gateway March 2015 Performance by Grade Presentation, which also contained Reported CNL figures that excluded Repo/Remarketing Expenses (but failed to disclose this fact), were authored by Gateway’s Business Analytics Group and Gateway’s Investor Relations Manager, Chelsea Feliciano. Like the CNL figures and information in the Supplemental Data, Offering Documents, and TCF 2014-1

Investor Presentation, the Gateway March 2016 Overview Presentation and Gateway March 2015 Performance by Grade Presentation were, upon information and belief, also reviewed by TCF Bank's Sydney Libsack, among others at TCF Bank.

f. Accordingly, Gateway and TCF Bank, through Sydney Libsack, Brandon Pierson, Gerald Wilkins, Gina "Frankie" Judy, Chelsea Feliciano, Brian MacInnis, additional members of Gateway's Business Analytics Group, and additional members of TCF Bank's Syndicated Loan & Asset Sales Group (including, *inter alia*, Denise Sorrells and Matthew Cook), among others, knew that Gateway's Reported CNL excluded Repo/Remarketing Expenses and that the Offering Documents, Supplemental Data, and Investor Presentations falsely represented that such Expenses were included in Reported CNL.

g. Moreover, the members of TCF Bank's Loan Sale Committee, which had final authority over the TCF Securitizations, including the Offering Documents, Supplemental Data, Investor Presentations, and the contents therein, were also aware, or recklessly disregarded, that those documents falsely stated that Reported CNL included Repo/Remarketing Expenses when those Expenses were actually excluded. The TCF Securitizations and the documents pursuant to which the Securitizations' Notes and Certificates were sold, were, upon information and belief, reviewed and considered during meetings of the Loan Sale Committee, and

the decision to move forward with each of the TCF Securitizations was made during Committee meetings and reflected in its minutes.

h. Members of TCF Bank's Loan Sale Committee included (i) TCF Bank's Sydney Libsack, who, as discussed above, created and/or approved the Offering Documents, Supplemental Data, and Investor Presentations and was therefore aware of their contents, including the misrepresentations and omissions therein, and (ii) other members of TCF Bank's, Gateway's, and TCF Auto's senior management, including, upon information and belief, Michael Jones, Craig Dahl, and Brian Maas. Members of Gateway's Auto Platform Management Team, including Brian MacInnis and Gerald Wilkins, also attended and participated in Loan Sale Committee meetings involving the TCF Securitizations, and were thus, also aware of, or recklessly disregarded, the Offering Documents, Supplemental Data, and Investor Presentations and the misrepresentations and omissions therein.

i. Moreover, as discussed above, as the signatories to TCF Auto's Form ABS-15G filings with the SEC, Michael Jones and Brian Maass were the "senior officers in charge" of the TCF Securitizations for TCF Auto, and thus, had final authority to approve the Offering Documents and the contents therein on TCF Auto's behalf. Accordingly, TCF Auto also had knowledge of Defendants' misrepresentations and omissions.

j. Additionally, as discussed at Section IV.E, *supra*, many of the same members of Gateway's and TCF Bank's senior management involved in creating, drafting, authorizing, and/or approving the Offering Documents, Supplemental Data, and Investor Presentations, and the false and misleading Reported CNL figures, definitions, explanatory footnotes, and other CNL-related information therein, including Sydney Libsack, Brian MacInnis, David MacInnis, Brandon Pierson, Todd Pierson, Gerald Wilkins, Chelsea Feliciano, Denise Sorrells, and Matthew Cook, had numerous phone, email, and in-person conversations with Plaintiff GIC, during which GIC specifically and repeatedly asked why Gateway's Reported CNL performance appeared superior to that of its peers.

k. That these individuals were charged with, and responsible for, answering investor questions, such as those posed by GIC, regarding Gateway's Reported CNL figures and definitions, further demonstrates that these individuals were knowledgeable about Reported CNL, including how it was calculated, and that Repo/Remarketing Expenses were excluded from that calculation, despite the Offering Documents' representations to the contrary.

l. Moreover, even assuming that these individuals were not previously aware that Reported CNL excluded Repo/Remarketing Expenses and/or that the Offering Documents, Supplemental Data, and Investor Presentations falsely indicated that Repo/Remarketing Expenses were included in Reported CNL (which,

of course, is belied by the fact that these same individuals were the creators and authors of those very documents), they necessarily became aware of the issue once GIC repeatedly brought it to their attention. Rather than correct Defendants' representations regarding Reported CNL and disclose that the apparent performance differential between Gateway's Reported CNL and that of other ABS sponsors was due to Defendants' exclusion of Repo/Remarketing Expenses, these individuals continued to misrepresent that the apparent performance differential was simply due to Defendants' superior credit selection and loan servicing.

282. Third, the fact that Gateway's CNL reporting departed from industry practice, and from the logic behind that practice, provides further indication that Defendants were aware that Gateway's Reported CNL excluded Repo/Remarketing Expenses.

283. As set forth above in Sections III.E and V.D, *supra*, a clear and logical industry standard operates across the auto ABS industry to ensure that the CNL reported by ABS sponsors is presented on the same basis as the CNL experienced by ABS investors. Where Repo/Remarketing Expenses are passed on to ABS securitizations/investors, they are included in reported CNL; where ABS sponsors bare such expenses themselves, they are excluded in reported CNL. Either and both ways, reported CNL corresponds to Experienced CNL.

284. As likewise set forth above in Section III.E and V.D, *supra*, Gateway is one of only three ABS sponsors to violate such standard practice (and of the three, is the worst violator), by causing ABS securitizations/investors to bear the Underlying Receivables' Repo/Remarketing Expenses but providing them with Reported CNL that excludes those expenses. Such reporting practices open a disjuncture between the CNL figures reported by ABS sponsors for their loans (lower, due to exclusion of Repo/Remarketing Expenses), and the CNL figures experienced by investors in ABS backed by such loans (higher, due to inclusion of Repo/Remarketing Expenses).

285. In the context of *scienter*, the relevant aspect of the foregoing is the sheer absence of any legitimate, rational explanation or justification for operating to create such disjunctures between Reported CNL and Experienced CNL. Put simply, **there is no reason to report CNL differently than investors experience it**. Reporting in such a manner, therefore, can only be the product of knowing or reckless disregard for the misleading impact of such reporting for ABS investors.

286. Fourth, the Investor Presentations represented that Gateway's Auto Platform Management Team, which included Gateway's co-founders, Brian MacInnis and David MacInnis, Gateway's COO, Todd Pierson, Gateway's CFO, Gerald Wilkins, and Gateway's EVP of Servicing, Andy Sturm, had 100+ years of combined experience in the auto origination and servicing industry. *See* Gateway

March 2015 Presentation at 4-5; TCF 2014-1 Investor Presentation at 19. The Investor Presentations also indicated that Gateway's Auto Platform Management Team had "considerable experience . . . **reporting on loan performance to its investors**." TCF 2014-1 Investor Presentation at 19 (emphasis added). This further indicates that these individuals were knowledgeable about the standard, accepted way to calculate and report CNL (*i.e.*, by including Repo/Remarketing Expenses when those Expenses are borne by investors). It also demonstrates that they knew that Gateway's practice of excluding Repo/Remarketing Expenses from Reported CNL, while at the same time passing them on to investors, was in contravention of a clear, logical industry standard. Accordingly, their decision to secretly exclude Repo/Remarketing Expenses from Reported CNL was not the product of an innocent or unknowing mistake but was instead, a deliberate and knowing decision.

a. Brian MacInnis and David MacInnis co-founded Gateway in 2007 as an indirect automobile finance company operating under an originate-to-sell model (*i.e.*, Gateway did not retain its loans, but sold them), and had operated Gateway for nearly a decade before the events at issue herein. During that period, Gateway experienced substantial growth, and sold and/or securitized billions of dollars of auto loans.

b. Prior to founding and operating Gateway, Brian MacInnis and David MacInnis were employed as executives at Onyx Acceptance Corp. ("Onyx"),

which also focused on indirect automobile finance, including "the purchase, securitization and servicing" of auto loans.[18] Brian MacInnis founded Onyx and served as its CEO and Chairman; David MacInnis occupied a series of roles at Onyx (Vice President, Senior Vice President, Executive Vice President) between 1994 and 2006. Between its founding and 2002, Onyx originated more than $8 billion of auto loans and completed 30 auto loan ABS securitizations. *See* Onyx 10-K, at 3.

c. The other three members of Gateway's Auto Platform Management Team – Gerald Wilkins, Andy Sturm, and Todd Pierson – were also previously employed by Onyx. Gerald Wilkins worked at Onyx since its inception in 1993, during which time he worked on at least 34 securitizations. Andy Sturm previously served as SVP and Chief Information Officer of Onyx, and Todd Pierson was Onyx's COO and EVP. *See* TCF 2014-1 Investor Presentation at 19; Gateway March 2015 Presentation at 4-5.

d. Prior to their time at Onyx, Brian MacInnis and David MacInnis were employed for more than a decade (since at least 1981, until approximately 1993) by Western Financial Savings ("WFS"), where Brian MacInnis led its auto finance division ("WFS Financial") and David MacInnis served in multiple

[18] *See* Onyx Form 10-K for the year ended December 31, 2002, filed with the SEC on or about March 28, 2003 ("Onyx 10-K") at 3.

capacities, including direct lending manager and collections manager. Between 1985 and 1999, WFS Financial securitized more than $14 billion of auto loans.

287. Through their above-detailed decades of experience in originating, servicing, and securitizing auto loans, Gateway's Auto Platform Management Team and senior most executives were deeply familiar with the auto loan ABS industry and the standards operative therein and were likewise familiar with auto loan ABS investors and the standard information such investors expected and received in connection with auto loan ABS securitizations. Their decision to operate Gateway in violation of such standards was not an innocent one, but one made with scienter, either through actual knowledge of the violation or through extreme and reckless disregard for the violation.

288. Fifth, and relatedly, Defendants had both motive and opportunity to exclude Repo/Remarketing Expenses from Reported CNL. The exclusion of Repo/Remarketing Expenses from Reported CNL had the effect of materially reducing, by approximately 15%-20% (*see* Section III.E.2, *supra*) the CNL levels publicly reported for Gateway auto loans. The lower CNL levels that Defendants were thereby able to report made Gateway loans and Gateway ABS more attractive to investors, including Plaintiffs. More particularly, reporting Gateway's CNL in this manner allowed Defendants to manufacture **the appearance of** a loan quality/performance advantage, in comparison to other ABS sponsors who included

Repo/Remarketing Expenses in their reported CNL – an apparent superiority, as detailed herein, that Defendants themselves used to market the TCF Securitizations, *see* TCF 2014-1 Presentation at 29, 44 and Section IV.B.3, *infra*, and that Plaintiffs noticed and inquired about, and that formed part of the reason for Plaintiffs' decision to invest in TCF Securitizations and Certificates, *see* Sections IV.E, *supra*, and VII.B, *infra*.

289. Moreover, upon information and belief, Defendants had an additional motive for secretly excluding Repo/Remarketing Expenses from Reported CNL. According to CW 2, through 2010, Gateway, and specifically Brian MacInnis and Todd Pierson, had been causing Gateway to underreport CNL. Specifically, Brian MacInnis, Todd Pierson (and other Gateway employees at their direction) would force dealers to buy back defaulted loans and the vehicles financed by those loans, rather than sell the vehicles at auction. According to CW 2, Gateway would then record the dealers' repurchases as loan prepayments in full, rather than defaults, the effect of which was to artificially diminish Gateway's Reported CNL.

290. In 2010, after Gateway's former business associates, including CW 2, discovered the practice, they terminated their business relationship with Gateway, and shortly thereafter, in 2011, Gateway was acquired by TCF Bank. On information and belief, Defendants' secret exclusion of Repo/Remarketing Expenses from Reported CNL either served as (i) an additional mechanism for Gateway to

underreport CNL, or (ii) a way for Defendants to narrow what would have otherwise been a large gap between Gateway's Reported CNL in the years prior to 2011 (when it was recording defaults as prepayments) and its Reported CNL for the years thereafter (when it was not).

291. Sixth, in January 2017, shortly after the December 2016 discovery/disclosure of Defendants' CNL misreporting, Defendants terminated their employment of Brian MacInnis, Gateway's CEO and TCF Bank's EVP, and David MacInnis, Gateway's President. Todd Pierson, who replaced Brian MacInnis as Gateway's CEO, was also terminated shortly thereafter, in November 2017. This further supports an inference of scienter. Moreover, Sydney Libsack's departure from TCF Bank in November 2017, just prior to the Moody's Announcement, also supports an inference of scienter.

## VII. PLAINTIFFS' DUE DILIGENCE

### A. Plaintiffs' Extensive Pre-Purchase Evaluation of the Certificates

292. As already detailed in Section III.A above, Plaintiffs utilized the Supplemental Data to conduct – as part of their due diligence – extensive and sophisticated pre-purchase analyses of the Certificates, the TCF Securitizations and the Underlying Receivables. Such analyses included:

a. review of the Offering Documents, Supplemental Data, and Investor Presentations;

b. evaluation of

i. the credit characteristics of the Underlying Receivables,

ii. the CNL and prepayment performance of numerous prior loan pools originated by Gateway, and

iii. the credit characteristics of such loan pools;

c. development, based on analysis of the foregoing, of a "base case" view of the Underlying Receivables' prospective prepayment and CNL;

d. projection of such "base case" cashflows through the TCF Securitizations to evaluate the TCF Securitization structure and how "base case" cashflows from the Underlying Receivables would flow to the Certificates;

e. development, based, *inter alia*, on historical CNL and prepayment performance of numerous prior loan pools originated by Gateway (and other originators), of multiple "stress" scenarios with respect to CNL and prepayments, and projection of cashflows under such "stress" scenarios through the TCF Securitizations to evaluate Certificate cashflows under alternative and more negative performance scenarios;

f. performance of "break even" analyses to determine prospective CNL levels at which Certificate returns would diminish to zero; and

g. formulation, based on the foregoing, of an offer price for the Certificates that would still allow for acceptable returns in "stress" scenarios.

293. While Plaintiffs performed their own, independent analyses as summarized above, Plaintiffs' due diligence also took into consideration similar analyses performed by others, including Defendants, the Initial Purchasers, and the TCF Securitizations' credit rating agencies (Moody's and S&P).

**B. Plaintiffs' Additional Due Diligence**

294. In addition to the above-noted due diligence, Plaintiffs conducted further due diligence through direct communications with Defendants, via in-person meetings as well as telephone and email conversations.

295. For example, Axonic had a conference call with members of TCF's senior management on June 20, 2014 as part of Axonic's pre-investment evaluation of Gateway and TCF Bank, and of Gateway's loan origination, servicing, underwriting, performance, and performance reporting, including Reported CNL. Axonic also met with members of TCF's senior management during an SFIG conference in Miami, Florida on September 19, 2016.

296. As detailed in Section IV.E, *supra*, GIC:

a. visited Gateway headquarters on October 19-20, 2015 to meet with members of Gateway's and TCF Bank's senior management team, including Brian and David MacInnis, Todd and Brandon Pierson, Gerald Wilkins, Sydney Libsack, Jennifer Ishiguro, Denise Sorrells, and Chelsea Feliciano, as part of GIC's

pre-investment evaluation of the TCF Securitizations, and of Gateway's loan origination, servicing, underwriting, performance, and performance reporting;

b. initiated two follow-up communications by telephone in the ensuing weeks, on November 5 and November 10, 2015, with Gateway CEO and TCF Bank EVP, Brian MacInnis;

c. engaged in three further meetings during 2016 in New York City with Defendants' executives – once more with Gateway's CEO and TCF Bank's EVP, Brian MacInnis, once with TCF Bank's SVP Sydney Libsack, and again with Mr. Libsack and TCF Bank's Matthew Cook– on June 6, 2016, August 22, 2016, and October 25, 2016, respectively;

d. communicated by email with Sydney Libsack and Matthew Cook between October 25, 2016 and November 8, 2016; and

e. participated in various other phone calls with members of Gateway and TCF senior management on at least the following dates: June 2, 2015; June 9, 2015; June 24, 2015; October 22, 2015; October 30, 2015; November 3, 2015; June 20, 2016; and December 5, 2016.

297. As already detailed in Section IV.E, *supra*, GIC, prior to making any investments in Defendants' auto loans or Defendant-sponsored ABS, such as the TCF Securitizations, had:

a. examined the performance record of Gateway-originated auto loans;

b. compared it the performance of other originators' auto loans;

c. observed that Gateway-originated loans' credit performance (including reported CNL) appeared superior to that of other originators;

d. determined that the apparent performance differential was not fully explained by differences in the loans' credit characteristics; and

e. repeatedly raised the issue of this apparent performance differential in its discussions with TCF Bank's and Gateway's senior management, and repeatedly asked them for explanations as to its cause. In response, TCF Bank's and Gateway's senior management refused to provide any information other than the false explanation that Defendants were better than their peers at credit selection and loan servicing.

## VIII. PLAINTIFFS' REASONABLE AND DIRECT RELIANCE ON DEFENDANTS' REPRESENTATIONS

298. Plaintiffs actually, reasonably, and/or justifiably relied upon Defendants' material misrepresentations and omissions by, *inter alia*: (a) reading the Offering Documents; (b) reviewing the Supplemental Data; (c) reading the Investor Presentations; and (d) utilizing the Offering Documents, Supplemental Data, and Investor Presentations, including the CNL information contained therein to:

a. model the prospective performance of the Underlying Receivables, the TCF Securitizations, and the Certificates, under base case and multiple stress scenarios;

b. evaluate the Certificates' value and risk;

c. decide to purchase the Certificates; and

d. determine the price at which to do so.

299. But for Defendants' material misrepresentations and omissions, Plaintiffs would not have purchased the Certificates at the prices they did, or at all.

300. Prior to purchasing their Certificates, Plaintiffs engaged in reasonable and robust due diligence, as detailed in Sections III.A and VII above, including, in addition to a close review of the Offering Documents, Investor Presentations, and Supplemental Data, repeated and direct communications with TCF Bank and Gateway, including numerous communications concerning Gateway's Reported CNL. However, Plaintiffs (and not only Plaintiffs, but all other ABS investors, as well as the credit rating agencies, such as Moody's) were entirely dependent on the provision of data from Defendants with respect to the performance (including, centrally, CNL) of Gateway-originated auto loans, and relied on Defendants' representations and statements in the Offering Documents, Investor Presentations, Supplemental Data, and direct communications in performing their due diligence.

301. Before deciding to purchase the Certificates, Plaintiffs reviewed and considered the information in Offering Documents, Investor Presentations, and Supplemental Data, including statistical information contained in the Offering Documents, Investor Presentations, and Supplemental Data concerning the Underlying Receivables specific to each TCF Securitization in question, as well as information concerning the characteristics and performance of Gateway's previously-originated auto loans. Plaintiffs used these and other statistics concerning the Underlying Receivables and similar Gateway-originated receivables to conduct rigorous quantitative analyses and modeling of the Underlying Receivables, the TCF Securitizations, and their anticipated cashflows, and the anticipated performance and value of the Certificates themselves, in order to assess whether or not to purchase the Certificates, and if so, at what price. In such analyses, Reported CNL was a material – and, indeed, absolutely central – input. Plaintiffs directly relied on and used the Reported CNL data in conducting their own analyses of the Underlying Receivables and the Certificates' risk/return profiles, and in analyzing whether to purchase the Certificates and, if so, at what price.

302. Plaintiffs' analyses began with examination of the Underlying Receivables' credit characteristics, as represented in the Offering Documents and Supplemental Data. Next, interpolating this data with further data concerning the credit characteristics and historical performance of Gateway's previously-originated

auto loan receivables (as represented in the Offering Documents, Investor Presentations, and Supplemental Data), Plaintiffs then ran multiple simulations of the projected performance of the Underlying Receivables under different market conditions in order to:

a. model:

i. the Underlying Receivables' cashflows, defaults, loss severities, and CNL under "base case" and multiple "stress scenarios;

ii. how such cashflows and losses flowed through the TCF Securitizations to the Notes and Certificates; and thus

iii. the Certificates' prospective returns, under base case and multiple stress scenarios;

b. determine, based on the foregoing, whether or not to invest in the Certificates; and

c. determine, based on the foregoing, the price which they would offer to pay for the Certificates (a price that allowed for acceptable returns even in a stress scenario outcome).

303. Ultimately, however, all of Plaintiffs' due diligence was for naught. Prior to their purchases of the Certificates, Plaintiffs' review and analysis of the Underlying Receivables, the TCF Securitizations, and the Certificates was limited to the information, data, and representations supplied by Defendants in direct

communications, and in the Offering Documents, Investor Presentations, and Supplemental Data, which contained material misrepresentations and omissions. The accuracy and quality of the financial analyses, modeling, and stress tests that formed part of Plaintiffs' due diligence was entirely dependent on the quality of the data provided by Defendants concerning the characteristics and performance of Gateway-originated auto loans – data now known to be false in key respects.

304. Defendants knew that Plaintiffs' due diligence, evaluation, valuation, and/or pricing of the Underlying Receivables and the Certificates were reliant on the information Defendants were providing, including, principally, the CNL performance of Gateway-originated auto loans as reported in the Offering Documents, Investor Presentations, and the Supplemental Data.

305. Defendants further represented, in the Offering Documents, Investor Presentations, and Supplemental Data, that the CNL reported therein included – *i.e.*, was "net" of – Repo/Remarketing Expenses. *See* Section IV.B, *supra*.

306. Plaintiffs' due diligence did not and could not have uncovered the truth of the matters misrepresented by Defendants: here, that in contravention of industry standard and Defendants' repeated, affirmative representations, the Reported CNL in the Offering Documents, Investor Presentations, and Supplemental Data did not include Repo/Remarketing Expenses, even though such expenses were passed through to the TCF Securitizations and ultimately to their investors, such as

Plaintiffs. The information necessary to make such an assessment was known only to Defendants. Both prior and subsequent to Plaintiffs' Certificate purchases, and at all times until at least December 2016, the only persons aware that Gateway's Reported CNL did not include Repo/Remarketing Expenses were persons employed by TCF Bank, TCF Auto, the TCF Issuing Trusts, and Gateway itself, which – in contravention of industry standards – excluded such Repo/Remarketing Expenses from Reported CNL. Plaintiffs did not and could not have had access to such information, and no amount of due diligence, reasonable or otherwise, would have provided Plaintiffs with such access.

307. Indeed, as detailed in Sections IV.E and VII.B above, Plaintiffs repeatedly requested additional information from Defendants TCF Bank and Gateway concerning the apparent performance differential between Gateway auto loans and those of other auto loan originators, as indicated by Defendants' Reported CNL. Plaintiffs also repeatedly asked for the Servicing Agreements between Gateway, US Bank, and the TCF Issuing Trusts. Defendants, however, refused to provide the Servicing Agreements or indeed, any additional information beyond the false explanation that the performance differential between Gateway's Reported CNL and that of other originators was due to Gateway's purportedly superior credit selection (in making loans) and purportedly superior aggressiveness in servicing such loans.

308. Although the Gateway loan performance information contained in the Offering Documents, Investor Presentations, and Supplemental Data was extensive, it still nowhere contained sufficiently granular detail to allow discernment of how Repo/Remarketing Expenses were, or were not, flowing through to Reported CNL.

a. For the most part, the performance information contained in the Offering Documents and Supplemental Data was presented on cumulative *net* loss basis, where "net" indicated losses presented net of recoveries produced through auto repossession and liquidation. *See* Section IV.B, *supra*. Consequently, such data, reporting a state of affairs **subsequent** to repossession and liquidation experience, did not indicate the costs associated with the repossession and liquidation experience.

b. To a lesser degree, the performance information contained in the Offering Documents, Investor Presentations, and Supplemental Data presented gross losses, recoveries, and net losses (in the TCF 2015-2 and TCF 2016-1 Securitizations, on a "managed pool" basis only; in the TCF 2016-DP1 Supplemental Data, also on a "static pool" basis). However, even though such data reported affairs prior, during, and subsequent to repossession and liquidation experience, it still nowhere provided information to show or allow for an understanding of how Repo/Remarketing Expenses were, or were not, flowing through to Reported CNL.

309. Subsequent to Plaintiffs' Certificate purchases and at all times until December 2016, US Bank's publication and distribution of the Monthly Reports to TCF Securitization investors, including to Plaintiffs, did not alter this informational state of affairs or provide Plaintiffs with any information indicating that Reported CNL did not include Repo/Remarketing Expenses. While the Monthly Reports included a line-item labeled "Additional Servicer Expenses (Reimbursables)," nothing indicated either (1) that such Additional Servicer Expenses were comprised of or included Repo/Remarketing Expenses, or (2) that such amounts had not been included in Reported CNL.

310. Had Defendants reported accurate CNL data in the Offering Documents, Investor Presentations, and Supplemental Data (*i.e.*, CNL data that included associated Repo/Remarketing Expenses) or alternatively, disclosed to investors that Reported CNL excluded Repo/Remarketing Expenses, Plaintiffs' financial analyses would have generated substantially reduced cashflows from the Underlying Receivables to the Certificates, and Plaintiffs' analyses of the Certificates' returns, value, and appropriate pricing would all have been significantly lower.

## IX. PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO DEFENDANTS' MATERIAL OMISSIONS

311. As set forth above, Defendants omitted to disclose – in the Offering Documents, Supplemental Data, Investor Presentations, and in their direct communications with Plaintiffs – that Reported CNL did not include Repo/Remarketing Expenses and that those Expenses were passed on to investors. *See* Sections IV.A and IV.D, *supra*.

312. As set forth above, such omissions were material, both because Reported CNL is fundamentally material to ABS investors, including Plaintiffs, and because Reported CNL was substantially understated via exclusion of Repo/Remarketing Expenses. *See* Sections III and V, *supra*.

313. Moreover, reasonable investors, such as Plaintiffs, reasonably could, and did, expect Reported CNL to include Repo/Remarketing Expenses. *See* Section III.E, *supra*. Such inclusion was not only logical and appropriate, but industry standard practice. *See* Sections III.E and V.D, *supra*.

314. Consequently, Plaintiffs are entitled to a presumption of reliance with respect to their claims alleging Defendants' omission of the material fact that Reported CNL had excluded Repo/Remarketing Expenses and nevertheless, those Expenses were borne by investors.

## X. LOSS CAUSATION/ECONOMIC LOSS

315. The material misrepresentations and omissions in the Offering Documents, Investor Presentations, Supplemental Data, and in Defendants' direct communications with Plaintiffs, directly and proximately caused Plaintiffs' damages.

316. Plaintiffs paid a purchase price for the Certificates that was far in excess of what those securities were actually worth at the time of purchase. Plaintiffs paid the price they did based on the material misrepresentations and omissions in the Offering Documents, Investor Presentations, Supplemental Data, and direct communications concerning the CNL for Gateway-originated auto loans, and the misleading CNL figures reported by Defendants therein. Such misrepresentations, misleading statements, and omissions concerning Gateway auto loans' CNL created an illogical disjuncture between (1) the CNL, as Defendants reported it, of Gateway's pooled auto loans (Reported CNL), and (2) the CNL of pooled Gateway auto loans, as investors in Gateway-sponsored auto loan ABS experienced them (Experienced CNL). Defendants' exclusion of Repo/Remarketing Expenses from Reported CNL made Reported CNL appear lower than Experienced CNL (which included such expenses), and consequently, because Plaintiffs' analysis, evaluation, valuation, and pricing of the Certificates all depended fundamentally on Reported CNL:

a. made the foreseeable risks and losses associated with the Underlying Receivables, the TCF Securitizations, and the Certificates appear lower than they in fact were;

b. made the prospective cashflows and returns associated with the Underlying Receivables, the TCF Securitizations, and the Certificates appear higher than they in fact were;

c. made the value of the Certificates appear higher than they in fact were; and consequently

d. inflated the prices Plaintiffs offered and ultimately paid for the Certificates.

317. The artificial inflation in Plaintiffs' Certificate purchase prices resulting from Defendants' misrepresentations concerning Reported CNL, can be measured, on an *ex ante* basis, as the difference between (a) Plaintiffs' actual Certificate pricing evaluations when purchasing the Certificates, based on Defendants' Reported CNL, and (b) pricing evaluations identical to Plaintiffs' actual evaluations in all respects except being based on Reported CNL *plus* Repo/Remarketing Expenses.

318. Plaintiffs' damages resulting from Defendants' misrepresentations concerning Reported CNL can also be measured, on an *ex post* basis, as the sum

total of Repo/Remarketing Expenses paid to Gateway from each TCF Securitization's Underlying Receivables' cashflows.

319. These two damage measures represent different means to describe the same thing – the effect on Certificate cashflows/returns of Repo/Remarketing Expenses – and should substantially converge.

## XI. DEFENDANTS' ACTIONS CONSTITUTE A SERVICER TERMINATION EVENT

320. In certain circumstances, termed by the Offering Documents "Servicer Termination Events," Gateway can be terminated as the TCF Securitizations' servicer.

321. According to the Offering Documents, one such circumstance constituting a "Servicer Termination Event" occurs if:

> any representation or warranty of the servicer made in the servicing agreement or any other transaction document proves to be incorrect in any material respect when made, which failure materially and adversely affects the rights of the noteholders or certificateholders, and which failure continues unremedied for sixty (60) days after there shall have been given, by registered or certified mail, given (1) to the servicer by the issuing entity or the indenture trustee or (2) to the issuing entity, the indenture trustee and the servicer from the noteholders of notes evidencing not less than a majority of the outstanding Note Balance of the Controlling Class, or, if no notes are outstanding, from the Majority Certificateholders.

*See, e.g.*, TCF-2015-DP1 Certificate PPM at 106; TCF 2015-2 Notes Preliminary OM at S-115; TCF 2015-2 Notes OM at S-115; TCF 2016-1 Notes Preliminary OM at S-111; TCF 2016-DP1 Certificate PPM at 103; TCF 2016-1 Notes OM at S-111.

322. If the above-described Servicer Termination Event, or other Servicer Termination Events, remains unremedied, Gateway may be removed as the TCF Securitizations' servicer, and Gateway's servicing rights and obligations with respect to the Underlying Receivables may be terminated. *See, e.g.*, TCF-2015-DP1 Certificate PPM at 106; TCF 2015-2 Notes Preliminary OM at S-115; TCF 2015-2 Notes OM at S-115; TCF 2016-1 Notes Preliminary OM at S-111; TCF 2016-DP1 Certificate PPM at 103; TCF 2016-1 Notes OM at S-111.

323. As set forth in Section IV, *supra*, Defendants' representations concerning Reported CNL, in the TCF Securitizations' Offering Documents, were materially incorrect. *See also* Sections III and V, *supra* (further indicating the materiality of Defendants' misrepresentations and omissions).

324. As set forth in Section X, *supra*, Defendants' materially incorrect representations concerning Reported CNL have had a material and adverse effect on Plaintiffs' rights as Certificateholders, including Plaintiffs' rights to receive the benefit of their bargain – namely, Certificates whose cashflows and values could be accurately estimated and quantified using the Reported CNL figures provided by Defendants.

325. Certificateholders, including Plaintiffs, are intended third-party beneficiaries of the Servicing Agreements for each of the TCF Securitizations, pursuant to which Gateway serves as the TCF Securitizations' Servicer absent unremedied Servicer Termination Events.

**FIRST CLAIM FOR RELIEF**
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

326. Plaintiffs repeat and reallege each and every allegation set forth above in ¶¶ 1-326 as if fully set forth herein.

327. This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against Defendants.

328. Defendants, by the use and means of instrumentalities of interstate commerce, the mails, employed devices, schemes, and artifices, made, or substantially participated in, the creation of untrue statements of material fact and/or omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business which operated a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

329. Defendants' misrepresentations, misleading statements, and omissions were made with scienter, and were intended to and did, as alleged herein: (i) deceive

the investing public, including Plaintiffs; (ii) artificially inflate and maintain the price of the Certificates (and to lesser extent, the Notes); and (iii) cause Plaintiffs to purchase the Certificates at artificially inflated prices.

330. Defendants misrepresented the CNL experienced by and/or associated with Gateway-originated auto loans, and made other, related material misrepresentations, misleading statements, and omissions as set forth above. These material misrepresentations, misleading statements, and omissions caused artificial inflation in the pricing and/or valuations of the Certificates at and after the time the Certificates were purchased by Plaintiffs.

331. Defendants were responsible for making the statements and omissions alleged herein, by virtue of their senior management (i) having prepared, approved, and authorized the Offering Documents, Supplemental Data, and Investor Presentations which contained the untrue statements of material fact and/or (ii) making direct statements to Plaintiffs, as detailed above.

332. Defendants were privy to material non-public information concerning the true composition of the CNL reported for Gateway auto loans, and that such Reported CNL excluded Repo/Remarketing Expenses, because Defendants' senior management calculated and reviewed the CNL data and caused it to be included in the Offering Documents, Supplemental Data, and Investor Presentations, as detailed above. Defendants knew or recklessly disregarded that the CNL they reported in

the Offering Documents, Supplemental Data, and Investor Presentations excluded Repo/Remarketing Expenses, and omitted to disclose such facts.

333. Defendants were also privy to material non-public information concerning Gateway's entitlement to reimbursement for Repo/Remarketing Expenses from the TCF Securitizations' investors because Defendants' management handled and processed those reimbursements, and because Defendants' management were signatories to the Servicing Agreements, which delineated Gateway's right to reimbursement for such Expenses. Defendants also knew or recklessly disregarded that Repo/Remarketing Expenses were passed on to investors, and omitted to disclose such facts. They also refused to provide the Servicing Agreements to Plaintiffs, despite Plaintiffs' repeated requests, which would have revealed that Repo/Remarketing Expenses were borne by investors.

334. By making the material misrepresentations and omissions detailed herein, Defendants knew or recklessly disregarded that they would artificially inflate Plaintiffs' evaluation and modeling of the Underlying Receivables' cashflows, and hence Plaintiffs' valuation and pricing of the Certificates (based on such cashflows).

335. Defendants' material misrepresentations and omissions were made in connection with the purchase or sale of the Certificates.

336. In ignorance of the materially false and misleading nature of the CNL reported by Defendants, and Defendants' related misrepresentations, misleading statements, and omissions in the Offering Documents, Supplemental Data, Investor Presentations, and Defendants' direct communications with Plaintiffs, Plaintiffs purchased the Certificates at artificially inflated prices. But for the fraud alleged herein, Plaintiffs would not have purchased the Certificates at artificially inflated prices.

337. Plaintiffs were substantially damaged as a direct and proximate result of their purchases of the Certificates at artificially inflated valuations and prices.

338. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiffs, who have been damaged as a result of such violation.

**SECOND CLAIM FOR RELIEF**
**For Common Law Fraud under California Law**
**(Against All Defendants)**

339. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

340. Defendants made the foregoing false and/or misleading statements, which were material, and/or failed to disclose or concealed information necessary to make such statements not misleading, with the intent, knowledge, and/or

foreseeability that Plaintiffs would rely thereon, and upon which Plaintiffs reasonably relied to their detriment.

341. Defendants knew or but for their egregious recklessness would have known that their statements and omissions were false and/or misleading at the time they were made.

342. Plaintiffs actually and justifiably relied on Defendants' misrepresentations and/or omissions to their detriment when Plaintiffs purchased the Certificates.

343. Plaintiffs would not have acquired the Certificates had they known the truth about the matters alleged herein, and would not have paid the prices they paid, which were inflated by Defendants' misconduct.

344. As a result of Defendants' false and misleading statements and omissions, Plaintiffs suffered monetary injury and punitive damages, the amount of which will be proved at trial herein.

## THIRD CLAIM FOR RELIEF
## For Aiding and Abetting Common Law Fraud under California Law
## (Against All Defendants)

345. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

346. This claim is asserted in the alternative to the Second Claim against all Defendants.

347. Each Defendant had actual knowledge of and substantially assisted in the fraudulent scheme and acts perpetrated by its fellow Defendants.

348. Each Defendant knew that the other Defendants, in the Offering Documents, Investor Presentations, Supplemental Data, and/or in direct communications with Plaintiffs, intentionally and materially misrepresented Reported CNL and/or omitted material facts concerning Reported CNL and Gateway's Repo/Remarketing Expenses by virtue of the fact that they wrote, reviewed and/or approved the Offering Documents, Supplemental Data, and Investor Presentations contained therein, as detailed above.

349. Each Defendant substantially assisted the other Defendants in perpetrating the fraud by concealing – in the Offering Documents, Supplemental Data, Investor Presentations, and direct communications with Plaintiffs – that Reported CNL did not include Repo/Remarketing Expenses even though such Expenses were passed on to investors, and by making affirmative misrepresentations and/or misleading statements indicating that Reported CNL did include Repo/Remarketing Expenses.

350. Each Defendant could not have perpetrated this fraud without substantial assistance from its fellow Defendants, all of whom were key Transaction Parties for the TCF Securitizations.

351. As a direct and natural result of (a) Defendants' fraudulent scheme, and (b) each Defendant's aiding and abetting of its fellow Defendants in that fraudulent scheme, Plaintiffs suffered substantial damages.

**FOURTH CLAIM FOR RELIEF**
**For a Declaratory Judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 (Against Gateway)**

352. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

353. Gateway serves as Servicer for each of the TCF Securitizations pursuant to Servicing Agreements between itself, the TCF Issuing Trusts, and US Bank (as the TCF Securitizations' indenture trustee).

354. Certificateholders are intended third-party beneficiaries of such Servicing Agreements.

355. Gateway made materially incorrect representations in the Offering Documents, Supplemental Data, Investor Presentations, and in direct communications with Plaintiffs concerning, *inter alia*, Reported CNL and Gateway's Repo/Remarketing Expenses.

356. Gateway's materially incorrect representations have materially and adversely affected the rights of Certificateholders, including Plaintiffs, by depriving them of the benefit of their bargain – namely, Certificates whose cashflows and

value could be accurately estimated and quantified using the Reported CNL that Gateway and its co-Defendants provided.

357. Consequently, Gateway's actions constitute a Servicer Termination Event which, if unremedied, allows for termination of Gateway as the TCF Securitizations' servicer.

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A. Awarding Plaintiffs compensatory damages;

B. Awarding Plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

C. Declaring the occurrence of a Servicer Termination Event; and

D. Awarding such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 4, 2018

Respectfully submitted,

**KIRBY McINERNEY LLP**

*/s/ Robert J. Gralewski, Jr.*
Robert Gralewski
Daniel Hume (*Pro Hac Vice*)
Meghan J. Summers (*Pro Hac Vice*)
825 Third Avenue, 16th Floor
New York, NY 10022
Tel.: (212)-371-6600

*Attorneys for Plaintiffs*